Robert M. Fusfeld
Attorney for Plaintiff
Securities and Exchange Commission, Central Regional Office
1801 California Street, Suite 1500
Denver, Colorado 80202
303.844.1080
303.844.1068 (facsimile)

Robert B. Blackburn (RB 1545)
Local Counsel for Plaintiff
Securities and Exchange Commission, Northeast Regional Office
233 Broadway, 11th Floor
New York, NY 10279
646.428.1610
646.428.1979 (facsimile)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff | : |
| | : 04 Civ. 02322 GEL |
| v. | : ECF CASE |
| | : |
| UNIVERSAL EXPRESS, INC., | : |
| RICHARD A. ALTOMARE, | : **COMPLAINT** |
| CHRIS G. GUNDERSON, | : |
| MARK S. NEUHAUS, | : |
| GEORGE J. SANDHU, | : |
| SPIGA, LTD., | : |
| TARUN MENDIRATTA | : |
| | : |
| Defendants. | : |

Plaintiff Securities and Exchange Commission (Commission") for its complaint alleges

as follows:

## I.  SUMMARY

1)    This case involves the dissemination of false information to the investing public by

Universal Express, Inc. ("Universal") and its chief executive officer Richard Altomare and

its attorney Chris Gunderson to facilitate an illegal unregistered distribution of 500 million

shares of Universal stock to the public through Mark Neuhaus, George Sandhu, Spiga Limited, and Tarun Menditatta ("the re-sellers").  As the dilutive issuances to the re-sellers apparently weighed on Universal's stock price, Universal issued a series of false press releases from May 2002 to April 2003 announcing funding commitments for a total of $885 million and thereafter made other false statements in public interviews, press releases, and Universal's filings with the Commission.

2)    Each of the re-sellers acquired Universal stock from the company at a substantial discount from the public market price of the stock.  During the illegal distribution of stock by the re-sellers, Altomare diverted a substantial portion of the proceeds to family members and personal accounts.  The recipients of the stock re-sold the shares to the public for a quick risk-free profit and then used the proceeds to finance their subsequent share purchases in the ongoing scheme.

3)    As a result of this conduct, Universal, directly and indirectly, has engaged in and unless restrained and enjoined by this Court will in the future engage in, transactions, acts, practices, and courses of business that violate Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c) and 77q(a)], Sections 10(b), 13(a), and 13(b)(2) of the Exchange Act as amended ("Exchange Act") [15 U.S.C. §§ 78j(b), m(a), m(b)(2)] and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13].

4)    As a result of this conduct, Altomare, directly and indirectly, has engaged in and unless restrained and enjoined by this Court will in the future engage in, transactions, acts, practices, and courses of business that violate Sections 5(a), 5(c), and 17(a) of the Securities Act, and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §

78m(b)(5)], and Rules 10b-5, 13a-14, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1 and 240.13b2-2].  Further, Altomare aided and abetted Universal's violations of Sections 13(a) and 13(b)(2) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

5)    As a result of this conduct, Gunderson, directly and indirectly, has engaged in and unless restrained and enjoined by this Court will in the future engage in, transactions, acts, practices, and courses of business that violate Sections 5(a), 5(c), and 17(a) of the Securities Act, and Sections 10(b) and 13(b)(5) of the Exchange Act, and Rules 10b-5 and 13b2-1 thereunder.  Further, Gunderson aided and abetted Universal's violations of Sections 13(a) and 13(b)(2) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

6)    As a result of this conduct, Neuhaus, Spiga, and Sandhu, directly and indirectly, have engaged in and unless restrained and enjoined by this Court will in the future engage in, transactions, acts, practices, and courses of business that violate Sections 5(a), 5(c), and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

7)    As a result of this conduct, Mendiratta, directly and indirectly, have engaged in and unless restrained and enjoined by this Court will in the future engage in, transactions, acts, practices, and courses of business that violate Sections 5(a) and 5(c) of the Securities Act.

8)    The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) and (e) of the Exchange Act [15 U.S.C. § 78u(d) and (e)], seeking: a Temporary Restraining Order against Universal, Altomare and Gunderson from violations of the registration provisions of

Sections 5(a) and 5(c) of the Securities Act of 1933, and other relief; and a Preliminary

Injunction and Permanent Injunction restraining and enjoining all defendants from all the

alleged violations and granting other equitable relief.

9)    The Commission seeks an order requiring defendants to pay third tier civil penalties

pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of

the Exchange Act [15 U.S.C. Section § 78u(d)(3)], and requiring each of them to disgorge

ill-gotten gains, including pre-judgment and post-judgment interest.

10)    The Commission seeks an order barring all defendants from participating in an offering of

penny stock pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and

Section 21(d)(6) of the Exchange Act [15 U.S.C. 78u(d)(6)].

11)    The Commission seeks an accounting from Universal and Altomare.

12)    The Commission seeks an order barring Altomare from acting as an officer or director of

any issuer that has a class of securities registered pursuant to Section 12 of the Exchange

Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act,

pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of

the Exchange Act [15 U.S.C. § 78u(d)(2)] and pursuant to the equitable powers of the

court.

## II. JURISDICTION AND VENUE

13)    This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act

[15 U.S.C. § 77u(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e)

and 78aa]. Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

14)    In connection with the transactions, acts, practices, and courses of business described in

this Complaint, all of the defendants, directly and indirectly, have made use of the means or

instrumentalities of interstate commerce, of the mails, and/or of the means and instruments of transportation or communication in interstate commerce.

15) Universal does business in and has an office located in this judicial district. Sandhu and Neuhaus reside in this district. Moreover, certain of the transactions, acts, practices and courses of business constituting the violations of law alleged herein occurred within this district.

### III. DEFENDANTS

16) Universal Express, Inc., a Nevada Corporation, has its principal place of business in Boca Raton, Florida and a second office in New York, New York. The company operates a variety of developmental stage businesses including WorldPost, a "private postal network" that purportedly negotiates group discounts on behalf of the network's independently owned postal stores. The common stock of Universal is registered with the Commission pursuant to Section 12(g) of the Exchange Act and the company files reports with the Commission on Forms 10-KSB and 10-QSB. Universal's stock trades over the counter and in January and February 2004 the average daily trading volume was 6.5 million shares.

17) Richard A. Altomare, age 55, resides in Boca Raton, Florida and has been Universal's chief executive officer ("CEO") and a director of Universal since 1992 when Universal emerged from a Chapter 11 reorganization. Altomare is currently the sole officer and director of Universal and signs the company's filings with the Commission.

18) Chris G. Gunderson resides in Queens, New York and has been Universal's in-house counsel since 1995.

19) Mark S. Neuhaus, age 49, is a racecar driver who resides in New York, New York. He participated in the unregistered public distribution of Universal stock and engaged in fraudulent conduct.

20) <u>George Sandhu</u>, age 38, resides in New York, New York and is employed by an investment adviser registered with the Commission.  He participated in the unregistered public distribution of Universal stock and engaged in fraudulent conduct.

21) <u>Spiga Ltd.</u>, is a Bermuda-based investment company controlled by Sandhu and owned by Sandhu's brother-in-law who lives overseas.  Sandhu has trading authority over the brokerage accounts held in the name of Spiga.  Sandhu also controls transfers of funds from those accounts.

22) Tarun Mendiratta, age 33, resides in Weston, Connecticut.  Mendiratta directed and controlled the disposition of Universal stock received by nominees who he controlled as part of the public distribution of Universal stock.

**IV. FACTS**

**A.  Fraudulent Stock Distribution Scheme**

23) On June 30, 2000, the end of Universal's 2000 fiscal year, the company had approximately 19 million shares outstanding.  By December 31, 2003, Universal's outstanding shares exceeded 650 million due primarily to the execution of a capital-raising scheme, in violation of the registration provisions of the federal securities laws, initiated in April 2001 involving continuous issuances of new Universal shares to the re-sellers in exchange for cash payments.  Universal sold shares to the re-sellers at a substantial discount to the prevailing trading price of Universal stock.  Gunderson prepared false documentation to disguise the nature of the transactions.  Neither the issuance of stock to the re-sellers, nor their subsequent public distribution of that stock was registered with the Commission.

24) To create the appearance that the issuance of stock to the re-sellers qualified for a simplified type of registration on Form S-8, Gunderson prepared consulting agreements between Universal and the re-sellers purporting to obligate them to perform services, as

required in the registration statement, in exchange for "registered" Universal shares. Even if the consultants had performed services rather than paying for the shares, however, the Form S-8 registration statements filed by Universal purportedly to register the issuances covered just 50 million shares, one-tenth of the total number of shares issued to the re-sellers. Further, no registration statement covered the public distribution of that stock by the re-sellers.

25) Notwithstanding Gunderson's knowledge that the number of shares issued to the re-sellers exceeded the number covered by Universal's first Form S-8 registration statement, when one of Neuhaus' brokers questioned the registration of the Universal issuances to Neuhaus, Gunderson prepared a legal opinion falsely stating that the shares were "covered by the company's S-8 registrations for its common shares."

26) Altomare and Gunderson each issued instructions to Universal's transfer agent for the issuance of stock to the re-sellers and falsely told the transfer agent that the stock was validly registered under Universal's S-8 registration statements.

27) Gunderson drafted purported stock purchase agreements with the re-sellers to disguise the nature of the illegal capital raising scheme.

28) Gunderson drafted fraudulent consulting agreements for the re-sellers to disguise the nature of the illegal capital raising scheme.

29) From April 2001 through November 2003, Altomare and Gunderson caused Universal to issue to Neuhaus or his affiliates a total of 270 million shares. Neuhaus or his affiliates paid a total of $5 million for the stock.

30) From August 2001 to December 2003, Altomare and Sandhu negotiated the issuance of more than 157 million Universal shares to Spiga, for which Sandhu or his affiliates paid at least $2.5 million.

31) Finally, from August 2002 to February 2004, Altomare and Mendiratta negotiated the issuance of 80 million Universal shares to Mendiratta's nominees, for which Mendiratta or his affiliates paid at least $1.6 million.

32) Following the payments by the re-sellers for the stock, Altomare frequently wired a substantial portion of the funds received to himself and his wife. Altomare also paid his personal expenses directly from Universal's accounts. Of the total re-seller payments to Universal from April 2001 through December 2003 of between $8.5 and $9 million, Altomare either diverted to his personal accounts or used to cover personal expenses a total of approximately $1 million.

33) During this time Universal has been in financial distress. From April 2001 through the present it has operated at a loss and has had limited revenue from business operations.

34) Universal's filings with the Commission disclose that Altomare and his wife owe Universal almost $2 million as a result of "advances" made by the company to each of them. Many of these "advances" occurred before the initiation of Universal's stock distribution scheme in April 2001. The filings do not disclose Altomare's direct uses of Universal funds for personal purposes or that the "advances" to Altomare and his wife after April 2001 were made from the proceeds of the illegal sales to the re-sellers.

35) Each of Universal's annual and periodic filings with the Commission following initiation of the stock distribution scheme, all of which Altomare signed, made false statements designed to conceal the illegal arrangements between Universal and the re-sellers. Each of

the filings fraudulently stated that the shares issued to the re-sellers were "advisory fees . . . prepaid to consultants retained by the Company to provide advisory services." Each filing also falsely stated that the funds transferred to Universal by the re-sellers were payments for "stock rights," which the filings defined as "amounts received from investors for their future rights to purchase shares of stock."

36) Universal's auditors failed to correct these misrepresentations because Altomare and Gunderson provided the auditors with misleading information regarding the stock issuances. Altomare and Gunderson misled Universal's auditors to believe that the shares issued to the re-sellers were prepayments for future services by delivering to the auditors the re-sellers consulting agreements without disclosing that the re-sellers had actually paid for the shares. Altomare and Gunderson also misled the auditors to believe that the wires of funds to Universal from the re-sellers were payments for "stock rights" rather than the "S-8" shares by including the wires in lists of "stock rights" payments delivered to the auditors.

37) Notwithstanding these efforts to conceal the scheme, during the 2002 audit, Universal's auditor questioned the more than $2.1 million in transfers to Universal from Neuhaus and Sandhu during the 2002 fiscal year. In response, Universal delivered to the auditor several 2001 restricted stock purchase letters between Universal and Coldwater Capital, LLC, a Neuhaus alter ego ("Coldwater"), signed by Altomare and Neuhaus and between Universal and Spiga signed by Altomare and Spiga's representative. The letters, which Gunderson prepared, purported to obligate Coldwater and Spiga, respectively, to purchase restricted stock at $0.32 per share and thereby permitted Universal and Altomare to assert that all the wires were payments for the restricted shares.

38) Gunderson backdated some of the stock purchase letters provided to the auditors. The letter signed by Altomare and Spiga was dated August 10, *2001*. The fax date stamps on the fully executed agreement, however, indicate that the agreement was actually signed on August 20, *2002*, a few weeks after the audit began. In addition, all of the certificates representing the restricted shares supposedly purchased by Coldwater and Spiga during Universal's 2002 fiscal year were issued on October 2, 2002, a few days after the auditors completed the audit.

### V. FALSE OR MISLEADING PRESS RELEASES ANNOUNCING ACQUISITION FUNDING COMMITMENTS

39) From May 2002 to April 2003, Altomare issued four false or misleading press releases that announced Universal's receipt of large funding commitments for acquisitions. Each release was followed by a substantial increase in Universal's share price and trading volume, permitting the re-sellers to dispose of large amounts of Universal shares.

### A. May 23, 2002 Announcement of $100 million in Funding Commitments

40) In early 2002, Neuhaus and Sandhu, at Altomare's request, prepared "funding" letters.

41) Neuhaus' letter stated that Coldwater had "authorized $5,000,000 in additional seed capital" and that it would "also provide up to $40,000,000 in long-term financing, if necessary." Coldwater's total assets at the time were far less than $45,000,000.

42) Sandhu's letter, which he signed as "Advisor" to Target Growth Fund, Ltd., stated that Sandhu had "authorized up to $7,500,000 in additional capital from the Fund for future approved [Universal] acquisitions," and that he was "also prepared based upon due diligence and proper collateral to arrange an additional $50,000,000 in long term financing. . . ." In fact, the value of Target Growth Fund's total assets was only $4 or $5 million.

43) In May 2002, Altomare asked Sandhu and Neuhaus to prepare new letters expressing commitments to fund Universal's proposed acquisition of a transportation company.

44) Sandhu's letter dated May 21, 2002 stated: "[B]ased upon the initial proposed letter of intent, we would be committed to the funding of the combined company.  Please let us know when the final terms have been negotiated so we can move our discussions to the next level."

45) Altomare or Gunderson faxed to Neuhaus the language they wanted Neuhaus to put in his letter, including the statement: "[M]y hedge fund and partners enthusiastically commit to the funding of Universal Express' strategic acquisition . . . ."  Although Neuhaus did not manage a fund of any sort, he copied Altomare's text onto Coldwater letterhead, added his signature, and on May 22, 2002 delivered the letter to Altomare.

46) On May 23, 2002, blending the contents of the four funding letters, Altomare crafted a materially false press release announcing that Universal had received "Over $100,000,000 in Funding Commitments" from "two International Hedge Funds."  Quoting Altomare, the release further stated:  "To complete our corporate objectives, Universal obviously needs to jump start revenues, profits and logistical capabilities.  Fortunately, that belief is shared by these investors, who have already invested over $5,000,000 with Universal over the past five years. . . .   These monies will be invested initially as debt and equity only at prices well above the current market value . . . .  [D]eveloping companies like Universal Express with capital can now seize the opportunities that are readily available to it."

47) Altomare knew or recklessly disregarded that Coldwater and Sandhu's fund could not invest $100 million in Universal and that Coldwater was not an "International Hedge Fund."  Moreover, even on their face, Sandhu's letters did not state a "commitment" to

invest, but instead stated only that Sandhu was prepared "based upon due diligence and proper collateral" to arrange financing and that Sandhu "*would be* committed to the funding of the combined company" if the acquisition worked out. Altomare also knew that the payments by Neuhaus and Sandhu for the Universal shares, most of which they quickly resold, did not reflect a "shared belief" in the future of Universal and that these payments totaled less than $5 million. Finally, Altomare knew that Neuhaus and Sandhu were purchasing Universal shares at substantial discounts to Universal's stock price and thus that there was no basis for his assertion in the release that Sandhu and Neuhaus would in the future pay a premium to Universal's trading price for Universal securities.

48) Following the issuance of the release on the morning of May 23, 2002 Universal's stock price jumped to as high as $0.038 and closed at $0.033, up 68% from the May 22 closing price of $0.020. Trading volume was 26 million, an 800% increase over the previous day.

49) After the release was issued, Neuhaus, who prior to May 23, 2002 had been selling approximately 500,000 Universal shares per day, received an electronic copy of the release. He then sold more than three million shares before the close of trading.

50) Sandhu sold about 1 million shares on May 23, 2002 and an additional million shares on May 24, 2002.

**B.    July 10, 2002 Announcement of $460 million Letter of Intent**

51) In June 2002, Altomare told a loan broker that certain assets relating to a bankruptcy proceeding were worth $900 million and that Universal could purchase the assets for $460 million. The broker indicated that he could find a lender that would provide funding on this basis and sent Altomare a short letter of intent on June 27, 2002. In fact, Altomare did not have an agreement for the purchase of the assets and Altomare never delivered to the broker promised bankruptcy court documents supporting the value of the assets.

52) By July 9, 2002, Universal's stock price had drifted down to $0.02.  On July 10, Altomare issued a materially false press release announcing that "in addition to its previously announced $100,000,000 in venture funding commitments, . . . [Universal] has received a letter of intent from a funding institution for $460,000,000."

53) Altomare knew that he had obtained this letter by falsely representing that Universal could buy assets worth $900 million for $460 million.  In addition, Altomare knew that the letter of intent had been delivered not by a funding institution, but by a loan broker that had no available funds of its own to invest.

54) Following the issuance of the release on July 10, 2002, Universal's stock price jumped to as high as $0.035 before falling back to $0.024 at the close.  Trading volume increased more than 700% over the prior trading day.

55) Neuhaus disposed of relatively few Universal shares on July 9, 2002 but thereafter resumed selling substantial amounts of shares on a daily basis.

56) Sandhu, who had been selling between 50,000 and 450,000 shares per day, sold nearly 1.5 million shares on July 10, 2002.

### C.     November 21, 2002 Announcement of $25 Million in Additional Funding

57) On November 19, 2002, Transamerica Business Capital Corporation ("Transamerica") issued to Universal a tentative "funding proposal letter" for a $20 million credit facility in connection with a proposed acquisition.  The third paragraph of Transamerica's letter stated: "It should be emphasized that the following is only a letter of proposal and it is not intended nor should it be construed as a commitment on the part of Transamerica Business Capital Corporation."  The following day, Universal received a tentative letter of intent from New Millennium Financial Corp. regarding a $5 million credit facility.

58) On November 21, 2002, Altomare issued a materially false press release that began:  "In further preparation of its planned acquisition programs, Universal announced additional funding of $25,000,000 from Transamerica and New Millennium Financial."  Quoting Altomare, the release continued, "This funding, in addition to previously announced funding of $100,000,000 and $460,000,000 . . . is designed to advance our delivery network capabilities and obviously add revenues and personnel infrastructure. . . . [H]aving the continued financial and corporate confidence of so many respected institutions continues to empower all of us at Universal. . . .  This $25,000,000 brings our total financial commitments to $585,000,000."

59) Altomare knew that the letters from Transamerica and New Millennium Financial Corp. did not represent financial commitments.  After becoming aware of the press release, Transamerica stated in a December 15, 2002 letter to Altomare that the announcement "incorrectly states the facts" and Transamerica "expects that the misstated facts in your press release will be promptly corrected."  Universal and Altomare failed to correct the release.

60) Altomare also knew that his acquisition discussions on which the previous $100 million and $460 million funding announcements were based had long since fruitlessly terminated.

61) Following the issuance of the November 21, 2002 press release, Universal's stock price closed at $0.026 up 57% from its previous close.  Trading volume increased 280% over the previous trading day.

62) Neuhaus sold at least one million Universal shares on the day the release was issued and continued selling substantial amounts thereafter.

63) Mendiratta sold nearly one million Universal shares on November 21, 2002.

64) Sandhu sold 2.9 million shares of Universal stock on November 22, 2002.

### D. April 9, 2003 Announcement of $300 Million in Funding

65) In December 2002, Altomare convinced Coach USA, an American subsidiary of Stagecoach PLC, a public company based in Scotland, to sign a letter of intent for the sale of its assets to Universal. The proposed terms required Universal to pay half the purchase price ($300 million) in cash at the closing, which was to occur no later than March 31, 2003.

66) In early March, Millennium Capital, LLC ("Millennium"), an investment banking firm, proposed to Universal a three-party financing program for the acquisition. The third required participant in the program, in addition to Universal and Millennium, was a commercial bank that would bear the entire credit risk associated with Universal's ability to repay the $300 million. Although Altomare was unable to find a bank willing to participate, on March 27, 2003 he convinced Millennium to prepare and deliver a document that outlined the terms of a $300 million loan but failed to mention the need for a participating bank.

67) On April 9, 2003 Altomare issued a materially false Universal press release with the headline "Universal Express Inc. ("Universal-L") – Receives $300,000,000 For Transportation Funding." The release then asserted that the company "to-day received $300,000,000 in committed and approved funds and plans to acquire a soon to be announced nationally established transportation company. A Letter of Intent with that Company to be acquired has been signed . . . ." Quoting Altomare, the release further stated: "The formal closing should be concluded in 75 days or less, and a specific announcement will be made by both parties at the appropriate time . . . ." The purpose of this preliminary announcement, according to the release, was "simply [to] inform[] the

public of [Universal's] financial capability to now effectuate a transaction of this size . . . ." Continuing this theme, the release also observed: "During the developmental stages of any company, that company may receive financial commitments based on the funder's due diligence requirements . . . .   To-day's commitment is far more definite and it is for that reason a press release has been issued."

68)   In reality, Universal had received no money for transportation funding, Universal's letter of intent with Coach USA had expired, and no prospective Universal lender had even performed due diligence on Coach USA much less made a definite commitment to fund the acquisition.

69)   Following the issuance of the release on April 9, 2003, Universal stock traded as high as $0.028 before closing at $0.0255, up 271% from the previous day's close of $0.00688. Volume was slightly under 110 million shares, 47 times the volume of the previous day.

70)   Neuhaus sold just 800,000 shares on April 9, 2003, and shortly thereafter resumed selling larger amounts.

71)   Sandhu sold nearly 15 million shares on April 9, 2003 and more than 6 million shares the following day.

72)   Mendiratta sold more than 2.5 million shares on April 9, 2003.

73)   In early June 2003, Coach USA's parent announced that it had signed an agreement to sell a significant portion of the Coach USA assets to another buyer.  Even after this announcement, however, Universal and Altomare continued to represent to investors in various promotional materials that Universal had financial commitments of $300 million until at least September 2003.

## VI. OTHER FALSE OR MISLEADING STATEMENTS

### A.  Naked Short Selling Statements

74) In September 2003, Altomare began publicly suggesting that so-called "naked short selling" of Universal shares had artificially depressed Universal's stock price.  In early October, Altomare stated in an interview that without the downward pressure of "naked shorting"  Universal's share price would be much higher.  In fact, as of September 30, 2003, the total "fails to deliver" of Universal's shares outstanding was de minimis.

75) In addition, none of Altomare's public statements regarding naked short selling disclosed Universal's issuance of hundreds of millions Universal shares to the re-sellers who had dumped these shares into the market.

76) In a subsequent interview with Dow Jones Newswire, Altomare falsely stated that Universal provided the Commission enforcement staff with 11,000 to 12,000 pages of documents in response to a staff subpoena requesting documents relating to short selling of Universal shares.  In fact, Universal's total production in response to the SEC subpoena was only 295 pages, none of which provided evidence that investors or brokers were intentionally failing to deliver Universal shares in connection with "naked short selling."

### B.       Announcement of Airline Acquisition

77) In fall 2003, Altomare and the owner of North American Airlines ("North American"), signed an option for the sale of the airline to Universal.  To fund the 50% non-refundable $1 million deposit required by the owner, Altomare and Neuhaus agreed that Neuhaus would wire the $1 million on Universal's behalf in exchange for 20 million "free trading" Universal shares and 20 million restricted Universal shares.  With Universal's stock trading at $0.05 at that time, Altomare and Neuhaus knew that Neuhaus could recover the entire $1

million cost of the deposit by selling the 20 million "free trading" shares even if Universal's announcement of the deal failed to cause a jump in Universal's stock price.

78)   On October 7, after North American's owner resisted Altomare's requests to make an exception to the contract's confidentiality provisions so that Universal could issue a press release announcing the contract, Neuhaus sent the owner an e-mail falsely stating that SEC rules required Universal to make a public announcement.

79)   After receiving Neuhaus' e-mail, North American's owner relented and on Sunday, October 12, 2003 Altomare issued a press release, reviewed by Neuhaus, announcing the contract. In an apparent attempt to convince investors that Universal and Altomare had a serious stake in completing the acquisition, the release, quoting Altomare, stated: "We have paid a $1,000,000 deposit, 50% of which is non-refundable."

80)   The release failed to disclose that the deposit had been financed through an illegal issuance of Universal shares to Neuhaus and that Neuhaus planned to sell the shares into the market after the announcement.

81)   On Monday morning, October 13, 2003 the stock opened at $0.108, an increase of 50% over the previous Friday's close, and traded as high as $0.131 on volume of 132 million shares.

82)   Neuhaus sold more than 1 million shares on October 13, 2003 and continued selling an average of 1 million shares per day over the next several weeks.  The sales covered the entire cost of the $1 million deposit by October 22 and generated another $1 million in proceeds by November 6, 2003.

83)   Mendiratta sold more than 500,000 Universal shares on October 13, 2003 and continued selling substantial amounts thereafter.

### C. Statements Regarding Private Postal Network Membership

84) Each of Universal's eight most recent filings with the Commission falsely stated that its private postal network, called WorldPost, had 8,000, and in later filings 9,000, members. In fact, stores listed on the network's web site as members of the network are not actually members.

### D. False Sarbanes-Oxley Certifications by Altomare

85) In each of Universal's periodic filings with the Commission since its June 30, 2002 Form 10-KSB, Altomare falsely certified that to the best of his knowledge there were no untrue statement of material fact or omission of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

**FIRST CLAIM FOR RELIEF**
(Violations by All Defendants of Sections 5(a) and (c) of the Securities Act)
15 U.S.C. § 77e(a) and (c)

86) Paragraphs 1 through 85 are hereby re-alleged and incorporated by reference.

87) All of the defendants, directly or indirectly (a) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities as to which no registration statement was in effect through the use or medium of any prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect for the purpose of sale or for delivery after sale; or (c) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise securities as to which no registration statement was in effect , or while the registration statement was the subject of a refusal order or stop order or (prior to

the effective date of the registration statement) any public proceeding of examination under

Section 8 of the Securities Act [15 U.S.C. § 77h].

88) By reason of the foregoing, all of the defendants violated, and unless restrained and

enjoined will violate Sections 5(a) and (c) of the Securities Act.

### SECOND CLAIM FOR RELIEF
(Violations by Universal, Altomare, Gunderson, Neuhaus, Spiga, and Sandhu
of Section 17(a)(1) of the Securities Act)
15 U.S.C. § 77q(a)(1)

89) Paragraphs 1 through 85 are hereby re-alleged and incorporated by reference.

90) Universal, Altomare, Gunderson, Neuhaus, Spiga, and Sandhu, directly and indirectly, with

scienter, in the offer or sale of Universal securities, by use of any means or instruments of

transportation or communication in interstate commerce or by use of the mails, have

employed a device, scheme, or artifice to defraud.

91) By reason of the foregoing, Universal, Altomare, Gunderson, Neuhaus, Spiga, and Sandhu

violated and unless restrained and enjoined will violate Section 17(a)(1) of the Securities

Act.

### THIRD CLAIM FOR RELIEF
(Violations by Universal, Altomare, Gunderson, Neuhaus and Sandhu
of Section 17(a)(2) and (3) of the Securities Act)
15 U.S.C. § 77q(a)(2) and (3)

92) Paragraphs 1 through 85 are hereby re-alleged and incorporated by reference.

93) Universal, Altomare, Gunderson, Neuhaus, Spiga, and Sandhu directly and indirectly, in

the offer or sale of Universal securities, by use of the means or instruments of

transportation or communication in interstate commerce or by use of the mails, have

obtained money or property by means of untrue statements of material fact or omissions to

state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; or engaged in transactions,

practices, or courses of business which have been or are operating as a fraud or deceit upon

the purchasers of Universal securities.

94)   By reason of the foregoing, Universal, Altomare, Gunderson, Neuhaus, Spiga, and Sandhu

violated and unless restrained and enjoined will violate Sections 17(a)(2) and (3) of the

Securities Act.

### FOURTH CLAIM FOR RELIEF
(Violations by Universal, Altomare, Gunderson, Neuhaus and Sandhu
of Section 10(b) of the Exchange Act and Rule 10b-5)
15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5

95)   Paragraphs 1 through 85 are hereby re-alleged and incorporated by reference.

96)   Universal, Altomare, Gunderson, Neuhaus, Spiga, and Sandhu directly and indirectly, with

scienter, in connection with the purchase or sale of Universal securities, by use of any

means or instrumentalities of interstate commerce or by use of the mails, have employed a

device, scheme, or artifice to defraud; have made an untrue statement of material fact or

omitted to state a material fact necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading; or have engaged in an act,

practice, or course of business which has been and is operating as a fraud or deceit upon the

purchasers or sellers of such securities.

97)   By reason of the foregoing, Universal, Altomare, Gunderson, Neuhaus, Spiga, and Sandhu

violated and unless restrained and enjoined will violate Section 10(b) of the Exchange Act

and Rule 10b-5.

### FIFTH CLAIM FOR RELIEF
(Violations by Universal and Aiding and Abetting by Altomare and Gunderson of Universal's
Violations of Sections 13(a) of the Exchange Act,
and Rules 12b-20, 13a-1, and 13a-13)
15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13

98)   Paragraphs 1 through 85 are hereby re-alleged and incorporated by reference.

99) Universal, as issuer of a security registered pursuant to Section 12 of the Exchange Act, failed to file with the Commission, in accordance with rules and regulations the Commission has prescribed, information and documents required by the Commission to keep reasonably current the information and documents required in or with an application or registration statement filed pursuant to Section 12 of the Exchange Act and annual reports and quarterly reports as the Commission has prescribed, and failed to add such further material information necessary to make the required statements, in the light of the circumstances under which they were made not misleading.

100) By reason of the foregoing, Universal violated, and Altomare and Gunderson aided and abetted those violations, and unless restrained and enjoined will violate or aid and abet violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13.

**SIXTH CLAIM FOR RELIEF**
(Violations by Universal and Aiding and Abetting by Altomare and Gunderson of Universal's
Violations of Section 13(b)(2) of the Exchange Act)
15 U.S.C. § 78m(b)(2)

101) Paragraphs 1 through 85 are hereby re-alleged and incorporated by reference.

102) Universal while being registered pursuant to Section 12 of the Exchange Act or being an issuer required to file reports pursuant to Section 15(d) of the Exchange Act failed to: (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of the issuer; (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; (ii) transactions were recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

(iii) access to assets was permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

103) By reason of the foregoing, Universal violated, and Gunderson aided and abetted such violations, and unless restrained and enjoined will violate and aid and abet violations of Section 13(b)(2) of the Exchange Act.

### SEVENTH CLAIM FOR RELIEF
(Violations by Altomare and Gunderson of Section 13(b)(5) of the Exchange Act)
15 U.S.C. 78m(b)(5)

104) Paragraphs 1 through 85 are hereby re-alleged and incorporated by reference.

105) Altomare and Gunderson with respect to Universal knowingly circumvented or knowingly failed to implement a system of internal accounting controls and knowingly falsified books, records, or accounts described in Section 13(b)(2) of the Exchange Act.

106) By reason of the foregoing, Altomare and Gunderson violated and unless restrained and enjoined will violate Section 13(b)(5) of the Exchange Act.

### EIGHTH CLAIM FOR RELIEF
(Violations by Altomare and Gunderson of Rule 13b2-1 Under the Exchange Act)
17 C.F.R. Section 240.13b2-1

107) Paragraphs 1 through 85 are hereby re-alleged and incorporated by reference.

108) Altomare and Gunderson, with respect to Universal directly or indirectly, falsified or caused to be falsified, books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act.

109) By reason of the foregoing, Altomare and Gunderson violated and unless restrained and enjoined will violate Rule 13b2-1 under the Exchange Act.

## NINTH CLAIM FOR RELIEF
(Violations by Altomare of Rule 13b2-2 Under the Exchange Act)
17 C.F.R. Section 240.13b2-2

110) Paragraphs 1 through 85 are hereby re-alleged and incorporated by reference.

111) Altomare, an officer and director of Universal, directly or indirectly, a) made or caused to be made a materially false or misleading statement, or b) omitted to state, or caused another person to omit to state, a material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant in connection with 1) an audit or examination of the financial statements of the issuer required to be made or 2) the preparation or filing of any document or report required to be filed with the Commission.

112) By reason of the foregoing, Altomare violated and unless restrained and enjoined will violate Rule 13b2-2 under the Exchange Act.

## TENTH CLAIM FOR RELIEF
(Violations by Altomare of Rule 13a-14 Under the Exchange Act)
17 C.F.R. Section 240.13a-14

113) Paragraphs 1 through 85 are hereby re-alleged and incorporated by reference.

114) Altomare as the certifying official, in periodic filings on Forms 10-KSB and 10-QSB filed with the Commission, falsely certified that to the best of his knowledge there were no untrue statements of material fact or omission of a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

115) By reason of the foregoing, Altomare violated and unless restrained and enjoined will violate Rule 13a-14 under the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

**I.**

Find that the defendants committed the violations alleged.

**II.**

Enter a Temporary Restraining in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, enjoining Universal, Altomare and Gunderson, from violating, directly or indirectly, Sections 5(a) or 5(c) of the Securities Act.

**III.**

Enter a Preliminary Injunction, and a Permanent Injunction, in a form consistent with Rule 65 (d) of the Federal Rules of Civil Procedure, enjoining all defendants from violating, directly or indirectly, each of the provisions of law and rules alleged in this complaint.

**IV.**

Order that each of the defendants disgorge all ill-gotten gains, including pre-judgment and post-judgment interest, resulting from the violations alleged herein.

**V.**

Order all defendants to pay third tier civil penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act in an amount to be determined by the Court.

**VI.**

Order that all defendants except Universal be barred from participating in an offering of penny stock pursuant to Section 20(g) of the Securities Act and Section 21(d)(6) of the Exchange Act.

**VII.**

Order that Universal and Altomare provide an accounting to the Commission itemizing all monies or anything of value they received, directly or indirectly, from the re-sellers and all other persons or entities who received Universal stock since January 1, 2000 to the present and anything of value received, directly or indirectly by Altomare or any member of his immediate family from Universal since January 1, 2000.

**VIII.**

Order that Altomare be barred from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act, pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act and the Court's equitable powers.

**IX.**

Grant such other relief as this Court may deem just or appropriate.

Respectfully submitted March 24, 2004.


/s/_____
Robert B. Blackburn, Esq. (RB 1545)
Local Counsel
Securities and Exchange Commission
233 Broadway, 11th Floor
New York, NY 10279
646.428.1610
646.428.1979 (facsimile)

/s/_____
Robert M. Fusfeld
Attorney for the Plaintiff
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO 80202
303.844.1080
303.844.1068 (facsimile)