Robert M. Fusfeld
Attorney for Plaintiff
Securities and Exchange Commission, Central Regional Office
1801 California Street, Suite 1500
Denver, Colorado 80202
303.844.1080
303.844.1068 (facsimile)

Robert B. Blackburn (RB 1545)
Local Counsel for Plaintiff
Securities and Exchange Commission, Northeast Regional Office
233 Broadway, 11th Floor
New York, NY 10279
646.428.1610
646.428.1979 (facsimile)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff<br><br>        v.<br><br>UNIVERSAL EXPRESS, INC.,<br>RICHARD A. ALTOMARE,<br>CHRIS G. GUNDERSON,<br>MARK S. NEUHAUS,<br>GEORGE J. SANDHU,<br>SPIGA, LTD.,<br>TARUN MENDIRATTA<br><br>                Defendants. | 04 Civ. 02322 GEL<br>ECF CASE<br><br>**MEMORANDUM OF LAW**<br>**IN SUPPORT OF**<br>**APPLICATION FOR**<br>**TEMPORARY**<br>**RESTRAINING ORDER**<br>**AND ORDER TO SHOW**<br>**CAUSE AND OTHER**<br>**RELIEF** |

## INTRODUCTION

The accompanying Complaint charges defendants with engaging in a covert scheme to finance Universal Express distribute illegally unregistered stock to the public in violation of the registration provisions of the Securities Act of 1933. In order to cover up this illegal unregistered distribution of more than 500 million shares of Universal Express stock, the company, Altomare, and Gunderson caused Universal to make false and fraudulent filings with

the Commission and to give false documents to Universal's auditors. Further, defendants Universal, Altomare, Sandhu, Spiga, and Neuhaus caused or participated in Universal's false claims to have lavish amounts of financing for its business operations. In the case of Neuhaus and Sandhu, they sold substantial amounts of Universal stock knowing that the company's stock had risen dramatically shortly after false press releases were issued. Defendant Altomare caused Universal, to make substantial undisclosed payments to him personally or on his behalf.

The Securities and Exchange Commission ("the Commission") seeks: 1) a Temporary Restraining Order prohibiting defendants Universal, Altomare, and Gunderson from violating the registration provisions of the Securities Act of 1933; 2) an Order to Show Cause why a preliminary injunction should not issue; 3) an order requiring defendants Universal and Altomare to perform an accounting; 4) an order expediting discovery and for service of process; and 5) an order preventing document alteration or destruction.

Absent such relief it is likely that defendants will continue to victimize the investing public by making false public statements and dumping illegally unregistered stock into the public markets. Within the past 10 days, persons issued more than 8 million shares of Universal stock have sold 4 million shares of that stock into the public markets without registration.

**FACTS**

The relevant facts are set forth in the accompanying declaration of Hugh Beck.

Between June 30, 2000 and February 2004 Universal's outstanding common stock increased from 19 million shares to more than 650 million shares. Millions of shares were issued by Universal to Neuhaus, Spiga, and Mendiratta pursuant to purported Form S-8 registrations with the Commission. In fact, Universal registered only 50 million shares pursuant Form S-8, the rest of the stock was not registered. Neuhaus, Spiga, Sandhu, and Mendirrata re-sold a total of 500 shares into the public markets. None of the public re-sales of Universal stock to the

investing public were registered with the Commission. Each of the recipients either paid a portion of the market price for the stock or sent a portion of their re-sale proceeds back to the company. This was in effect a capital raising process that financed Universal which was operating at a loss.

At the same time, in an apparent effort to hype the market to receive the massive distribution of stock, the company, Altomare, Neuhaus, Spiga, and Sandhu made false public statements about Universal's ability to obtain financing or to acquire various assets.

The company, Altomare, and Gunderson also made false filings with the Commission that falsely portrayed the S-8 stock issuances and falsely accounted for the cash received in the financing scheme.

## ARGUMENT

**A.    THE COMMISSION HAS SATISFIED THE STANDARD FOR A TRO AND PRELIMINARY INJUNCTION**

Because the Commission is "not ... an ordinary litigant, but ... a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2nd Cir. 1975). It need not show irreparable injury or a balance of equities in its favor. Id. at 808; *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1035 (2nd Cir. 1990). Unlike ordinary litigants, the Commission must only make a "proper showing" of violative activity to

obtain a temporary restraining order or preliminary injunction against statutory violations.[1] It meets this burden when it makes a substantial showing of (i) a current violation and (ii) the risk of repetition. *E.g., SEC v. Cavanagh*, 155 F.3d 129, 132 (2nd Cir. 1998); *SEC v. Unifund SAL*, 910 F.2d at 1036-37; *SEC v. Management Dynamics, Inc.*, 515 F.2d at 807; *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2nd Cir. 1972). As the Second Circuit recognized in *Unifund*, quoting the Supreme Court:

> the standards of the public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief in these cases.

910 F.2d at 1035-36, quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 331 (1944).

**B.    VIOLATIONS OF SECTIONS 5(a) AND 5(c) OF THE SECURITIES ACT**

Sections 5(a) and 5(c) of the Securities Act prohibit any person from selling or offering to sell an unregistered security. Defendants have the burden to show that the unregistered transactions in which they participated were exempt from registration. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *SEC v. North American Research and Development Corp.*, 424 F.2d 63 (2nd Cir. 1970); *SEC v. Culpepper*, 270 F.2d 241, 246 (2nd Cir. 1959). Moreover, because "public policy strongly supports registration," any exemption from registration "must be strictly construed against the person claiming its benefit." Quinn and Co. v. SEC, 452 F.2d 943, 946 (10th Cir. 1971).

---

[1] Section 20(b) of the Securities Act provides in relevant part: "Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices which constitute or will constitute a violation of any provision of this title, or of any rule or regulation prescribed under authority thereof, the Commission may, in its discretion, bring an action in any district court of the United States ... to enjoin such acts or practices, and *upon a proper showing*, a permanent or temporary injunction or restraining order shall be granted without bond." 15 U.S.C. § 77t(b) (emphasis added). Section 20(a) of the Securities Act of 1933 contains similar language. 15 U.S.C. § 77a.

Absent an exemption, Sections 5(a) and 5(c) of the Securities Act prohibit the use of the mails or any other interstate means to sell or to offer to sell any security unless a registration statement is in effect or has been filed with the Commission as to that security. To establish a *prima facie* case for a violation of Section 5, the Commission must prove that (1) the defendant offered to sell or sold a security; (2) the defendant used the mails or interstate means to sell or offer the security; and (3) no registration statement was filed or was in effect as to the security. *SEC v. North American Research and Development Corp.*, 424 F.2d 63 (2nd Cir. 1970); *Neuwirth Inv. Fund, Ltd. v. Swanton,* 422 F. Supp. 1187, 1193 n.8 (S.D.N.Y. 1975).

In addition, "courts have established the concept of participant liability to bring within § 5 persons other than direct sellers who are responsible for the distribution of unregistered securities." *SEC v. Murphy*, 626 F.2d 633, 649 (9th Cir. 1980). Under this doctrine, a participant in an unregistered distribution is liable as a primary violator of Section 5 if his participation is "necessary and substantial and not simply 'de minimis.'" *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 860 (S.D.N.Y. 1997).

Universal, Altomare, Gunderson, Neuhaus, Sandhu, Spiga, and Mendiratta violated Sections 5(a) and 5(c) because the initial issuances by Universal to the re-sellers, in which Altomare and Gunderson were necessary and substantial participants, were not validly registered and neither these initial issuances nor the later re-sales of the shares qualified for exemptions from registration.

**1.    The S-8 Issuances To The Re-Sellers Were Not Validly Registered**

Although all of the letters instructing Universal's transfer agent to issue the nearly 500 million shares to the re-sellers stated that the shares were to be "free trading as under an S-8 Registration," Universal's registration statements covered a total of only 50 million shares. Moreover, the Form S-8 rules for issuances of securities to consultants provide that the

consultants' services may not be "in connection with the offer or sale of securities in a capital raising transaction."  Because Universal's discounted sales of the legend-free shares to the re-sellers were capital raising transactions, Universal's S-8 registration statements did not validly register any of these transactions.

2. **The Public Re-Sales Were An Unregistered Distribution of Stock**

In a little more than two years Neuhaus, Sandhu, Spiga, and Mendiratta were responsible for the sale to the public of more than 500 million unregistered shares of Universal stock.

The stock sales at issue in this case were not exempt from registration pursuant to Section 4(1) of the Exchange Act [15 U.S.C. §77d(1)], which exempts "transactions by any person other than an issuer, underwriter, or dealer."  All the defendants were statutory underwriters.[2] Neuhaus and Spiga repeatedly re-sold the Universal shares within a short period of time following their initial purchases of the shares and each required Universal to issue the shares without restrictive legends to facilitate the re-sales.  These facts demonstrate that Neuhaus and Spiga each purchased the shares from Universal with a view to their distribution and therefore acted as underwriters for purposes of Section 4(1).  Sanhdu and Mendiratta coordinated the issuances of the shares to Spiga and Mendiratta's nominees, respectively, and also placed sell

---

[2] "Underwriter" is defined in Securities Act Section 2(a)(11) [15 U.S.C. §77b(a)(11)] to include "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of a security, or participates * * * in any such undertaking, * * *."  Section 2(a)(11) further defines "issuer" as used in that section to include "any person directly or indirectly controlling or controlled by the issuer" id. "Distribution" (not defined in the statute) refers to "the entire process in a public offering through which a block of securities is dispersed and ultimately comes to rest in the hands of the public." *In the Matter of Jacob Wonsover*, Rel. 34-41123 (March 1, 1999), 1999 WL 100935 at *12 n.25, *aff'd*, 205 F.3d 408 (D.C. Cir. 2000); *Ackerberg v. Johnson*, 892 F.2d 1328, 1336 (8th Cir. 1989) ("the definition of distribution as used in [Section 2(a)(11)] is generally considered to be synonymous with a public offering")(citing authorities).

orders and directed payments to Universal on their behalf. Based on this direct participation in the purchase and subsequent distribution of Universal shares, Sandhu and Mendiratta also qualified as statutory underwriters.

### 3. Altomare and Gunderson were Necessary and Substantial Participants in Universal's Distribution of Stock

Altomare negotiated with the re-sellers the terms of the stock sales. As the sole director and officer of Universal, Altomare was the only employee of Universal with power to authorize the issuance of the shares to them. Altomare signed the consulting agreements that purported to obligate Universal to issue shares to the re-sellers for future services. Altomare also signed most of the letters to the transfer agent containing the instructions that the shares were "to be free trading under an S-8 registration." Gunderson prepared the consulting agreements and the restricted stock purchase letters that formed the basis for the fiction that the shares being issued to the re-sellers were payments for their future consulting services. Gunderson calculated the price discounts for Neuhaus' purchases and followed up to ensure the purchase price was wired. Gunderson also signed some of the letters to the transfer agent instructing it to issue shares to the re-sellers. Knowing Universal was selling shares to Neuhaus to raise capital, Gunderson also wrote at least two legal opinions representing that the issuances to Neuhaus were covered by Universal's S-8 registration statement. Consequently, Altomare and Gunderson each played a necessary and substantial role in Universal's distribution of shares to the public.

### C. VIOLATIONS OF SECTION 17(a) OF THE SECURITIES ACT AND SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER

The Second Circuit has stated that the antifraud provisions of the federal securities laws are "broad and ... are obviously meant to be inclusive"; that they were enacted "to achieve a high standard of business ethics in the securities industry"; and that they should be "construed not technically and restrictively, but flexibly to effectuate [their] remedial purposes." *SEC v. First*

7

*Jersey Securities, Inc.,* 101 F.3d 1450, 1466 (2nd Cir. 1996) (internal quotation marks omitted) *citing Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151 (1972); *SEC v. Zandford*, 535 U.S. 813, 824 (2002).

Subsections (1), (2), and (3) of Section 17(a) of the Securities Act respectively proscribe, "in the offer or sale of any securities," employing "any device, scheme, or artifice to defraud," disseminating false or misleading material statements, and engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." Section 10(b) of the Exchange Act and Rule 10b-5 thereunder proscribe similar conduct "in connection with the purchase or sale of securities." A statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). In addition, to prove a violation of the Section 17(a)(1) prohibition against employing "any device, scheme, or artifice to defraud" or of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the Commission must show that the defendant acted with scienter, which is a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).[3]

Information is "material" for purposes of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 if there is "a substantial likelihood that a reasonable investor would view it as significantly altering the 'total mix' of information available." *United States v. Cusimano*, 123 F.3d 83, 88 (2nd Cir. 1997), citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

---

[3] To prove a violation of Section 17(a)(2) and (3), however, the Commission need not show that a defendant acted with scienter. *Aaron v. SEC* 446 U.S. 680 (1980).

Information concerning the financial condition of a company is presumptively material. *E.g.*, *SEC v. Blavin*, 557 F. Supp. 1304, 1313 (E.D. Mich. 1983), *aff'd*, 760 F.2d 706 (6th Cir. 1985), citing *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980). Moreover, the market's reaction in both volume and price to false financing claims by Universal demonstrate that investors found the information material.

From at least May 2002 through November 2003, Universal and Altomare disseminated false and misleading information regarding Universal's business in an effort to support Universal's stock price and thereby maintain the viability of the Universal stock distribution scheme. As the proceeds from the scheme flowed into Universal's bank accounts, Altomare used a substantial portion of the money for personal expenses. To disguise the stock distribution, Universal's filings with the Commission signed by Altomare falsely represented that the re-sellers' payments to the company were for stock rights and that the shares issued to the re-sellers' were payments for future services. Gunderson was responsible for these misrepresentations because he prepared the fictitious consulting agreements and bogus restricted stock purchase letters on which the misrepresentations were based.

When Neuhaus read Universal's May 23, 2002 press release announcing his commitment letter, he knew the press release was false. Nevertheless Neuhaus dumped three million shares on unwitting purchasers soon after the release was issued. Consequently, these sales as well as Neuhaus' subsequent sales into the inflated market were fraudulent.

When Sandhu read Universal's May 23, 2002 press release, Sandhu knew that the press release was false because he knew that he did not manage a hedge fund that could invest the $57 million mentioned in his first letter. Nevertheless, following the issuance of the release he sold 500,000 shares and the following day sold an additional million shares. Thus, like Neuhaus,

Sandhu and Spiga sold Universal shares in transactions that operated as a fraud and deceit upon the purchasers with the knowledge that the price of the shares was artificially inflated by a false Universal press release.

Finally, Altomare made materially false statements about short sellers, the number of mail box businesses in Universal's network.

Consequently, Universal, Altomare, Gunderson, Neuhaus, Spiga, and Sandhu violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

**D.    VIOLATIONS OF THE ISSUER REPORTING PROVISIONS OF THE EXCHANGE ACT**

Section 13(a) of the Exchange Act requires all issuers whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act to file with the Commission periodic reports containing such information as the Commission prescribes by its rules and regulations.  Pursuant to Section 13(a), the Commission has promulgated Rules 13a-1 and13a-13, which require issuers to file with the Commission periodic reports.  "The requirement that an issuer file reports under Section 13(a) embodies the requirement that such reports be true and correct." *SEC v. Savoy Industries*, 587 F.2d 1149, 1167 (D.C. Cir. 1978).  In addition, Rule 12b-20 requires that such reports contain any additional information necessary to ensure that the required statements in the reports are not, under the circumstances, materially misleading.  Thus, the filing of a periodic report that contains materially false and misleading statements or that

omits material facts necessary to make the statements therein not misleading constitutes a violation of Exchange Act's reporting provisions.[4]

Universal's periodic reports falsely represented that its private postal network consisted of 8,000 members, that its stock sales to the re-sellers were prepayments for future services, and that the re-sellers' payments for the "S-8" shares were payments for "stock rights." Consequently, Universal violated Section 13(a) of the Exchange Act and Rules 13a-1, 13a-13, and 12b-20 thereunder. Altomare aided and abetted Universal's violations because he signed the reports filed with the Commission. He directly violated Rule 13a-14 by falsely certifying that Universal's Commission filings contained no material inaccuracies. Gunderson likewise aided and abetted these violations because he prepared agreements supporting the fiction that the "S-8" issuances were payments for future services and that the payments by the re-sellers to the company were for stock options.

### E.    VIOLATIONS OF THE ISSUER BOOKS AND RECORDS PROVISIONS OF THE EXCHANGE ACT

Section 13(b)(2) of the Exchange Act requires every issuer, among other things, to "make and keep books, records, and accounts, which . . . accurately and fairly reflect the transactions . . . of the issuer." Section 13(b)(5) provides that "no person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in [Section 13(b)(2)]." Similarly, Rule 13b2-1 provides that

---

[4] An individual is liable for aiding and abetting such violations if there is: (1) a securities law violation by the primary party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation. *IIT v. Cornfeld*, 619 F.2d 909, 922 (2d Cir. 1980). Section 20(e) of the Exchange Act provides that a person who knowingly provides substantial assistance to another person in violation of the Exchange Act and its rules is in violation of those same provisions as an aider and abettor.

"no person shall, directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act."  Finally, Rule 13b2-2 prohibits an officer or director from "directly or indirectly" making or causing to be made a materially false or misleading statement, or omitting to state information necessary to render statements made not misleading, to an accountant in connection with any required audit of the issuer's financial statements or the preparation of a report required to be filed with the Commission.

By categorizing the shares purchased by the re-sellers as payments for future consulting services, Universal's statement of shareholders' equity failed to accurately and fairly reflect the transactions between Universal and the re-sellers.  Consequently, Universal violated Section 13(b)(2).  Altomare and Gunderson both knew of and substantially assisted this violation. Gunderson prepared the agreements that supported the fiction that the "S-8" shares were prepayments for future consulting services.  Altomare signed these agreements on behalf of Universal.  Consequently, Altomare and Gunderson both aided and abetted Universal's violations of Section 13(b)(2).

By preparing and signing of the consulting and restricted stock purchase agreements and then delivering the agreements to Universal's auditors, Altomare and Gunderson knowingly circumvented Universal's internal accounting controls.  Moreover, as Universal's CFO, Altomare was responsible for the falsification of Universal's shareholder equity records. Consequently, Altomare and Gunderson both violated Section 13(b)(5) and Rule 13b2-1.

Finally, by delivering or causing to be delivered the restricted stock purchase letters and consulting agreements to Universal's auditors, Altomare falsely represented or caused others to falsely represent to Universal's auditors that the shares issued to the re-sellers were

prepayments for future services and that the re-sellers' money transfers were payments for restricted stock. Consequently, Altomare violated Rule 13b2-2.

### THE COURT SHOULD ORDER ALTOMARE AND UNIVERSAL TO PROVIDE A SWORN ACCOUNTING

The Court also should issue an order requiring Altomare to account for his receipt of undisclosed compensation from Universal. While the company was losing money from its business operations it was sponsoring a huge unregistered dump of its stock and making false public statements. It funneled significant portions of the money raised by the stock re-sales to Altomare. Under these circumstances he should be ordered to provide a sworn accounting of his ill gotten gains.

The equitable remedy of a sworn accounting is frequently imposed to provide an accurate measure of unjust enrichment and defendants' current financial resources. *See, e.g., Manor Nursing Centers*, 458 F.2d at 1105; *SEC v. Oxford Capital Securities, Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992); *SEC v. Bloom* [1987-88 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 93,577 at 97,584 (S.D.N.Y. Jan. 12, 1988).

### AN ORDER GRANTING EXPEDITED DISCOVERY IS APPROPRIATE

The Commission seeks to depose witnesses, subpoena bank and brokerage records and other documents, and take other discovery on an expedited basis prior to a hearing on its motion for a preliminary injunction. Because of the continuing nature of the defendants financing scheme, the Commission has brought this action expeditiously, before it had an opportunity to interview all persons who have information relevant to this matter, or to take any investigative or deposition testimony. The opportunity to take discovery prior to the preliminary injunction hearing will enable the Commission to present a more complete evidentiary record to the Court and will sharpen and focus the issues that must be decided by the Court at such a hearing. Expedited discovery will

also assist the Commission in properly effectuating any order entered by this Court freezing the accounts in which the illegal securities trades occurred.

## AN ORDER SHOULD ISSUE PERMITTING ALTERNATIVE MEANS OF SERVICE

Rule 4(f)(3) of the Federal Rules of Civil Procedure permits the Court to authorize alternative means for service of process in foreign countries. We respectfully request that the Court authorize service upon the defendants by serving them via facsimile, Federal Express or other overnight courier service.

## AN ORDER SHOULD BE ISSUED PREVENTING THE ALTERATION OR DESTRUCTION OF DOCUMENTS

In order to protect all documents necessary for full discovery in this matter, the Commission requests that the Court enter an order preventing the alteration or destruction of documents. Such "innocuous" orders are routinely granted to protect the integrity of the litigation. *See, e.g., Unifund*, 910 F.2d at 1040 n.11; *Musella*, 578 F. Supp. at 425. A non-destruction order is especially appropriate in this case.

## CONCLUSION

For the reasons set forth above, the Commission respectfully requests that this Court grant its application for a temporary restraining order, order to show cause, and other relief against defendants.

Respectfully submitted March 24, 2004.

/s/_____
Robert B. Blackburn, Esq. (RB 1545)
Local Counsel
Securities and Exchange Commission
233 Broadway, 11th Floor
New York, NY 10279
646.428.1610
646.428.1979 (facsimile)

/s/_____
Robert M. Fusfeld
Attorney for the Plaintiff
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO 80202
303.844.1080
303.844.1068 (facsimile)