Julie K. Lutz
Leslie J. Hughes
Attorneys for Plaintiff
Securities and Exchange Commission, Central Regional Office
1801 California Street, Suite 1500
Denver, Colorado 80202
303.844.1080
303.844.1068 (facsimile)

Robert B. Blackburn (RB 1545)
Local Counsel for Plaintiff
Securities and Exchange Commission, Northeast Regional Office
233 Broadway, 11th Floor
New York, NY 10279
646.428.1610
646.428.1979 (facsimile)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| Plaintiff, | : |
| | : |
| | : 1:04-cv-2322 (GEL) |
| v. | : |
| | : |
| UNIVERSAL EXPRESS, INC., et al., | : |
| | : |
| Defendants. | : |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AGAINST UNIVERSAL EXPRESS, RICHARD ALTOMARE
AND CHRIS GUNDERSON**

# TABLE OF CONTENTS

TABLE OFAUTHORITIES   .       .       .       .       .       .       .       .       iii

I.      INTRODUCTION      .       .       .       .       .       .       .       .       1

II.     ARGUMENT  .       .       .       .       .       .       .       .       .       3

    A.      The Standards for Summary  .       .       .       .       .       .       1

    B.      The Universal Express Defendants Violated
the Registration Provisions    .       .       .       .       .       .       4

       1.      Applicable Legal Principles as to Section   .       .       .       4

       2.      Universal Express, Altomare and Gunderson Offered and
Sold Securities  .       .       .       .       .       .       5

       3.      Universal Express, Altomare and Gunderson Used Interstate
Means .  .       .       .       .       .       .       .       6

       4.      No Registration Statement Covered Universal
Express' Sales .       .       .       .       .       .       .       6

       5.      Universal Express' Sales Were Not Exempt From
the Registration Provisions    .       .       .       .       .       7

          a.      The Bankruptcy Code Does Not Exempt
Universal Express' Issuances of Stock to
Neuhaus, Menditatta's nominees, and Spiga .       .       7

             i.      The Section 1145 exemption is unavailable because
Neuhaus, Menditatta's nominees and Spiga did not
have claims against Universal Express' bankruptcy
estate  .       .       .       .       .       .       8

             ii.     The 1994 Employee Stock Option Plan Does Not
Create an Exemption From the Registration
Requirements    .       .       .       .       .       9

          b.      The Public Re-Sales of Universal Express by
Neuhaus, Menditatta and Sandhu Constituted an
Unregistered Distribution of Universal Express
Stock .  .       .       .       .       .       .       11

       6.      Altomare and Gunderson were Necessary and Substantial
Participants in the Distribution of Universal Express Stock   .       13

C.     The Universal Express Defendants Violated the Antifraud
Provisions     .     .     .     .     .     .     .     .     13

    1.     Applicable Legal Principles     .     .     .     .     .     13

    2.     Universal Express, Altomare and Gunderson Are
Liable For Antifraud Violations     .     .     .     .     16

III.     APPROPRIATE RELIEF     .     .     .     .     .     .     .     .     19

A.     The Court Should Issue Permanent Injunctions Against Universal
Express, Altomare and Gunderson     .     .     .     .     .     19

B.     Universal Express, Altomare and Gunderson Should Be
Ordered to Pay Disgorgement, Pre-judgment Interest and
Post-judgment Interest     .     .     .     .     .     .     20

C.     Universal Express, Altomare and Gunderson Should Be
Ordered to Pay Civil Penalties     .     .     .     .     .     23

D.     An Officer and Director Bar Should Be Imposed
Against Altomare     .     .     .     .     .     .     .     24

E.     Penny Stock Bars Should Be Imposed Against
Altomare and Gunderson     .     .     .     .     .     .     25

IV.     CONCLUSION     .     .     .     .     .     .     .     .     26

# TABLE OF AUTHORITIES

## Cases

Aaron v. SEC, 446 U.S. 680 (1980) ...................................……………………..15

Anderson v. Liberty Lobby. Inc., 477 U.S. 242 (1986)...........................................................3

Azrielli v. Cohen Law Offices, 21 F. 3d 512  (2nd Cir. 1994) .................................18

Baskin v. Hawley, 807 F.2d 1120 (2d Cir. 1986) .....................................................18

Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020 (2d Cir.1993)............................................14

Burt Rigid Box, Inc. v. Travelers Property Cas. Corp., 302 F.3d 83 (2d Cir. 2002)....................3

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .......................................................3

CFTC v. British American Commodity Options Corp., 788 F. 2d 92 (2d. Cir., 1986),
cert denied,  479 US 853(1986) ...................................................................21

Coca Cola Co. Foods Div. v. Olmarc Packaging Co., 620 F.Supp. 966 (D.C. Ill. 1985) ..........18

Diliberti v. U.S., 817 F.2d 1259 (1987) ...................................................................4

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976) ...................................................16

Europe and Overseas Commodity Traders v. Banoue Paribas London,
147 F.3d 118 (2d Cir. 1998)..........................................................................4

Felts v. NASA, 469 F. Supp. 54, 67-8 (N.D. Miss. 1978).................................................16, 18

Ganino v. Citizens Utilities Co., 228 F.3d 154 (2d. Cir. 2000) .................................................15

Greene v. Horizon/CMS Healthcare Corp., No. 97-114 JP/DJS, 1998 U.S. Dist.
LEXIS 12254 (D.N.M. July 13, 1998) ...................................................................16

In re  Apple Computer Sec. Litigation, 886 F.2d 1109 (9th Cir. 1989), cert. denied,
496 U.S. 943 (1990)....................................................................................15, 18

In re Craftmatic Secs. Litig., 890 F.2d 628 (3rd Cir. 1990).......................................................17

In re Frontier Airlines, Inc., et al.,  93 B.R. 1014 (D. Colo. 1988).........................................11

In Re Home Health Corporation of America, Inc. Sec. Litig., 1998 U.S. Dist.
LEXIS 1230 (E.D. Pa. 1999) ...........................................................................17

In the matter of Homestead Partners, Ltd., 197 B.R. 706 (Bankr. N.D. Ga. 1996)...................8

In the matter of IBM Sec. Litig., 163 F. 3d 102, (2d. cir. 1998)...............................................15

In re Par Pharmaceuticals, Inc. Sec. Litig., 733 F. Supp. 668 (S.D.N.Y. 1990) ......................18

In re Standard Oil & Exploration, Inc., 136 B.R. 141 (Bankr. D. Mich. 1992)...................7, 11

In the Matter of Fidelity Financial Corp., [1982 Transfer Binder] Fed. Sec. L. Rep.
(CCH) ¶ 83,239 at 85,244 (July 30, 1982) ................................................................................17

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)................................3

McMahan & Co. v. Wherehouse Entertainment, Inc., 900 F.2d 576 (2d Cir.1990),
cert. denied, 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991) ..................................14

Merrill Lynch v. First Nat. Bank of Little Rock, 774 F.2d 909 (8th Cir. 1985) ........................18

Mooney Aerospace Group, Ltd., SEC No-Action Letter, 2002 SEC No-Act.
LEXIS 843 (Dec. 20, 2002) ........................................................................................................9

Mount Verson Fire Ins. Co. v. Belize NY. Inc., 277 F.3d 232 (2d Cir. 2002) .....................3

Neuwirth Inv. Fund, Ltd. v. Swanton, 422 F. Supp. 1187 (S.D.N.Y. 1975) ...........................4

Quinn and Co. v. SEC, 452 F.2d 943 (10th Cir. 1971)...............................................................5

Resnick v. Touche Ross & Co., 470 F. Supp. 1020 (S.D.N.Y. 1979). ....................................16

Rolf v. Blythe Eastman Dillon & Co., 570 F. 2d 38 (2d Cir. 1978) ........................................16

Rubin v. Schottenstein, Zox & Dunn, 143 F.3d 263 (6th Cir. 1998)........................................18

Searls v. Glasser, 64 F.3d 1061 (7th Cir. 1995) .......................................................................17

SEC v. American Bd. Of Trade, 750 F. Supp. 100 (S.D.N.Y. 1990) ......................................19

SEC v. Benson, 657 F. Supp. 1122 (S.D.N.Y. 1987) ...............................................................22

SEC v. Bilzerian, 814 F. Supp. 116 (D.D.C. 1993), aff'd, 29 F.3d 689
(D.C. Cir. 1994) .........................................................................................................................21

SEC v. Blavin, 760 F.2d 706 (6th Cir. 1985) ...........................................................................14

SEC v. Cavanagh, 155 F. 3d 129 (2d. Cir. 1998) ...............................................................4, 19

SEC v. Cavanagh, 2004 U.S. Dist. LEXIS 13372 (S.D.N.Y 2004)…………………….........22

SEC v. Chinese Consol. Benevolent Ass'n, 120 F.2d 738 (2d. Cir. 1941), cert. denied,
314 U.S. 618 (1941)....................................................................................................................4

SEC v. Coffey, 493 F.2d 1304 (6th Cir. 1974) .........................................................................18

SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90 (2nd Cir. 1978) .......................19

SEC v. Culpepper, 270 F.2d 241 (2nd Cir. 1959)..................................................................4, 19

SEC v. Dimensional Entertainment Corp., 493 F. Supp. 1270 (S.D.N.Y. 1980) ....................21

SEC v. First City Financial Corp., Ltd., 890 F.2d 1215 (D.C. Cir. 1989) ..................13, 20, 21

SEC v. First Jersey Sec., Inc., 101 F.3d 1450 (2d Cir. 1996), cert. denied,
522 U.S. 812 (1997)............................................................................................13, 20, 22

SEC v. First Pacific Bancorp, 142 F.3d 1186 (9th Cir. 1998) ....................................................24

SEC v. First Securities Co. of Chicago, 463 F. 2d 981 (7th Cir. 1972), cert. denied,
409 U.S. 880 (1972)...................................................................................................16

SEC v. Frank, 388 F. 2d 486 (2nd Cir. 1968) .........................................................................18

SEC v. Granco Products, Inc., 236 F. Supp. 968 (S.D.N.Y. 1964) ..........................................8

SEC v. Great Lakes Equities Co., 775 F. Supp. 211 (E.D. Mich. 1991) ...................................22

SEC v. Holschuh, 694 F.2d 130 (7th Cir. 1982) .........................................................................4

SEC v. Hughes Capital Corp, 917 F. Supp. 1080 (D.N.J. 1996) aff'd, 124 F.3d 449
(3d Cir. 1997) ..............................................................................................................21

SEC v. Int'l Chem. Dev. Corp., 469 F.2d 20 (10th Cir. 1972)...........................................14, 17

SEC v. Kenton Capital Ltd., 69 F. Supp. 2d 1 (D.D.C. 1998) ....................................................21

SEC v. Lorin, 76 F.3d 458 (2d. Cir. 1996) . ............................................................................22

SEC v. Lybrand, 200 F. Supp. 2d 384 (S.D.N.Y. 2002)..............................................................6

SEC v. Management Dynamics, Inc., 515 F.2d 801 (2nd Cir. 1975) .......................................19

SEC v. Manor Nursing Centers, Inc. 458 F.2d 1082 (2nd Cir. 1972)........................................22

SEC v. Mayhew, 121 F.3d 44 (2nd Cir. 1997)...........................................................................14

SEC v. Moran, 944 F. Supp. 286 (S.D.N.Y. 1996)....................................................................24

SEC v. Murphy, 626 F.2d 633 (9th Cir. 1980) ...........................................................4, 13, 14

SEC v. National Student Marketing Group, 402 F. Supp. 641 (D.D.C. 1975).......................18

<u>SEC v. North American Research and Development Corp.</u>,
424 F.2d 63 (2nd Cir. 1970).......................................................................................3, 4

<u>SEC v. Patel</u>, 61 F.3d 137 (2d Cir. 1995) ........................................................21, 24

<u>SEC v. Posner</u>, 16 F. 3d 520 (2d Cir. 1994) ...............................................................20

<u>SEC v. Ralston Purina Co.</u>, 346 U.S. 119, 97 L.Ed. 1494, 73 S.Ct. 981 (1953) .......................3

<u>SEC v. Rana Research Inc.</u>, 8 F.3d 1358 (9th Cir. 1993) .......................................................17

<u>SEC v. Rega</u> [1975-76 Transfer Binder] (CCH) Fed. Sec. L. Rep. ¶95,222
 at 98,149 (S.D.N.Y. 1975) ...................................................................................19

<u>SEC v. Texas Gulf Sulphur Co.</u>, 401 F.2d 833 (2nd Cir. 1968) ...............................................18

<u>SEC v. United Monetary Services, Inc.</u>, 1990 U.S. Dist. LEXIS 11334
(S.D. Fla. May 13 1990) ........................................................................................21

<u>SEC v. United States Envtl., Inc.</u>, 155 F.3d 107 (2d Cir. 1998), cert. denied,
526 U.S. 1111 (1999).............................................................................................13

<u>SEC v. Washington County Utility District</u>, 676 F.2d 218 (6th Cir. 1982).............................19

<u>SEC v. Zubkis</u>, No. 97 CIV 8086 JGK, 2000 WL 218393 (S.D.N.Y. Feb. 23, 2000) .............2

<u>TSC Indus. v. Northway, Inc.</u>, 426 U.S. 438 (1976) ................................................................14

<u>United Gas v. IRS</u>, 142 F. 2d 216 (3rd Cir. 1944) ....................................................................9

<u>Virginia Bankshares v. Sandberg</u>, 501 U.S. 1083, 111 S.Ct. 2749, 2760 (1991)...................14

<u>Walsingham v. Biocontrol Technology, Inc.</u>, 66 F. Supp. 2d 669 (W.D. Penn. 1998) ...........14

**<u>Statutes</u>**

<u>Federal Rules of Civil Procedure</u>

     Fed. R. Civ. P. 56    .    .    .    .    .    .    .    .    1

<u>U.S.C.</u>

     26 U.S.C. § 6621(a)(2)    .    .    .    .    .    .    .    22

     28 U.S.C. § 1961    .    .    .    .    .    .    .    .    22

<u>Securities Statutes and Rules</u>

Section 2(a)(11), 15 U.S.C. § 77b(a)(11).   .       .       .       .       .       10

Section 4(1), 15 U.S.C. § 77d(1).   .       .       .       .       .       .       10

Section 5, 15 U.S.C. § 77e.   .       .       .       .       .       .       2, 3, 9

Section 20(b), 15 U.S.C. § 77t(b).   .       .       .       .       .       .       18

Section 20(d) , 15 U.S.C. § 77t(d).   .       .       .       .       .       .       22

Section 20(g) , 15 U.S.C. § 77t(g).   .       .       .       .       .       .       25

Rule 144, 17 C.F.R. § 230.144 .       .       .       .       .       .       .       11

Rule 3a-51, 17 C.F.R. § 240.3a51-1   .       .       .       .       .       .       25

Regulation, 17 C.F.R. § 201.1002   .       .       .       .       .       .       23

Statutes/Bankruptcy Code

11 U.S.C. § 1145 ................................................................................6, 7, 10

11 U.S.C. § 364 ..........................................................................................6, 8

## Other Authorities

Am. Jur. 2d., Bankruptcy, §2767 (2006) ............................................................6, 10

Collier on Bankruptcy, ¶ 1145.02[1][a] (15th ed. revised 2004)................................7

Downes and Goodman, Dictionary of Finance and Investment Terms, 3rd Ed. 1991 ..............9

H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977) ......................................................8

III Loss, Securities Regulation, 3d ed. at 1287 ......................................................7

Morgan, Application of the Securities Laws in Chapter 11 Reorganizations under
the Bankruptcy Reform Act of 1978, 1983 U. Ill. L. Rev. 861 (1983).....................................7

R. Jennings and H. Marsh, Securities Regulation 337 (5th ed. 1982)……………….....……...7

S. Rep. No. 989, 95th Cong. 2d Sess. 130 (1978) ....................................................8

H.R. Rep. No. 98-355, 98th Cong. 2d Sess., 7-8 (1984),
reprinted in U.S.C.C.A.N. 2274, 2280-81…………………………………………….................... 23

# I.     INTRODUCTION

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") submits this memorandum and the separate statement of undisputed facts[1] in support of its motion for an order granting partial summary judgment against defendants Universal Express, Inc. ("Universal Express"), Richard Altomare ("Altomare") and Chris Gunderson ("Gunderson") ("Collectively the "Universal Express defendants").[2]  The SEC seeks an order finding that the Universal Express defendants directly or indirectly offered or sold securities without a valid registration statement in violation of the registration provisions, and engaged in antifraud violations.   The SEC seeks an order enjoining Universal Express, Altomare and Gunderson from future violations, requiring disgorgement of funds received from illegal stock sales, pre-judgment interest, civil penalties, entry of penny stock bars as to Altomare and Gunderson, and an officer and director bar against Altomare.

Between April 2001 and March 2004, Universal Express, Altomare and Gunderson engaged in a massive unregistered distribution of Universal Express stock through defendants Mark S. Neuhaus ("Neuhaus"), Tarun Mendiratta ("Mendiratta"), Spiga, Ltd. ("Spiga") and George Sandhu ("Sandhu").  By 2002, nearly 65% of the company's outstanding stock had passed through the hands of these defendants and into the public market.  Facts para. 169-172.  Neuhaus, Mendiratta and, through Sandhu,

---

[1]     Plaintiff's motion is based upon the evidence cited in and filed with the Statement of Undisputed Facts, attached to the Notice of Motion pursuant to Local Rule 56.1.  References to paragraphs in the Plaintiff's Statement of Undisputed Facts are indicated by "Facts para. _."

[2]     These allegations are set forth in the First through Fourth Claims of the complaint.  The SEC is not seeking summary judgment as to allegations that the defendants maintained inadequate internal controls and false books and records, or provided false information to Universal Express's auditors.

Spiga funneled over $9 million in proceeds from their sales of unregistered stock back to Universal Express. Facts para. 163. This money was critical to Universal Express' survival, since the company continuously failed to generate net income from any business operations through the period at issue in the case. Further, nearly $2 million of the proceeds of unregistered stock sales went to Altomare and Gunderson. Facts para. 165, 167.

All of the contemporaneous documentation demonstrates that the issuances to Neuhaus, Menditratta's nominees and Spiga were purported Form S-8 compensation for their work as ostensible consultants to the company. Facts para. 43-46; 64-70; 73-74. However, S-8 was not a legitimate basis for the issuances for numerous reasons, including the fact that the issuances were being used as a capital raising vehicle for the company. Universal Express, Altomare and Gunderson now claim that the over 500 million shares issued to Neuhaus, Menditratta and Spiga were exempt from registration under the federal securities laws by virtue of the company's 1994 bankruptcy reorganization plan and provision of the Bankruptcy Code. However, the limited exemptions contained in the Bankruptcy Code apply only to stock issued in exchange for a claim asserted against the debtor as part of the bankruptcy proceedings. It is undisputed that none of the defendants asserted a claim in the 1994 proceeding. Facts para. 21-42; 80-81. Further, the Bankruptcy Code provisions do not in any event exempt any transactions involving an underwriting of securities. During the time period at issue in this case, Neuhaus, Menditratta's nominees and Spiga continuously functioned as underwriters of Universal Express stock into the public market. Therefore, although factual disputes exist with respect to the purported basis upon which unregistered stock

2

was issued by the Universal Express defendants, the factual disputes are immaterial as a matter of law. Therefore entry of summary judgment is appropriate.

## II. ARGUMENT

### A.    The Standards for Summary Judgment

To prevail on a motion for summary judgment, the moving party bears the burden of demonstrating the absence of a material factual question. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Mount Verson Fire Ins. Co. v. Belize NY. Inc., 277 F.3d 232, 236 (2d Cir. 2002)) (citation omitted). "The substantive law governing the dispute will determine which facts are material, and only disputes over those facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" SEC v. Zubkis, No. 97 CIV 8086 JGK, 2000 WL 218393, at *1 (S.D.N.Y. Feb. 23, 2000) Id. (citation omitted). But "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." SEC v. Hughes Capital Corp., 917 F. Supp. 1080, 1084 (D.N.J. 1996) (citation omitted; emphasis in original).

When the moving party has discharged that burden, the non-moving party must come forward with "specific facts showing there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Burt Rigid Box, Inc. v. Travelers Property Cas. Corp. 302 F.3d 83, 91 (2d Cir. 2002). Further, "a party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony."

Diliberti v. U.S., 817 F.2d 1259 (1987); Perma Research & Development Co. v. The Singer Co., 410 F.2d 572, 578 (2d Cir. 1969).

**B.     The Universal Express Defendants Violated the Registration Provisions**

**1.     Applicable Legal Principles as to Section 5**

To establish a prima facie case for a violation of Section 5, the SEC must prove three elements: (1) that no registration statement was in effect for the securities; (2) that the defendant directly or indirectly sold or offered to sell the securities; and (3) that interstate means were used in connection with the offer or sale. Europe and Overseas Commodity Traders v. Banoue Paribas London, 147 F.3d 118, 124 n.4 (2d Cir. 1998); SEC v. North American Research and Development Corp., 424 F.2d 63 (2nd Cir. 1970); Neuwirth Inv. Fund, Ltd. v. Swanton, 422 F. Supp. 1187, 1193 n.8 (S.D.N.Y. 1975). A. registration statement is transaction specific. "Each sale of a security must either be made pursuant to a registration statement or fall under a. registration. exemption." SEC v. Cavanagh, 155 F. 3d 129, 133 (2d. Cir. 1998).    To prove a violation of Section 5, a plaintiff need not establish scienter.    Aaron v. Securities and Exchange Commission, 446 U.S. 680, 714 (1980); SEC v. Softpoint, Inc., 958 F. Supp. 846, 859-860 (S.D.N.Y. 1997).

Liability for violations of Section 5 extends to "those who are engaged in steps necessary to the distribution of security issues." SEC v. Chinese Consol. Benevolent Ass'n, 120 F.2d 738, 741 (2nd Cir.), cert. denied, 314 U.S. 618 (1941).  Thus, "those who had a necessary role in the transaction are held liable as participants." SEC v. Murphy, 626 F.2d 633, 650-51 (9th Cir. 1980); see also SEC v. Holschuh, 694 F.2d 130, 139-40 (7th Cir. 1982) (citing SEC v. Culpepper, 270 F.2d 241, 247 (2d Cir. 1959)). Under this doctrine, a participant in an unregistered distribution of stock is liable as a primary violator of Section 5

if his participation is "necessary and substantial and not simply 'de minimis.'" <u>SEC v. Softpoint, Inc.</u>, 958 F. Supp. 846, 860 (S.D.N.Y. 1997).

Once the SEC has established the offer and sale of unregistered securities through the use of the jurisdictional means, the burden shifts to the defendants to show that a claimed exemption from registration is available. <u>SEC v. Ralston Purina Co.</u>, 346 U.S. 119, 126 (1953); <u>SEC v. North American Research and Development Corp.</u>, 424 F.2d 63 (2nd Cir. 1970). <u>SEC v. Culpepper</u>, 270 F.2d 241, 246 (2nd Cir. 1959). Moreover, because "public policy strongly supports registration," any exemption from registration "must be strictly construed against the person claiming its benefit." <u>Quinn and Co. v. SEC</u>, 452 F.2d 943, 946 (10th Cir. 1971).

### 2.    Universal Express, Altomare and Gunderson Offered and Sold Securities

It is undisputed that during the period at issue, April 2001 through March 2004, Universal Express issued, and Altomare and Gunderson caused the issuance of, hundreds of millions of shares of unregistered stock to defendants Mendiratta, Neuhaus and Spiga, either directly or though their nominees. Facts para. 45, 64. Altomare and Gunderson negotiated, drafted and executed consulting agreements with defendants Neuhaus, Spiga and Mendiratta which provided for the issuance of stock as compensation. Facts para. 47-51, 53-62. With respect to each consulting agreement, Gunderson drafted, and Altomare signed, letters to the company's transfer agent directing her to issue the stock payable under the consulting agreement as free-trading stock in purported reliance upon Form S-8. Gunderson confirmed these instructions in daily telephone conversations with the transfer agent. Facts para. 64-69. Gunderson and Altomare negotiated several amendments to the consulting agreements with Neuhaus, Sandhu and Mendiratta, increasing both the terms of the agreements and the

number of shares payable under them. Facts para 49-50, 54, 56-57. During the time period at issue in the case, Altomare and Neuhaus caused Universal Express to issue over 500 million shares of stock to Neuhaus, Sandhu and Mendiratta, increasing the company's outstanding shares from 19 million to over 650 million. Facts para. 64.

### 3. Universal Express, Altomare and Gunderson Used Interstate Means

Use of the jurisdictional means is also undisputed, because the Universal Express defendants engaged in mail and facsimile correspondence with the company's transfer agent and the other defendants as a part of the issuances, and because Universal Express stock traded in the over the counter market while the issuances were ongoing. Facts para. 1, 68-72, 76. SEC v. Lybrand, 200 F. Supp. 2d 384, 392 (S.D.N.Y. 2002) (trading of stock over NASD bulletin board constituted use of interstate commerce); SEC v. Softpoint, Inc., supra, 958 F. Supp. at 861 (use of cross-state facsimiles, telephone calls, and wire transfers satisfied Section 5 jurisdictional requirement).

### 4. No Registration Statement Covered Universal Express' Sales

Between January 1, 2001 and March 31, 2004, Universal Express filed two Form S-8 registration statements purportedly registering 30 million and 20 million shares respectively to be issued as part of employee benefit plans. No other registration statements were filed by Universal Express during this time period. Facts para. 43-46. Gunderson and Altomare testified however, that, despite the filing of these plans and their contemporaneous statements to the contrary, no stock was issued under the company's Forms S-8. Facts para. 71.

5.      **Universal Express' Sales Were Not Exempt From the Registration Provisions**

a.      **The Bankruptcy Code Does Not Exempt Universal Express' Issuances of Stock to Neuhaus, Mendiratta's nominees, and Spiga**

The core argument raised by the Universal Express defendants in this action is that the 500 million unregistered shares of Universal Express stock they caused to be issued to the other defendants named in the case were exempted from the registration requirements of the Securities Act by virtue of provisions of the federal Bankruptcy Code. Although a factual dispute exists as to the basis upon which the Universal Express defendants purported to issue the stock, this factual dispute is immaterial. Even assuming arguendo that the Universal Express defendants purported to issue the stock pursuant to the company's 1994 bankruptcy plan, no bankruptcy exemption covers the sales at issue in this case, and the defense is therefore insufficient as a matter of law.

The Bankruptcy Code contains two exemptions from the registration requirements of the Securities Act, Section 364 (f) and Section 1145 (a) (1). These exemptions are intended to facilitate the reorganization process by allowing debtors to raise working capital funds during the Chapter 11 case or to settle claims of creditors at plan confirmation. The policy underlying such exemptions is to relieve debtors from strict adherence to the securities laws so long as adequate disclosure is made under the oversight of the bankruptcy court. Am. Jur. 2d., Bankruptcy, §2767 (2006); see also, In re Standard Oil & Exploration, Inc., 136 B.R. 141, 151 (Bankr. D. Mich. 1992) (under the Bankruptcy Code, the disclosure statement approval process under bankruptcy court supervision replaces the registration and prospectus delivery requirements of the federal securities laws.) By their terms, and in light of their underlying policies, the exemptions cannot be used as a vehicle to

7

raise fresh capital for use after confirmation.[3]

> **i.    The Section 1145 exemption is unavailable because Neuhaus, Mendiratta's nominees, and Spiga did not have claims against Universal Express' bankruptcy estate**

In bankruptcy proceedings, Section 1145 (a)(1) of the Bankruptcy Code provides a limited exemption for securities issued in exchange for a claim or interest, or in the event that the exchange involves cash or property, <u>principally</u> in exchange for a claim against, or interest in, the debtor, and <u>partly</u> for cash or property.  11 U.S.C. 1145 (a)(1)(B).  Section 1145 is designed to ensure that debtors use the provision first and foremost as an exemption from registration to satisfy existing obligations and interests, and not as a means for avoiding the registration requirements when raising fresh capital. Without such limitations, Section 1145 could become a convenient vehicle to evade the registration requirements of the Securities Act.    <u>See</u> Morgan, <u>Application of the Securities Laws in Chapter 11 Reorganizations under the Bankruptcy Reform Act of 1978</u>, 1983 U. Ill. L. Rev. 861, 876 (1983).

The threshold question under Section 1145 is whether the parties receiving the new securities hold a claim or interest in the Debtor.  Securities may not be issued under Section 1145 to parties who do not hold claims or interests.  <u>See</u> <u>SEC v. Granco Products, Inc.</u>, 236 F. Supp. 968, 970 (S.D.N.Y. 1964)(the SEC enjoined the debtor from selling unregistered securities to the general public because they did not participate in the reorganization); <u>In the matter of Homestead Partners, Ltd.</u>, 197 B.R. 706, 717 n.11 (Bankr. N.D. Ga. 1996)("the section 1145 exemption applies only to stock issuance in

---

[3]  <u>See</u> <u>Collier on Bankruptcy</u>, ¶ 1145.02[1][a] (15th ed. revised 2004).  <u>See</u> also, R. Jennings and H. Marsh, <u>Securities Regulation,</u> 337 (5th ed. 1982)(Section 1145(a)(1)(B) does "not exempt securities offered to the public to provide fresh capital to finance a Chapter 11 plan"); see also, III Loss, <u>Securities Regulation</u>, 3d ed. at 1287-1293.

exchange for a claim or preceding interest in the debtor" and no new value reorganization could rely on such exemption).  See also Mooney Aerospace Group, Ltd., SEC No-Action Letter, 2002 SEC No-Act. LEXIS 843 (Dec. 20, 2002). [4]

It is undisputed that neither defendant Neuhaus, Mendiratta, Spiga nor Sandhu held any claim against Universal Express at the time of the 1994 bankruptcy reorganization.  All of the defendants began ostensibly performing services pursuant to consulting agreements with Universal Express which were executed during 2001 or later. Facts para. 78-80.  As a result, the exemption set forth in Section 1145 of the Bankruptcy Code is not available for the issuances of stock to Neuhaus, Mendiratta, Spiga or Sandhu which are at issue in this case. [5]

### ii.      The 1994 Employee Stock Option Plan Does Not Create an Exemption From the Registration Requirements

At the time of their approval of Universal Express' 1994 Reorganization Plan, the shareholders of Universal Express also approved the adoption of an Employee Stock Option Plan ("ESOP Plan") [Ex. 248, ex. I]. [6]  Pursuant to the ESOP Plan, the management of

---

[4] See Collier on Bankruptcy, ¶ 1145.02[1][a] (15th ed. revised 2004).  See also, R. Jennings and H. Marsh, Securities Regulation 337 (5th ed. 1982)(Section 1145 (a)(1)(B) does "not exempt securities offered to the public to provide fresh capital to finance a Chapter 11 plan"); .see also, III Loss, Securities Regulation, 3d ed. at 1287-1293

[5]  The Section 364 exemption is facially irrelevant because it applies only to debt issuances. The legislative history to Section 364 (f) specifically states that it does not encompass an equity security or a security convertible into an equity security.  See H.R. Rep. No. 595, 95th Cong., 1st Sess. 419 (1977) and S. Rep. No.989, 95th Cong. 2d Sess. 130 (1978).   Section 364 mirrors an exemption found in Section 3(a)(7) of the Securities Act for certificates of indebtedness issued by a trustee in bankruptcy. Because Section 304 provides credit for administrative expenses of the estate during reorganization, this provision does not apply to financing for operations after the plan has been confirmed.  The Section 364 borrowing authority is available only to a trustee or debtor-in-possession. It is clear from the legislative history that Section 364 was not intended to be used to raise funds for a debtor's operations after confirmation.  See H.R. Rep. No. 595, 95th Cong., 1st Sess. 346-347 (1977).

[6] Such plans are often presented to shareholders together with a Reorganization Plan, because both require the approval of existing shareholders.  In addition, such plans give to the creditors and shareholders who are voting on the Reorganization Plan itself disclosure as to management's plans for operation of the reorganized entity.

Universal Express was authorized to grant stock options to present and future officers, directors, employees and consultants. The stated purpose of the ESOP Plan was to provide incentives to such persons to continue in service to the company by giving them a proprietary interest in it through capital stock ownership [Id, ¶ 1]. The ESOP Plan authorized the grant of stock options for a period not to exceed ten years from the date of the Plan's approval by Universal Express stockholders.[7] The total amount of Universal Express stock authorized by the terms of the Plan to be used for such stock options was 1,250,000 shares.[8] Thus, as a threshold matter, by its own terms the ESOP Plan cannot be used as a justification for the issuance of 507 million shares of Universal Express stock to Neuhaus, Mendiratta and Spiga between 2001 and 2004. Further, during the time period at issue in this case, Universal Express stated in its Forms 10-KSB that it had not issued any stock option pursuant to he 1994 Stock option Plan. Facts para. 29-36, 40-42.

Moreover, the ESOP Plan did not create any exemption from the registration requirements of Section 5 of the Securities Act with respect to the issuance of stock options pursuant to the plan. The ESOP Plan is not a part of the Reorganization Plan itself. [Ex. 248, ex. A, pp. USXP 00212-238]. Universal Express' Plan of Reorganization merely contemplates approval of the adoption of the ESOP Plan, as well as other documents pertaining to "Reorganized PPS" (now Universal Express), including its Restated Articles of Incorporation [Ex. 248, ex. A., pp. USXP 00228-229; restated articles at ex. D, pp.

---

[7] Following approval by creditors, Universal Express' Plan of Reorganization was approved by court order dated February 28, 1994 [Ex. 248, p. 1].

[8] The Plan provided that this number could be increased if the number of outstanding shares of the company was increased as a result of three events: (1) a recapitalization of the company; (2) a stock split; or (3) the issuance of a stock dividend. A recapitalization is a revision of the capital structure of a company, such as an exchange of stock for bonds. Bankruptcy is a common reason for recapitalization. Downes and Goodman, Dictionary of Finance and Investment Terms, 3rd Ed. 1991. See also, United Gas v. IRS, 142 F. 2d 216 (3rd Cir. 1944).

10

USXP00249-253].  The Reorganization Plan itself states that the exemption of Section 1145 shall only extend to stock issued in exchange for a claim in the bankruptcy proceeding. Facts para. 28.

The ESOP plan does not purport to extend the coverage of any bankruptcy exemptions to ongoing future issuance of stock options under the ESOP Plan.  Further, under the authorities cited above, the ESOP could not as a matter of law extend the limited coverage of Bankruptcy Code Section 1145 to future issuances of securities which occurred outside the scope of the bankruptcy reorganization itself.

**b.      The Public Re-sales of Universal Express by Neuhaus, Mendiratta and Sandhu Constituted an Unregistered Distribution of Universal Express Stock**

Generally, securities issued in reliance on Section 1145 of the Bankruptcy Code may be resold by the holders thereof without registration unless the holder is an "underwriter" with respect to such securities, as defined in Section 1145 ( b)(1) of the Bankruptcy Code.  This limitation was reiterated in Universal Express' Reorganization Plan.  Facts para. 27.  Section 1145 (b) 's definition of "underwriter" incorporates by reference the definition of underwriter set forth in section 2(a) (11) of the Securities Act. Section 1145(b) of the Bankruptcy Code provides assurance that parties emerging under the plan with control and those engaging in true market-making activity will not be covered by the exemption.  The bankruptcy exemptions apply only to the initial issuance under the plan, and not to any redistribution. Am. Jur. 2d., Bankruptcy, §2767 (2006);  In re Standard Oil & Exploration, Inc., 136 B.R. 141, 152:  In re Frontier Airlines, Inc., et al., 93 B.R. 1014, 1020 (D. Colo. 1988) (language of Section 1145 is intended to prevent the redistribution of the securities issued under a plan without compliance with Section 5

of the Securities Act.)

Similarly, the "private offering" exemption of Section 4(1) of the Securities Act
[15 U.S.C. §77d(1)], which exempts from the registration requirements "transactions by
any person other than an issuer, underwriter, or dealer", is unavailable because
Mendiratta, Neuhaus and Spiga were functioning as underwriters of Universal Express
stock. Section 2(a)(11) defines "underwriter" to mean "any person who has purchased
from an issuer with a view to, or offers or sells for an issuer in connection with, the
distribution of any security, or participates or has a direct or indirect participation in any
such undertaking . . . ." A person's status as an "underwriter" does not turn on his
subjective intent to resell at the time of his purchase of securities from an issuer, but on
an analysis of the objective facts surrounding his sales, in order to determine whether he
is participating in a distribution for the issuer. (See, Rule 144, 17 CFR sec. 230.144).
Relevant factors include whether shares were acquired by the potential issuer for
investment purposes, the number of shares, the length of time the individual held the
securities, whether there was an unforeseeable change in circumstances of the holder
preceding the sales, and whether the individual is participating, directly or indirectly, in
the distribution of securities or raising capital for the issuer. [9]

The undisputed facts establish that in a little more than two years, accounts
controlled by Neuhaus, Sandhu, Spiga, and Mendiratta were responsible for the sale of at
least 470,796,706 unregistered shares of Universal stock into the public market. Facts
para. 82, 84, 88. The scope of these resales alone demonstrates a distribution of stock.
Further, Neuhaus, Sandhu and Mendiratta resold the unregistered stock issued to them

---

[9]     See 17 C.F.R. § 230.144; see also SEC v. Kern, 425 F. 3d 143, 148 (2d Cir. 2005) (discussing
requirements of Rule 144 safe harbor).

under the consulting agreements virtually immediately.  These sales were the means by which Universal Express raised capital for its operations.  Between 2001 and 2004, Universal Express operated continuously at a loss, and was continuously dependent upon the proceeds of unregistered stock sales to survive.  In every year, stock sales proceeds transferred to the company by Neuhaus, Spiga and Mendiratta exceeded u income earned on any legitimate business operations.  Facts para. 157-163.

> **6.    Altomare and Gunderson were Necessary and Substantial Participants in the Distribution of Universal Express Stock**

Altomare and Gunderson are liable as substantial participants in the unregistered resales by Neuhaus, Mendiratta, Spiga and Sandhu. Altomare and Gunderson negotiated with the re-sellers the terms of the stock sales.  As the sole director and officer of Universal, Altomare was the only employee of Universal with power to authorize the issuance of the shares to them.  Facts para. 47-49, 51, 54, 56, 58, 61.  Gunderson drafted, and Altomare signed, the letters to the transfer agent containing the instructions that the shares were "to be free trading under an S-8 registration, " thereby ensuring that the shares would not be legended.  Facts para. 68-70.  Altomare and Gunderson caused the stock payable to the consultants to be issued "up front".  Facts para. 50, 57, 62.  Altomare and Gunderson drafted and filed the company's two Form S-8 registration statements for 50 million shares and thereafter caused the issuance of over ten times that amount of stock to Neuhaus, Spiga and Mendiratta's nominees.  Facts para. 43-45.  Altomare and Gunderson received the proceeds of the unregistered sales.  Facts para. 165, 167.

## C.    The Universal Express Defendants Violated the Antifraud Provisions

### 1.    Applicable Legal Principles

In order to establish primary liability under §10(b) and Rule 10b-5, a plaintiff is

required to prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device.   See, e.g., Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1031 (2d Cir.1993);  McMahan & Co. v. Wherehouse Entertainment, Inc., 900 F.2d 576, 581 (2d Cir.1990), cert. denied, 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991); SEC v First Jersey, 101 F.3d 1450,1467,  (2d Cir. 1996). Section 17(a) of the Securities act proscribes similar conduct in connection with offers and sale of securities. United States v. Naftalin, 441 U.S. 768, 773 (1979).  ("[A] primary violator [of §10(b)] is one who participate[s] in the fraudulent scheme") SEC v. United States Envtl., Inc., 155 F.3d 107, 111 (2d Cir. 1998), cert. denied, 526 U.S. 1111 (1999) (citations and internal quotation marks omitted); SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1471 (2d Cir. 1996), cert. denied, 522 U.S. 812 (1997)

False and misleading statements on a matter material to a reasonable investor are actionable under the antifraud provisions of the securities laws.  The nature of certain information is such that its materiality "is not subject to serious challenge."  SEC v. Blavin, 760 F.2d 706, 711 (6th Cir. 1985) (quoting SEC v. Murphy, 626 F.2d 633, 653 (9th Cir. 1980) (information concerning a company's "financial condition, solvency, and profitability" is material).  Walsingham v. Biocontrol Technology, Inc., 66 F. Supp. 2d 669 (W.D. Penn. 1998) SEC v. Int'l Chem. Dev. Corp., 469 F.2d 20, 26 (10th Cir. 1972). "Material facts include those 'which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities.'" SEC v. Mayhew, 121 F.3d 44, 52 (2nd Cir. 1997) (quoting SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2nd Cir. 1968)).

An omission is material if there is a "substantial likelihood" that either "the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Indus. v. Northway, Inc., 426 U.S. 438, 449 (1976).   Incomplete disclosures, or "half truths", are actionable under the antifraud provisions of the federal securities laws and impose a duty to disclose whatever additional information is necessary to rectify the misleading statements. Virginia Bankshares v. Sandberg, 501 U.S. 1083, 1097, 111 S.Ct. 2749, 2760 (1991). Fraudulent omissions will only be "neutralized" when the omitted information is conveyed to the public "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by" the alleged misstatements. Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 (2d. Cir. 2000).

Revenue projections are also actionable under the federal securities laws.   A projection or statement of belief may be actionable if:  (1) the statement is not genuinely believed; (2) there is no reasonable basis for the belief; and/or (3) there are undisclosed facts tending to seriously undermine the accuracy of the statement.   In the matter of IBM Sec. Litig., 163 F. 3d 102, 107 (2d. cir. 1998); In re  Apple Computer Sec. Litigation, 886 F.2d 1109, 1113 (9th Cir. 1989), cert. denied, 496 U.S. 943 (1990); In re Burlington Coat Factory Sec. Litig., 114 F. 3d 1410, 1427 (3rd Cir. 1997); Helwig v. Vencor, Inc., 251 F. 3d 540, 557 (6th Cir. 2000).  A company must disclose material, firm-specific adverse facts that affect the projection's validity or plausibility.  Rubinstein v. Collins, 20 F.3d 160, 170 (5th Cir. 1994).

No scienter need be proved to establish a violation of the antifraud provisions of Sections 17(a) (2) and (3) of the Securities Act.  Aaron v. SEC, 446 U.S. 680 (1980).

However, to be actionable under the antifraud provisions of Section 10(b) of the Exchange Act and Section 17(a)(1), material misstatements must have been made with scienter. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976). Knowing or reckless conduct meets the scienter requirement. Resnick v. Touche Ross & Co., 470 F. Supp. 1020, 1022 (S.D.N.Y. 1979). The recklessness standard for liability under the antifraud federal securities laws is intended to discourage "deliberate ignorance". In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3rd Cir. 1999); see also, Greene v. Horizon/CMS Healthcare Corp., No. 97-114 JP/DJS, 1998 U.S. Dist. LEXIS 12254 * 11 (D.N.M. July 13, 1998). Imposition of liability for reckless conduct is especially appropriate in cases where the defendant owes a fiduciary duty to the defrauded party, e.g., officers or directors of the issuer whose stock plaintiffs bought. Rolf v. Blythe Eastman Dillon & Co., 570 F. 2d 38 (2d Cir. 1978); Felts v. NASA, Inc., 469 F. Supp. 54 (N.D. Miss. 1978).[10]

### 2. Universal Express, Altomare and Gunderson Are Liable For Antifraud Violations

During the time period at issue in this case, Universal Express, Altomare and Gunderson issued a series of press releases which misrepresented purported funding  or commitments,  the company's business operations, and its projected revenues. Facts para. 89-156.  Through Altomare and Gunderson, Universal Express announced substantial financing which had no reasonable basis in fact.  In several cases, Altomare and Gunderson prepared and issued press releases announcing financing based upon nothing more than a letter of intent from a loan broker who had not yet taken any steps to locate any funding source. Facts para. 134-135, 146-147, 150-153.  Altomare sought deceptive letters of intent

---

[10]   The scienter of a company's officers is imputed to the company, which can only act through the persons associated with it.  SEC v. First Securities Co. of Chicago, 463 F. 2d 981, 989-88 (7th Cir. 1972), cert. denied, 409 U.S. 880 (1972).

from Neuhaus and Sandhu, directing them to insert specific fraudulent language which he used not only in press releases but in merger negotiations with third parties. Facts para. 91, 92, 118, 121-124.  At all times, Universal Express lacked the economic resources to pursue any business combination and was dependent upon a continuous influx of proceeds from unregistered stock sales to survive.  Facts para. 156-162.  Altomare and Gunderson issued a press release which projected revenues of $9,000,000 annually from services and products relating to a postal store membership network that did not even exist.  Facts para. 154-155.

"[U]nder well established principles of law, a corporation has a duty to assure that disclosures in its press releases are not misleading."  In the Matter of Fidelity Financial Corp., [1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,239 at 85,244 (July 30, 1982). See also, SEC v. Int'l Chem. Dev. Corp., 469 F.2d at 27 n.3.  A corporation and its officers are subject to liability if they issue statements or projections without a reasonable basis. See In re Craftmatic Secs. Litig., 890 F.2d 628, 645-46 (3rd Cir. 1990); Searls v. Glasser, 64 F.3d 1061, 1067 (7th Cir. 1995). Antifraud liability on the part of Universal Express, Altomare and Gunderson can be predicated on a single false statement. See, e.g.,  Sec v. Rana Research Inc., supra, 8 F.3d 1358 (9th Cir. 1993) (liability imposed on the basis of one false press release and contemporaneous public statements).[11]

As the company's CEO, Altomare was "ultimately responsible for all of the company's public statements."  In Re Home Health Corporation of America, Inc. Sec. Litig., 1998 U.S. Dist. LEXIS 1230 (E.D. Pa. 1999).  Once corporate officers undertake to make statements, they are obligated to speak truthfully, and to make such additional

---

[11]  Cases cited in Rana Research also make clear that the "in connection with" requirement is satisfied in an SEC enforcement action where the issuance of a false press release is accompanied by public trading in the stock.  Id. at 1362.

disclosures as are necessary to avoid rendering the statements misleading.  <u>Baskin v.</u>

<u>Hawley</u>, 807 F.2d 1120, 1132 (2d Cir. 1986); <u>In re Par Pharmaceuticals, Inc. Sec. Litig.</u>,

733 F. Supp. 668, 674-75 (S.D.N.Y. 1990);   <u>See also</u> <u>Coca Cola Co. Foods Div. v. Olmarc</u>

<u>Packaging Co.</u>, 620 F.Supp. 966, 973 (D.C. Ill. 1985); <u>Merrill Lynch v. First Nat. Bank of</u>

<u>Little Rock</u>, 774 F.2d 909, 913 (8th Cir. 1985).  The statements of corporate officials are of

particular importance to investors; the investing public "justifiably places heavy reliance on

the statements and opinions of corporate insiders."  <u>In re Apple Securities Litigation</u>, 886 F.

2d at 1116.

Gunderson is liable for material misstatements because, as general counsel to the

company, he drafted and issued the fraudulent press releases with knowledge of the

relevant underlying facts.  "A 'lawyer has no privilege to assist in circulating a statement

with regard to statements which he knows to be false or misleading simply because his

client has furnished it to him.'"  <u>Azrielli v. Cohen Law Offices</u>, 21 F. 3d 512, 517 (2nd

Cir. 1994) (quoting <u>SEC v. Frank</u>, 388 F. 2d 486, 489 (2nd Cir. 1968); see also  <u>Rubin v.</u>

<u>Schottenstein, Zox & Dunn</u>, 143 F.3d 263, 267 (6th Cir. 1998); <u>SEC v. Coffey</u>, 493 F.2d

1304, 1315 (6th Cir. 1974)).  Lawyers are not free to ignore the commercial substance of a

transaction which could obviously be misleading to stockholders and the investing

public."  <u>SEC v. National Student Marketing Group</u>, 402 F. Supp. 641, 647-8 (D.D.C.

1975); <u>see</u> <u>also</u> <u>SEC v. Fehn</u>, 1994 U.S. Dist. LEXIS 8204, * 34-5 (D. Nev.), <u>aff'd</u> 97

F.3d 1276 (9th Cir. 1996), <u>cert.</u> <u>denied</u> 522 U.S. 813 (1997); <u>see also</u> <u>Felts v. NASA</u>, 469

F. Supp. 54, 67-8 (N.D. Miss. 1978) (lawyer must make a reasonable, independent

investigation to detect and correct false or misleading materials)

### III.  APPROPRIATE RELIEF

**A.     The Court Should Issue Permanent Injunctions Against Universal Express, Altomare and Gunderson**

A permanent injunction is the primary statutory remedy for violations of the federal securities laws.  Sections 20(b) of the Securities Act of 1933 [15 U.S.C. § 77t(b)] and 21(d)(1) Exchange Act of 1934 [15 U.S.C. §78u(d)(1)] authorizes this court to grant the Commission's request for a permanent injunction.  To obtain a permanent injunction against statutory violations alleged in the complaint, the SEC must show that a violation of the securities laws has occurred and there is a reasonable likelihood that the defendant, if not enjoined, will engage in future violations.  See SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d 90, 99-100 (2d Cir. 1978).

In determining whether to grant injunction relief, a court considers the following factors: whether the defendant has been found liable for the illegal conduct; the degree of scienter exhibited; whether the violation was an isolated incident; whether the defendant continues to maintain that his past conduct was blameless; and whether, by reason of his professional occupation, defendant might be in a position which may provide the opportunity for future violations..  See SEC v. Cavanagh, 155 F. 3d at 135; SEC v. First Jersey Sec., Inc., 101 F. 3d 1450, 1477 (2d Cir. 1996), cert. denied, 522 U.S. 812 (1997).

Universal Express, Altomare and Gunderson engaged in a pattern of illegal conduct over a period of several years.  Even accepting arguendo their current version of events, Altomare and Gunderson acted with a high degree of scienter. "[T]he likelihood of future illegal conduct is 'strongly suggested' by past illegal activity." SEC v. American Bd. Of Trade, 750 F. Supp. 100, 104 (S.D.N.Y. 1990); SEC v. Management Dynamics, Inc., 515 F.2d at 807; SEC v. Culpepper, 270 F.2d 241, 250 (2nd Cir. 1959).  Further, "as the

19

frequency and magnitude of the past violations increase, the strength of the inference also increases."  SEC v. Washington County Utility District, 676 F.2d 218, 227 (6th Cir. 1982). Once the Commission makes such a showing, "the burden is on the defendants to furnish to the court some basis for believing that their illegal activities will not be repeated."  SEC v. Rega [1975-76 Transfer Binder] (CCH) Fed. Sec. L. Rep. ¶95,222, at 98,149 (S.D.N.Y. 1975).

**B.    Universal Express, Altomare and Gunderson Should be Ordered to Pay Disgorgement, Pre-judgment Interest and Post-judgment Interest**

Disgorgement of illegally obtained profits is an appropriate remedy for violations of the federal securities laws and should be ordered against Universal Express, Altomare and Gunderson.  SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1474-75 (2d Cir. 1996) ("The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable. The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits.")  Thus the amount of disgorgement should include all gains flowing from defendant's illegal activities. SEC v. Cross Fin. Svcs., Inc., 908 F. Supp. 718, 734 (C.D. Cal. 1995).

The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged. See, e.g., SEC v. Lorin, 76 F.3d 458 (2d. Cir. 1996). The amount of disgorgement ordered "need only be a reasonable approximation of profits causally connected to the violation," SEC v. Patel, 61 F.3d 137 (2d Cir. 1995) (internal quotation marks omitted); "any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty," Id. at 140 (internal quotation marks omitted). See also, SEC v. Materia,

745 F.2d 197, 200-201 (2d Cir. 1984), cert. denied, 471 U.S. 1053 (1985); SEC v. First
City Financial Corp., Ltd., 890 F.2d 1215, 1230 (D.C. Cir. 1989).   The court also has the
power to order disgorgement of salary.  SEC v. Posner, 16 F. 3d 520,522 (2d Cir. 1994);
SEC v. Penn Central Co., 450 F. Supp. 908, 916 (E.D. Pa. 1978); CFTC v. British
American Commodity Options Corp., 788 F. 2d 92 (2d. Cir., 1986) cert denied 479 US
853(1986).

The SEC has produced a reasonable approximation of the disgorgement amount
for Universal Express, Altomare and Gunderson.  During the time period at issue in the
case, the company obtained payments totaling $9,959,828 directly and indirectly from
Neuhaus, Mendiratta and Spiga which were funded by the illegal stock sales.  Facts para.
163.  From those proceeds, which comprised the bulk of Universal Express' operating
revenues throughout the period, the company paid at least $1,419,025 to Altomare and
his wife Barbara Halpern, and $361,311 to Gunderson.  Facts para. 165, 167.  The burden
now shifts to the defendants "clearly to demonstrate that the disgorgement figure was not
a reasonable approximation."  Since it is difficult in many cases to separate "legal from
illegal profit,. . . it is proper to assume that all profits gained while defendants were in
violation of the law constituted ill-gotten gains."  SEC v. Bilzerian, 814 F. Supp. 116, 118
(D.D.C. 1993), aff'd, 29 F.3d 689 (D.C. Cir. 1994) (citations omitted).

Further, the Universal Express defendants are not entitled to offset expenses or
transfers for their own benefit from their ill-gotten gains on the illegal distribution. SEC
v. Dimensional Entertainment Corp., 493 F. Supp. 1270, 1283 (S.D.N.Y. 1980); SEC v.
Kenton Capital Ltd., 69 F. Supp. 2d 1 (D.D.C. 1998) ("overwhelming weight of authority
hold[s] that securities law violators may not offset their disgorgement liability with business

expenses"); <u>SEC v. Hughes Capital Corp</u>, 917 F. Supp. 1080 (D.N.J. 1996) (same), <u>aff'd</u>, 124 F.3d 449 (3d Cir. 1997); <u>SEC v. Great Lakes Equities Co.</u>, 775 F. Supp. 211 (E.D. Mich. 1991) ("deductions for overhead, commissions and other expenses are not warranted. The manner in which defendants . . . chose to spend their misappropriation is irrelevant as to their objection to disgorgement"); <u>SEC v. United Monetary Services, Inc.</u>, 1990 U.S. Dist. LEXIS 11334 (S.D. Fla. May 13 1990); <u>SEC v. Benson</u>, 657 F. Supp. 1122 (S.D.N.Y. 1987).

Once a court determines that disgorgement is appropriate, it has the discretion to charge pre-judgment interest at the IRS underpayment interest rate. <u>SEC v. Cavanagh,</u> 2004 U.S. Dist. LEXIS 13372 (S.D.N.Y 2004 at *99; <u>First Jersey, 1</u>01 F. 3d at 1476. Disgorgement should include prejudgment interest to assure that defendants do not profit from the illegal activity. <u>SEC v. Manor Nursing Centers, Inc.</u>, 458 F.2d 1082, 1105 (2d Cir. 1972). "Prejudgment interest, like the remedy of disgorgement itself, is meant to deprive wrongdoers of the fruits of their ill-gotten gains from violating securities laws." <u>SEC v. Lorin</u>, 877 F. Supp. 192, 201 (S.D.N.Y. 1995). The calculation of prejudgment interest follows the delinquent tax rate for underpaid taxes, as determined by the Internal Revenue Service, Internal Revenue Code, 26 U.S.C. § 6621(a)(2), and is assessed on a quarterly basis. See id. Under the IRS rate, the amount of prejudgment interest on the $9,959,828 in proceeds received by Universal Express on illegal stock sales is $1,522,924 calculated through August 31, 2006 (the last date for which the interest rate is currently available). Facts para. 163-164. The amount of prejudgment interest on the $1,419,025 in proceeds received by Altomare is $216,978. The amount of prejudgment interest on the $361,317 in proceeds received by Gunderson is $55,528. Facts para. 165-168. The SEC is also entitled

to an order for post-judgment interest pursuant to 28 U.S.C. § 1961.

**C.    Universal Express, Altomare and Gunderson Should Be Ordered to Pay Civil Penalties**

Sections 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act provide for the payment of civil monetary penalties for violations of those Acts. Civil monetary penalties are designed to serve as a deterrent against securities laws violations and thereby further important goals such as encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry. See SEC v. Palmisano, 135 F.3d 860, 866 (2d Cir. 1998).   Congress intended civil penalties to serve as deterrent mechanisms because ordering a defendant to repay his or her ill-gotten gains alone "merely restores [the] defendant to his original position without extracting a real penalty for his illegal behavior."  H.R. Rep. No. 98-355, 98th Cong. 2d Sess., 7-8 (1984), reprinted in U.S.C.C.A.N. 2274, 2280-81.   Courts apply the same factors in assessing civil penalties as they do in assessing the need for injunctive relief. SEC v. Kane, 2003 U.S. Dist. Lexis 5043, *11 (S.D.N.Y. 2003).   While there are maximum amounts associated with each of the three tiers of civil penalties set forth in the statue, the statute also provides for a greater penalty not to exceed the "gross amount of pecuniary gain to such defendant as a result of the violation."

The Court has the authority to impose civil monetary penalties on summary judgment.  See, e.g., SEC v. Sekhri, 2002 WL 31100823, at *19 (imposing three times civil penalty upon granting summary judgment in favor of SEC), SEC v. Freeman, 290 F. Supp. 2d 401, 407 (summary judgment on civil penalty following criminal conviction.); SEC v. Midwest Investments, Inc., No. 94-3433, 1996 U.S. App. LEXIS 14424 (6th Cir. 1996) (noting that civil penalties in stock fraud case had been imposed by the District Court on

summary judgment), <u>cert</u>. <u>denied</u>, 520 U.S. 1165 (1997); <u>SEC v. Cantor</u>, No. 97-6056, 1998 U.S. App. LEXIS 22518 (2d Cir. 1998) (affirming district court's imposition of a maximum civil penalty on summary judgment), <u>cert</u>. <u>denied</u> <u>sub</u> <u>nom</u>., <u>Levine v. SEC</u>, 525 U.S. 874 (1998).

The Commission requests that the Court impose third tier civil penalties against Universal Express, Altomare and Gunderson in the amount of their pecuniary gain.  As this court has stated, "[e]ach case … has its own particular facts and circumstances which determine the appropriate penalty to be imposed."  <u>SEC v. Moran</u>, 944 F. Supp. 286, 297 (S.D.N.Y. 1996).   Universal Express, Altomare and Gunderson misled the investing public over a several-year period and raised substantial funds through illegal stock sales. At all times, the company was no more than a developmental stage enterprise with minimal revenues which was dependent upon continued illegal stock sales to survive. The defendants enticed investors with baseless claims of financing and projected revenues which had no reasonable basis in fact.

**D.     An Officer and Director Bar Stock Bar Should Be Imposed Against Altomare**

Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act authorize the federal courts to bar an individual from serving as an officer or director of a publicly held company if his conduct demonstrates "substantial unfitness" to serve in such capacity.  In determining "substantial unfitness," several circuits have identified six factors to consider:  (1) the egregiousness of the underlying securities law violations; (2) the defendant's prior offenses; (3) the defendant's role or position when he engaged in the violations; (4) the defendant's degree of scienter; (5) the defendant's economic stake or benefit in the violation; and (6) the likelihood that the misconduct will recur.  <u>E.g.</u>,

SEC v. Patel, 61 F.3d 137, 141 (2d Cir. 1995); SEC v. First Pacific Bancorp, 142 F.3d 1186, 1189 (9th Cir. 1998). An officer and director bar against Altomare is appropriate in light of these factors. As CEO of Universal, Altomare spearheaded a massive unregistered distribution, solicited fraudulent letters of intent from Sandhu and Neuhaus, and repeatedly issued press releases which were fraudulent. Altomare profited by this misconduct through his receipt of at least $1.5 million in illicit trading proceeds at a time when his company was continuously operating at a loss. Altomare's pervasive misconduct and high degree of misconduct create a significant risk that the misconduct will occur.

**E.     Penny Stock Bars Should Be Imposed Against Altomare and Gunderson**

Section 20(g) of the Securities Act provides that a court may prohibit a person, who was participating in the offer of a penny stock at the time of the misconduct, from future participation in the offering of penny stock. 15 U.S.C. § 77t (g). When deciding to impose a penny stock bar, the court looks at essentially the same factors that govern the imposition of an officer and director bar. SEC v. Wolfson, 2006 U.S. Dist. LEXIS 29543 *28-29 (D. Utah 2006), citing SEC v. Steadman, 603 F.2d 1126, 1140 (5th Cir. 1979) and SEC v. Patel, 61 F.3d 137, 141 (2d Cir. 1995). Universal Express's shares were penny stocks because they sold at a price of less than five dollars. 17 C.F.R. § 240.3a51-1.

As discussed above, the conduct of Altomare and Gunderson was egregious both because of the amount of unregistered securities that they caused to be issued into the public market, as well as the their knowing issuance of false and misleading press releases. By virtue of their roles at Universal Express, they will have the opportunity to

engage in similar violations of the federal securities provisions. They obtained significant profits as a result of their misconduct.

## IV.  CONCLUSION

For the reasons set forth above, the Court should enter an order granting summary judgment in favor of the Commission and imposing the relief set forth in this memorandum.

Dated: August 18, 2006                    Respectfully submitted,


                                          s/  Julie K. Lutz
                                          Julie K. Lutz
                                          Attorney for the Plaintiff
                                          Securities and Exchange Commission

CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2006, I electronically filed the foregoing Memorandum of  Law In Support of Plaintiff's Motion For Partial Summary Judgment Against Defendants Universal Express, Inc., Richard A. Altomare and Chris Gunderson to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification to the following as indicated:

Arthur Tifford, Esq.
Tifford & Tifford, P.A.
1385 NW 15th Street
Miami, FL 33125
tiffordlaw@bellsouth.net

John A. Hutchings, Esq.
Dill Dill Carr Stonebraker & Hutchings, PC
455 Sherman Street, Suite 300
Denver, Colorado 80203
jhutchings@dilanddill.com

John B. Harris
Stillman & Friedman
425 Park Avenue
New York, NY 10022
Ishalov@stillmanfriedman.com
jharris@stillmanfriedman.com

Harry H. Wise III, Esq.
500 Fifth Avenue, Suite 1650
New York, NY 10110
hwiselaw@aol.com

Marvin Pickholz, Esq.
Jason Pickholz, Esq.
Akerman Senterfitt LLP
335 Madison Avenue, Suite 2600
New York, NY 10017
Jason.pickholz@pickholz.com

/s/ Julie Lutz_____
Julie K. Lutz

27