Julie K. Lutz
Leslie J. Hughes
Attorneys for Plaintiff
Securities and Exchange Commission, Central Regional Office
1801 California Street, Suite 1500
Denver, Colorado 80202
303.844.1080
303.844.1068 (facsimile)

Robert B. Blackburn (RB 1545)
Local Counsel for Plaintiff
Securities and Exchange Commission, Northeast Regional Office
233 Broadway, 11th Floor
New York, NY 10279
646.428.1610
646.428.1979 (facsimile)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

U.S. SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

        v.

UNIVERSAL EXPRESS, INC., et al.,

        Defendants.

1:04-cv-2322 (GEL)

---

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
AGAINST DEFENDANTS UNIVERSAL EXPRESS, INC.,
RICHARD A. ALTOMARE AND CHRIS GUNDERSON**

Plaintiff Securities and Exchange Commission ("SEC") files this Statement of Undisputed Facts in Support of its Motion for Partial Summary Judgment Against Defendants Universal Express, Inc. ("Universal Express"), Richard A. Altomare ("Altomare") and Chris Gunderson ("Gunderson").

**Citations to the Record**

1.      On April 7, 2006, Richard Altomare gave sworn testimony in a deposition, true and correct copies of relevant portions of the depositions are attached as Exhibits 302. References to Altomare's depositions are listed below as "Altomare 1 at _".

2.      On April 12, 2006, Austin Bleich gave sworn testimony in a deposition, a true and correct copy of relevant portions of the deposition is attached as Exhibit 303.  References to the pages of Bleich's deposition are listed below as "Bleich at _".

3.      On March 7, 2006, John T. Crane, Jr. gave sworn testimony in a deposition, a true and correct copy of relevant portions of the deposition is attached as Exhibit 304. References to the pages of Crane's deposition are listed below as "Crane at _".

4.      On April 11 and 20, 2006, Jeanette Drayer gave sworn testimony in a deposition, true and correct copies of relevant portions of the depositions are attached as Exhibit 305. References to the pages of Drayer's depositions are listed below as "Drayer 1 at _" and "Drayer 2 at _."

5.      On March 28, 2006, Gale Clarke Ellsworth gave sworn testimony in a deposition, a true and correct copy of relevant portions of the deposition is attached as Exhibit 306. References to the pages of Ellsworth's deposition are listed below as "Ellsworth at _".

6.      On April 13 and 21, 2006, Chris Gunderson gave sworn testimony in a deposition, true and correct copies of relevant portions of the depositions are attached as Exhibits 307 and 308.  References to the pages of Gunderson's depositions are listed below as "Gunderson 1 at _" or "Gunderson 2" at _."

7.      On April 10, 2006, Michael J. Margolis gave sworn testimony in a deposition, a true and correct copy of relevant portions of the deposition is attached as Exhibit 309. References to the pages of Margolis' deposition are listed below as "Margolis at _".

8.      On March 24, 2006, Byron McGough gave sworn testimony in a deposition, a true and correct copy of relevant portions of the deposition is attached as Exhibit 310. References to the pages of McGough's deposition are listed below as "McGough at _".

9.      On January 6 and 7, 2004, Mark S. Neuhaus gave sworn investigative testimony, true and correct copies of relevant portions of the transcripts are attached as Exhibits 311 and 312.  References to the pages of Neuhaus' transcripts are cited below as "Neuhaus 1 at _" or "Neuhaus 2" at _."

10.     On April 20, 2006, George Sandhu gave sworn testimony in a deposition, a true and correct copy of relevant portions of the deposition is attached as Exhibit 313. References to the pages of Sandhu's deposition are listed below as "Sandhu at _".

11.     On February 23, 2006, Marshall Stanek gave sworn testimony in a deposition, a true and correct copy of relevant portions of the deposition is attached as Exhibit 314. References to the pages of Stanek's deposition are listed below as "Stanek at _".

12.     On March 31, 2006, Kevin Thompson gave sworn testimony in a deposition, a true and correct copy of relevant portions of the deposition is attached as Exhibit 315. References to the pages of Thompson's deposition are listed below as "Thompson at _".

13.     References to deposition Exhibits are listed as "Exh __."

**Defendants**

14.     Universal Express, a Nevada corporation, has its principal place of business in Florida and has an office in New York, New York.  The company operates a variety of developmental stage businesses including luggage shipping and equipment leasing.  The common stock of Universal Express is registered with the Commission pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and as a result the company is required to file annual and quarterly reports with the SEC on Forms 10-KSB (annual) and 10-QSB (quarterly).  [Exh 237, pp 1-3.]

15.     Altomare is a resident of Florida, and has been Universal Express' chief executive officer and a director of Universal Express since 1992.  Altomare is currently the sole officer and director of Universal Express and signed all of the company's filings with the Commission.  [Altomare 1 at 10-12; Exh 237, p. 9.]

16.     Gunderson works in Universal Express' New York City office and has been Universal Express' in-house attorney since 1995.  [Gunderson 1 at 4-5.]

17.     Defendant Mark S. Neuhaus ("Neuhaus") lives in New York, New York.  Neuhaus has been associated with Universal Express since April of 2001.  [Neuhaus 1 at 185-186; Exh 7a.]

18.     Defendant George J. Sandhu ("Sandhu") lives in New York, New York.  Sandhu was formerly employed as an investment adviser registered with the SEC and currently acts as an independent consultant to various clients.  [Sandhu at 21-26.]  He has been associated with Universal Express as a consultant since July 2001.  [Exh 7b; Altomare 1 at 87-89]

19.     Defendant Spiga Ltd., is a company created in October 1997 under the British Virgin Island International Business Companies Act.  [Sandhu at 28.]  Spiga was an investment vehicle for various individuals including Sandhu's brother-in-law.  [Sandhu 28-29, 31.]  At relevant times, Sandhu had trading authority over brokerage accounts of Spiga.  He also controlled transfers of funds from those accounts.  [Exh. 3a-3d; 175, 177, 291; Margolis at 35-37.]

20.     Defendant Tarun Mendiratta ("Mendiratta") is a resident of Connecticut. Mendiratta has been associated with Universal Express since October 2002.  [Gunderson 2 at 27-28; Altomare 1 at 104-105; Exh 7c.]

**Universal Express' 1994 Bankruptcy Reorganization**

21.     Universal Express was previously named Packaging Plus Services Inc. (PPS). The company went through bankruptcy reorganization between 1991 and 1994. [Gunderson 1 at 8-9; Gunderson Exhibit 1, 1994 Form 10-KSB at p. 2.]

22.     The PPS bankruptcy reorganization plan was confirmed by the bankruptcy court on February 28, 1994.  Exhibit 248 is the final plan approved by the court.  [Gunderson 2 at 113-114; Exh 248.]  The reorganization plan was filed with the SEC on December 14, 1994.  [Gunderson 2 at 120, 129.]

23.     The reorganization plan authorized the issuance of 50,000,000 shares of New Common Stock to be issued to holders of allowed claims under the plan.  [Exh 248 at p. USXP00228, VI. A., third paragraph.]

24.     The classes of claims entitled to New Common Stock under the reorganization plan are discussed in Sections III and IV.  Existing shareholders were to receive one share of New Common Stock for each 50 shares of Existing Common Stock.  [Exh 248 at p. USXP00226, section IV. E. 2.]

25.     The disclosure statement estimated that 5,405,301 shares of New Common Stock would be issued to resolve outstanding claims of creditors and in exchange for shares of existing shareholders.  [Exh 248 at USXP00207, paragraph 8.04.]

26.     The disclosure statement stated that "Under Bankruptcy Code § 1145, the original issuance of the Reorganized PPS New Common Stock (hereinafter the "Securities") under the Plan will be exempt from the registration requirements of the Securities Act of 1933 … ."  [Exh 248 at p. USXP00209, section 8.11.01.]

27.     The disclosure statement stated that "Resale of Securities by a creditor or shareholder receiving the same directly under the Plan will also be exempt from the registration provided the creditor or shareholder is not an underwriter... The determination of whether a particular creditor or shareholder would be deemed to be an underwriter is necessarily an individual one, and any creditor or shareholder considering reselling Securities received under the Plan should consult a securities advisor and independent counsel to determine whether he would be considered an underwriter and, therefore, ineligible for the exemption described above."

28.     The reorganization plan provided that "exemption from the requirements of Section 5 of the Securities Act . . . shall apply to the New Common Stock, the New Warrants, and the Warrants Shares to be issued under the Plan in exchange for any Claim against or interest in PPS."  [Exh 248 at p. USXP00229-30, subsection F.]

29.    The reorganization plan attached a 1994 Stock Option Plan for PPS.  [Exh 248 at USXP00277-283.]  The 1994 Stock Option Plan authorizes the company to issue options to its "present and future officers, directors, employees, consultants, franchisees and professional advisors of the Company."  [Exh 248 at USXP00277, Section 1, Purpose of the Plan, paragraph 1.]

30.    The number of shares to be issued upon exercise of options granted pursuant to the Plan was limited to 1,250,000 shares.  [Exh 248 at USXP00278 section 3, Stock Subject to this Plan, paragraph 2.]

31.    The 1994 Stock Option Plan provided that "if the number of outstanding shares of Common Stock of the Company shall be changed by reason of any recapitalization, stock split or stock dividend, the aggregate number and kind of shares for which such options may … be granted under this Plan and the number of shares subject to the options theretofore granted under this Plan . . . shall be adjusted as determined by the Plan Administrators, in their sole and absolute discretion . . .. [Exh 248, at USXP00279, Article 3, first paragraph on this page.]

32.    The Plan provided that Board of Directors may modify the 1994 Stock Option Plan in its sole discretion, "except the Board of Directors may not, without approval of the stockholders, (A) increase the total number of shares with respect to which options may be granted under this Plan, except as may be effected pursuant to the provisions of Article '3' hereof."  [Exh 248 at USXP00283 paragraph 13.]

33.    No Plan Administrator was appointed by Universal Express, so all decisions were made by Altomare as the sole director of the company.  [Gunderson 2 at 143-144.]

34.    All options issued under the 1994 Stock Option Plan were to be evidenced by an option agreement, which shall include by reference the terms of this Plan as a condition pursuant to which the option is issued and received.  [Exh 248 at USXP00278, Section 2. Administration of the Plan, penultimate paragraph of this section.]

35.    The 1994 Stock Option Plan stated that the purchase price per share of Common Stock under each option to be granted shall be determined by the Plan Administrators but shall not be less than the fair market value of the common stock on the date such option is granted.  [Exh 248 at p. USXP00280, section 5, first paragraph.]

36.    A person electing to exercise an option under the Plan was required to give written notice to the Company of such election and the number of shares to be purchased and the notice was required to be accompanied by payment to the Company of the full purchase price.  [Exh 248 at USXP00280-81, section 7 Exercise of Option, third paragraph].  This notice was required to make such representations as to the investment intent of the purchaser, the information to which the purchaser had access, and such other matters that the Plan Administrators required, as would satisfy counsel to the Company that registration under the Securities Act of 1933, as amended, was not required in

connection with the issuance of the shares which were to be purchased. [Exh 248 at USXP00280-281, section 7, third paragraph.]

37.    Exibit I to the Reorganization Plan is Altomare's employment agreement. It has a term of five years. The employment agreement refers to the 1994 Stock Option Agreement. [Gunderson 2 at 126-7; Exh 248 at USXP00284.] The Employment Agreement grants Altomare stock options to purchase not less than 500,000 shares of PPS's Class A Common Stock and specifically refers to the grant occurring under Stock Option Plan. [Exh 248 at USXP00287-288 sub-paragraph F.] However, no shares were issued to Altomare under the 1994 stock option plan. [Gunderson 2 at 144.]

38.    Universal Express filed its annual report for the year ending June 30, 1994 on December 14, 1994. The company reported that the bankruptcy Confirmation Order approved the Company's 1994 Stock Option Plan, which provided for the issuance of up to 1.25 million shares of the Company's Class A Common Stock. [Gunderson Exhibit 1 at p. 20, F-15.]

39.    Universal Express reported in its annual report for the year ending June 30, 1997 that on November 8, 1996, the Company elected to effect a 1:12 reverse stock split of its common stock. [Exh 292, p. 32.] As a result of the reverse stock split, the Company adjusted the number of shares to be issued under the 1994 Stock Option Plan reducing it to 104,167 shares of common stock. The Company reported that "no options have been granted under the plan as of June 30, 1997." Id. at p. 33. (1,250,000/12 = 104,166.66)

40.    Universal Express reported in its annual report for the year ended June 30, 2001 that "The Company's '1994 Stock Option Plan' provides for the issuance of up to 104,167 shares of common stock. . . . No options have been granted under the plan as of June 30, 2001. [Exh 240 at p. 19.]

41.    Universal Express reported in its annual report for the year ended June 30, 2002 that "The Company's '1994 Stock Option Plan' provides for the issuance of up to 104,167 shares of common stock. . . . No options have been granted under the plan as of June 30, 2002. [Exh 237 at p. 27-8.]

42.    Universal Express reported in its annual report for the year ended June 30, 2003 that "The Company's '1994 Stock Option Plan' provides for the issuance of up to 104,167 shares of common stock. . . . No options have been granted under the plan as of June 30, 2003. [Exh 180, p.45.]

**Universal Express' S-8 Registration Statements and Consulting Agreements**

43.    During the time period at issue in this case, Universal Express filed two Form S-8 registration statements which purported to register a total of 50 million shares of Universal Express stock for use as compensation to consultants and employees of the company. The Forms S-8 were drafted and filed with the SEC under the direction of

Gunderson, and reviewed and signed prior to filing by Altomare.   [Exh 238, 239; Gunderson 1 at 64-67, 72-76.]

44.    Neither Form S-8 included any reoffer prospectus through which any resales of stock by S-8 consultants were registered.  [Exh 238-239, 257a-ii.]

45.    Between January 1, 2001 and March 31, 2004, Universal Express filed no registration statements other than the Forms S-8 referenced above. [Lonnie Morgan Affidavit submitted in support of motion for Summary Judgment Against Mendiratta, ¶ 5.]

46.    In 2001, Universal Express entered into consulting agreements with Neuhaus, Sandhu and Mendiratta.  Each agreement provided that Universal Express would compensate the consultant with stock.  [Exh 7a-d.]

**Neuhaus consulting agreement**

47.    Neuhaus entered into a consulting agreement with Universal Express in April 2001 which was drafted by Gunderson and signed by Altomare.  [Altomare 1 at 52-54.] Neuhaus thereafter provided consulting services to Universal Express which Neuhaus testified were limited to advertising Universal Express' name on the side of NASCAR automobiles raced by Neuhaus. [Altomare 1 at 55-56; Neuhaus 1 at 207-208.]  Universal Express kept no records with respect to services provided by Neuhaus pursuant to the consulting agreement and Neuhaus submitted no bills for services.  [Altomare 1 at 62, 103.]

48.    The consulting agreement provided that Universal Express would file a registration statement with the SEC with respect to the shares issued to Neuhaus, which would be S-8 shares. [Exh 7a, ¶ 4.]  Altomare and Gunderson participated in negotiating the original compensation to Neuhaus under the agreement, which was 1,000,000 Universal Express shares per month.  [Altomare 1 at 63-64.]

49.    Altomare and Gunderson negotiated with Neuhaus four amendments to his consulting contract with Universal Express, three to extend the term of the agreement to a total of 67 months, and one to increase his compensation retroactively to 1,500,000 per month as of April 2001.  [Exh 7a.]  Under the extensions, the agreement is still in effect; however, Altomare and Neuhaus agreed after the filing of the SEC's complaint in this case that Neuhaus would cease his activities on behalf of the company.  [Altomare 1 at 77-81.]

50.    Under both the original and amended versions, Neuhaus received the total shares payable monthly under the agreement up front, though the agreement and amendments do not disclose that.  [Neuhaus 1 at 215, 259; Exh 7a.]

**Spiga consulting agreement**

51.    Universal Express entered into a consulting agreement with Sandhu on behalf of Spiga in July 2001 which was drafted by Gunderson and signed by Altomare [Exh 7b; Altomare 1 at 86-90.]  Sandhu or employees of Sandhu performed the services rendered pursuant to the Spiga agreement.  Altomare did not deal with anyone at Spiga other than Sandhu as part of the Spiga consulting agreement.  [Altomare 1 at 95, 100-101.]  Among other services, Sandhu assisted Altomare in "all public relations matters" with respect to Universal Express, including reviewing press releases and introducing the company to brokers and investors.  [Altomare 1 at 91-94.]  Altomare and Sandhu spoke almost daily during the period at issue in this case.  [Altomare 1 at 92.]

52.    Universal Express kept no time or billing records with respect to services provided by Sandhu pursuant to the consulting agreement and Sandhu submitted no bills for services.  There are no records evidencing any of Sandhu's services pursuant to the agreement.  [Altomare 1 at 102-103.]

53.    The original agreement was for an eleven month term, with compensation of 1,000,000 Universal Express shares per month during that term.  [Exh 7b, ¶ 2.]

54.    In October 2001, Altomare, Gunderson and Sandhu negotiated an extension of the term of the Spiga agreement to thirty months.  [Exh 7b, p. 9227; Altomare 1 at 96-98.]  Universal Express entered into the extension based upon Altomare's satisfaction with the services performed by Sandhu to date.  [Altomare 1 at 96-98.]

55.    Altomare and Sandhu negotiated a second amendment to the Spiga consulting agreement "as of" January 2002, increasing the term of the agreement to sixty months. [Exh 7b, p. 9228; Altomare 1 at 98-99.]

56.    In April 2002, Altomare, Gunderson and Sandhu negotiated a retroactive amendment of the Spiga consulting agreement, increasing the shares payable to Spiga from 150,000 per month to 360,000 per month "as of" the date of the original agreement, July 2001.  [Exh 72, p. 9229; Altomare 1 at 98-100.]

57.    Sandhu testified that although the agreement stated that "[Universal Express] shall compensate the advisor as follows: 150,000 common shares per month during the term of this agreement."  Actually, Spiga received shares in "lump sums" and this was a "matter of convenience."  [Sandhu at 108.]

**Mendiratta consulting agreement**

58.    Mendiratta entered into a consulting arrangement with Universal Express in October 2002.  At Mendiratta's request, Altomare and Gunderson agreed that two consulting agreements would be executed in the names of Mendiratta's aunts who resided in India, Sabita Dhingra ("Dhingra") and Vena Kaila ("Kaila"), even though Mendiratta would perform all of the services under both agreements.  [Altomare 1 at 104-105;

Gunderson 2 at 27-28, 34; Exh 7c.]  The agreements were drafted by Gunderson and signed by Altomare. [Altomare 1 at 110-111.]

59.    On or about October 3, 2002, Universal Express and Dhingra entered into an agreement for Dhingra to provide services including among other things, preparing public relations and advertising reports, promotion of the company through advertisements, and promoting the company in the transportation field.  [Exh 7c, para. 3.]

60.    In exchange for services, Universal Express was to pay Dhingra 1 million shares per month for the 12 month term of the agreement.  The shares could be paid in advance, in whole or in part.  [Exh 7c, para. 2 and 4.]

61.    On or about August 20, 2003, Universal Express and Kaila entered into an agreement for Kaila to provide services including among other things, preparing public relations and advertising reports, promotion of the company through advertisements, and promoting the company in the transportation field.  [Exh 7d, para. 3.]

62.    In exchange for these services, Universal Express was to pay Kaila 1 million shares per month for the 24 month term of the agreement.  The shares could be paid in advance, in whole or in part.  [Exh 7d, para. 2 and 4.]

63.    Neither Mendiratta nor Universal Express created any records which document any services provided by Mendiratta to the company pursuant to the Dhingra and Kaila agreements. [Altomare 1 at 109.]

**Universal Express Issuance of Securities to Neuhaus and Mendiratta's Nominees and Spiga**

64.    Between April 2001 and January 2004, Universal Express issued more than 500 million shares to Neuhaus, Spiga, and Mendiratta's nominees [Exh 11a-11d], increasing its outstanding shares from 19 million to over 650 million.  [Exh 4, 5.]

65.    Between April 2001 and November 2003, Universal Express issued to Neuhaus 270,698,345 shares of Universal Express stock as to which Gunderson drafted, and Altomare reviewed and signed, letters to the company's transfer agent stating that the stock was "to be free trading under an S-8 registration."  [Exh 257a-ii; Affidavit of Lonnie L. Morgan as to Neuhaus ("Morgan Neuhaus Aff") ¶¶3, 4, Att. A; Gunderson 2 at 37, 39; Altomare 1 at 27-28.]   During the same period, Universal Express issued 26,233,248 unrestricted shares to Neuhaus.  [Morgan Neuhaus Aff. ¶3, Att. B.]

66.    Between August 2001 and December 2003, Universal Express issued to Spiga 152,389,115 shares of Universal Express stock, as to which Gunderson drafted, and Altomare reviewed and signed, letters to the company's transfer agent stating that the stock was "to be free trading under an S-8 registration."  [Affidavit of Lonnie L. Morgan as to George J. Sandhu ("Morgan Sandhu Aff."), ¶ 3; Exh 290.]  During the same period,

Universal Express issued 6,310,625 restricted shares to Spiga [Morgan Sandhu Aff., ¶ 2, Att. 1 and 2.]

67.    Between October 2002 and January 2004, Universal Express issued 78,857,000 shares to Mendiratta's nominees Dhingra and Kaila.  [Affidavit of Lonnie L. Morgan as to Tarun Mendiratta ("Morgan Mendiratta Aff.") ¶¶3, 4.]

68.    With respect to these issuances, Gunderson drafted, and Altomare reviewed and signed, letters to the company's transfer agent stating that the stock was "to be free trading under an S-8 registration."   [Morgan Mendiratta Aff. ¶4; Exh 260, 261: Gunderson 2 at 37, 39; Altomare 1 at 27-28.]

69.    Drayer relied on the statements in the instruction letters from Universal Express, Altomare and Gunderson for the reason the shares were to be issued as free-trading. [Drayer 2 at 137.]

70.    Altomare acknowledged his signature on the instruction letters to Drayer which stated "This stock is to be free trading under an S-8 registration."  [Altomare 1 at 122-23.]

71.    Gunderson testified that despite the language in the letter and the fact that the two Form S-8 registration statements were filed with the SEC, the bonus plans were never effectuated and shares were not issued under the two Forms S-8.  [Gunderson 1 at 64-65, 67, 74-76; Exh 238 and 239; Altomare 1 at 48-49 (no stock issued pursuant to S-8).]

72.    Gunderson testified that when he instructed the transfer agent to issue shares "as free trading under an S-8 registration" that he was referring to the shares being issued under the company's 1994 bankruptcy reorganization plan.  [Gunderson 2 at 38-40.]

73.    However, Gunderson never told the transfer agent that the shares issued pursuant to these letters were being issued under the company's 1994 plan of reorganization. [Drayer 2 at 136-137.]

74.    There are no contemporaneous documents which reflect that any of the issuances of stock by Universal Express at issue in this case were undertaken by Universal Express, Altomare and Gunderson in purported reliance upon the company's bankruptcy reorganization plan.  [Altomare 1 at 49.]

75.    On April 12, 2004, the staff of the SEC sent a letter to the transfer agent stating that it was considering recommending to the Commission that an enforcement action be brought against her for violating the Securities Act registration provisions by participating in the issuance of unregistered Universal Express stock.  [Drayer Exhibit 8.]

76.    Drayer relayed this information to Gunderson and requested the company's position on the legality of the issuance of the shares.  On April 23, 2004, Gunderson wrote to the transfer agent and stated that "the shares in question were properly issued

pursuant to and in compliance with the 1994 Stock Option Plan of the Packaging Plus Service, Inc." [Drayer Wells Response letter.]

77.    Gunderson's April 23, 2004 letter is the first time that a reference to the 1994 Stock Option Plan of Packaging Plus was included in a letter to the transfer agent. [Exh 257, 260, 290.]

78.    Dhingra, Kaila, Neuhaus and Spiga were not listed as creditors on the schedule of creditors that was included in Packaging Plus's reorganization plan. [Gunderson 2 at 137-38.]

79.    The shares issued to Dhingra and Kaila, as Mendiratta's nominees, and to Neuhaus and Spiga were not issued in exchange for any claim or interest in Packaging Plus Services. [Gunderson 2 at 139-140, 142.]

80.    Dhingra, Kaila, Mendiratta, Neuhaus and Sandhu were not employees, officers, or directors of Universal Express. [Gunderson 2 at 31, 35.]

81.    The consulting agreements between Universal Express and Dhingra, Kaila, Neuhaus and Spiga do not reference the 1994 Stock Option Plan and do not list a purchase price they are to pay to purchase shares under an option agreement. [Exh 7a-d.]

**Public Resale of Stock Issued to Neuhaus, Mendiratta and Sandhu and Payment of Proceeds to Universal Express, Altomare and Gunderson**

82.    During the time period at issue in this case, Neuhaus publicly sold 259,649,167 shares of the Universal Express stock issued to him for proceeds of $9,786,588. [Morgan Neuhaus Aff., ¶ 8.]

83.    While these sales were ongoing, Neuhaus and his affiliated entities transferred to Universal Express $5,861,488 derived from these sales. [Morgan Neuhaus Aff., ¶ 10; Affidavit of Kerry L. Matticks as to Neuhaus ("Matticks Neuhaus Aff.", ¶ 3, Att. A.]

84.    During the time period at issue in this case, Spiga, through Sandhu, resold 134,490,539 shares of the Universal Express stock issued to it for proceeds of $3,970,280 million. [Morgan Sandhu Aff., ¶ 6.]

85.    Sandhu had trading authority over Spiga's brokerage accounts, and he advised Spiga as to the amount, price, and date of sales of Universal Express stock to be made in its Canadian brokerage accounts. [Sandhu at 26, 28-29, 31, 107-110, 112-13, and 129-30.] Spiga delivered trading authorizations to various brokerage firms giving Sandhu authority to buy and sell securities on its behalf. [Exh 3a-c, 176, 291; Margolis at 35-37.]

86.    While these sales were ongoing, Spiga made payments totaling $2,604,880 to Universal Express. [Affidavit of Kerry Matticks as to Universal Express, Altomare and Gunderson ("Matticks USXP Aff."), ¶ 3, Att. C.]

87.     Sandhu issued the wire transfer instructions for the Spiga account at Bear Stearns. Sandhu instructed Margolis to wire out funds in specific amounts to specific addresses. Margolis did not speak with Dakin about transfer of funds from Spiga's account. [Margolis at 35-37, 55-56, Exh 177.]

88.     During the time period at issue in this case, the Dhingra and Kaila accounts sold a total of 76,657,000 Universal Express S-8 Shares for total proceeds of $4,170,243. [Morgan Mendiratta Aff. at 13.]    While these sales were ongoing, affiliates of Mendiratta's nominees transferred $1,483,460 to Universal Express.  [Matticks USXP Aff., ¶ 3, Att. A.]

**Issuance of False Press releases by Universal Express, Altomare and Gunderson**

89.     From May 2002 to April 2003, Altomare and Gunderson caused Universal Express to issue various press releases that announced Universal Express receipt of purported large funding commitments, purported acquisitions or other business operations.  Gunderson and Altomare would draft and/or edit drafts of press releases based upon the underlying documentation available for each transaction as well as quotes provided by Altomare.  Altomare and Gunderson reviewed and approved each release before its issuance and authorized its public issuance by Universal Express.  [Altomare 1 at 28-30.]

90.     Each release was followed by an increase in Universal Express' share price and trading volume, which permitted Neuhaus, Mendiratta and Sandhu to profitably dispose of large amounts of Universal Express shares.  The below table documents the market reaction to the various press releases issued by Universal Express based on published market data:  [Exh. 20a-20e.]

| Date of Release | Mkt. Volume Day Before | Mkt. Volume Day of Release | Previous Day Close Price | Day of Release Close Price |
|---|---|---|---|---|
| May 23, 2002 | 2.9 million | 26 million | $.02 | $.033 |
| July 10, 2002 | 1.3 million | 10.6 million | $.021 | $.024 |
| November 21, 2002 | 5.2 million | 19.6 million | $.017 | $.026 |
| April 9, 2003 | 2.3 million | 109.7 million | $.007 | $.026 |
| October 12, 2003 | 29.4 million | 131.8 million | $.072 | $.103 |

**May 23, 2002 Announcement of $100 million in Funding Commitments**

91.     In 2002, Altomare requested Neuhaus and Sandhu to prepare funding letters concerning a potential transaction involving Universal Express.  [Neuhaus 2 at 47-48; Sandhu at 42, 50-51, 68-70.]

92.    On May 23, 2002, Universal issued a press release falsely claiming it had received "Over $100,000,000 in Funding Commitments" from "two International Hedge Funds." [Exh 21.] Quoting Altomare, the release further stated: "To complete our corporate objectives, Universal obviously needs to jump start revenues, profits and logistical capabilities. Fortunately, that belief is shared by these investors, who have already invested over $5,000,000 with Universal over the past five years. . . .

93.    The $100,000,000 in the press releases refers to the letters of intent provided by Neuhaus and Sandhu. [Altomare 1 at 170-72.]

94.    Neuhaus prepared a letter dated March 22, 2002 which stated that Coldwater Capital, an entity Neuhaus controlled, had "authorized $5,000,000 in additional seed capital" for Universal Express and that it would "also provide up to $40,000,000 in long-term financing, if necessary." [Exh 22.]

95.    In sworn investigative testimony in 2004, Neuhaus admitted that the value of Coldwater's total assets at that time was far less than $45,000,000. [Exh 9a, pp. 175-177.] Neuhaus valued the investments of Coldwater as definitely below $30,000,000 and testified that he did not think they ever exceeded $20,000,000 during 2002. [Neuhaus 1 at 177.]

96.    Neuhaus also admitted that the statement in the letter that Coldwater Capital had been investing in Universal Express for the past 10 years was false. [Neuhaus 2 at 50.] Neuhaus testified that he put these and other false statements in the letter because Altomare asked him to. [Neuhaus 2 at 51.]

97.    Neuhaus also admitted that Coldwater did not have a Board of Directors, even though the letter refers to Coldwater's Board of Directors as having authorized the provision of capital to Universal Express. He did this also because Altomare asked him to. [Neuhaus 2 at 52.]

98.    The letter stated that Coldwater would provide Universal Express with an additional $40,000,000, if necessary. Neuhaus testified that Coldwater could not have lent or invested as equity $40,000,000 of its own money. Instead, Neuhaus said he could have arranged the money through other lenders. [Neuhaus 2 at 57.]

99.    Neuhaus testified that Coldwater is not a hedge fund and has never been. Neuhaus stated that it may have been Altomare who suggested referring to Coldwater as a hedge fund. [Neuhaus 2 at 65.]

100.    On May 22, 2002, Neuhaus provided another letter to Altomare on behalf of Coldwater. [Exh 26.] In this letter, Neuhaus stated that his "hedge fund and partners enthusiastically commit to the funding of Universal Express' strategic acquisition of Trailway's Bus Systems and will do whatever we can to help Universal Express close the transaction with Trailways." [Exh 26.]

101.   Although the May 22 letter stated that Coldwater and its partners "enthusiastically commit to the funding of Universal Express' strategic acquisition of Trailways Bus Systems," Neuhaus testified that they merely had a "preliminary interest" in funding the acquisition.  Neuhaus testified that Altomare asked him to use the stronger, committed language.  [Neuhaus 2 at 69-70.]

102.   At the time he received the letters from Neuhaus, Altomare had neither sought nor obtained any financial information on Coldwater.  [Altomare 1 at 147.]  Altomare did not know if Coldwater had assets of $5 million at the time he issued the May 23, 2002 press release.  [Altomare 1 at 150.]

103.   Neuhaus did not put any restrictions on Altomare's use of the March 22, 2002 letter.  [Altomare 1 at 159; Exh 22.]

104.   Neuhaus confirmed and reiterated the statements in the March 22 letter he knew to be false or misleading in a conversation with Gayle Ellsworth ("Ellsworth") from Trailways Bus Systems when she called to perform due diligence on the potential merger with Universal Express.  [Ellsworth at 59-61.]

105.   Altomare also put Neuhaus together with GE Capital as one of Universal Express' "funders" [Altomare 1 at 240-42.]

106.   On the day of the issuance of the May 23, 2002 release, Neuhaus, who had been selling approximately 500,000 Universal Express shares per day prior to May 23, 2002, sold more than three million shares before the close of trading.  He received total proceeds of $80,180.  [Exh 27a, 27b.]

107.   Altomare also requested Sandhu to prepare a letter in March 2002.  Altomare told Sandhu that he wanted the letter to show to a potential acquisition target which was in the transportation business.  [Sandhu at 42, 50-51.]

108.   On March 25, 2002, Sandhu wrote a letter to Altomare which he sent by fax.  The letter is on Azure Capital Holdings letterhead, which is where Sandhu was working at the time.  Sandhu testified that Altomare gave him the language to use in the letter.  [Sandhu at 41-43, 54-55, 72, Exh 23.]

109.   Sandhu's letter states "As investment advisor to Target Growth Fund Ltd., our Bermuda Exempted Mutual Fund, we have been investing in Universal Express for over six years.  During this time we have invested over US$3,000,000. We are happy to continue investing in Universal Express at this time based on your continued development.  As investment advisor, we have authorized up to US$7,500,000 in additional capital from the Fund for future approved acquisitions that Universal Express Inc. may desire to transact.  We are also prepared based upon due diligence and proper collateral to arrange an additional US$50,000,000 in long term financing for such an acquisition." [Exh 23.]

110.    At the time of the letter, Target Growth Fund had invested less than $500,000 in Universal Express through convertible debentures which were bought in 1999.  [Sandhu 46-47.]

111.    Sandhu testified that his statement that "we have invested US$3,000,000" referred to investments by Target Growth Fund, Spiga, International Investment Group or its fund.  [Sandhu at 49, 66-67, Exh 23.]

112.    Sandhu does not recall how much money Spiga had invested in Universal Express as of March 25, 2002.  [Sandhu at 66.]

113.    Business records Universal Express sent to its auditors show that as of March 25, 2002 "Spiga-Sandhu" had paid $100,000 to Universal Express.  These records also show that "Euroba Mr. Sandhu" had invested an additional $75,000 prior to that date.  [Exh 51a.]

114.    Sandhu does not recall how much money International Investment Group had invested with Universal Express as of March 25, 2002.  [Sandhu at 67.]

115.    International Investment Group's Equity Opportunities Fund had invested $175,000 in Universal Express convertible debentures prior March 25, 2002.  [Exh GS 10.]

116.    Sandhu stated that his reference to having "authorized up to US$7,500,000 in additional capital from the Fund" refers to an additional investment by Target Growth Fund.  [Sandhu at 51-52; Exh 23.]

117.    Target Growth Fund did not have $7.5 million sitting in an account to invest with Universal Express. Rather it had extremely large investors who, in Sandhu's opinion, would have been favorable to making such an investment if called upon.  [Sandhu at 52-53; 68-69.]

118.    At the time of Sandhu's letter dated March 25, 2002, Altomare did not have financial information on Target Growth Fund and he never sought any financial information about it.  [Altomare 1 at 161.]

119.    In May 2002, Altomare told Sandhu that he had signed a letter of intent to acquire Trailways Transportation Systems Inc. ("Trailways").  Altomare asked Sandhu to act as a reference.  [Sandhu at 58-59.]

120.    Sandhu saw a preliminary letter of intent between Universal Express and Trailways.  [Sandhu at 61-63.]

121.    Sandhu signed a second letter dated May 21, 2002 which he sent to Altomare to be used in connection with Universal Express acquisition of Trailways. Altomare told Sandhu that he had signed a letter of intent to acquire Trailways and asked Sandhu to act as a reference if anybody called.  [Sandhu 58-59, 69-70; Exh 24.]

122.    Altomare had created the language in the May 21, 2002 letter as a draft and sent it to Sandhu to use.  Sandhu modified that language and used it in his letter. [Sandhu at 71-72; Exh 24.]

123.    In the second letter dated May 21, 2002, Sandhu stated: "[B]ased upon the initial proposed letter of intent, we would be committed to the funding of the combined company.  Please let us know when the final terms have been negotiated so we can move our discussions to the next level."  [Exh 24.]

124.    He testified that the letter was not a formal commitment to provide funds to Universal Express.  [Sandhu at 69-71; Exh 24.]

125.    Sandhu authorized Altomare to give his name and contact information to Trailways as a part of the merger discussion between the two entities.  [Altomare 1 at 169.]

126.    Altomare gave the letters of intent he received from Sandhu to Trailways as part of his discussions with that company in 2002.  Altomare told Neuhaus and Sandhu that he was providing the letters to Trailways and neither voiced any objection.  [Altomare 1 at 163.]

127.    Ellsworth called Sandhu regarding the potential acquisition and to discuss experience with Universal Express and Mr. Altomare shortly after May 10, 2002, when she received the list of references from Altomare.  [Ellsworth at 54-55, 59; Sandhu at 59-61.]

128.    When Ellsworth called Sandhu, he identified himself and said he knew about the transaction and that he welcomed her call.  [Ellsworth at 55.]

129.    Ellsworth asked Sandhu about the March 25th, 2002 letter.  [Ellsworth at 55; Exh 164.]  Regarding the March 25, 2002 letter, Sandhu confirmed to Ellsworth that he had invested over $3 million with Mr. Altomare.  [Ellsworth at 56.]

130.    Ellsworth also asked Sandhu whether he had authorized additional capital of $7,500,000 and he replied that he had.  [Ellsworth at 56.]

131.    Ellsworth asked Sandhu whether he was prepared, based on due diligence and proper collateral to arrange an additional $50 million in long term financing and Sandhu responded that he had.  [Ellsworth at 57.]

132.    Following the issuance of the May 23, 2000 release, Spiga sold about 1 million shares of Universal Express stock on May 23 and an additional one million shares on May 24, generating proceeds of about $64,000.  ["Morgan Sandhu Aff., ¶ 16]

**July 10, 2002 Announcement of $460 million Letter of Intent**

133.    By July 9, 2002, Universal Express stock price had again drifted down to $0.02. [Exh 20a-20e.] On July 10, Universal Express, Altomare and Gunderson issued a press release announcing that "in addition to its previously announced $100,000,000 in venture funding commitments, . . . [Universal Express] has received a letter of intent from a funding institution for $460,000,000."  [Exh 28.]

134.    The release was based upon a letter Altomare obtained from a loan broker.  [Exh 29.]  The broker represented First International Exchange Group ("FIEG").  FIEG brokers deals between companies needing financing and a network of independent lenders.  [Crane at 25-26.]  It does not lend its own funds. [Crane at 42.] The broker wrote the letter based upon Altomare's representation that he had an agreement to purchase assets of Greyhound Corporation worth approximately $950,000,000 for 50 cents on the dollar.  [Crane at 13-14.]

135.    At the time of the July 10, 2000 release, there was no commitment by FIEG to arrange financing because the due diligence steps discussed with Altomare had not taken place and no lender had been located.  [Crane at 36-37.]  Altomare never delivered to the loan broker promised documents corroborating the value of the Greyhound assets or any arrangements for Universal Express to acquire them.  [Crane at 14.]  By approximately the end of 2002, Altomare informed the broker that the purported Greyhound deal was dead, and the letter of intent was therefore null and void.  [Crane at 37-38.]  The letter of intent was specific to the Greyhound deal.  [Crane at 38.]

136.    Altomare did not show a draft of July 2002 the release to Crane before issuing it. [Altomare 1 at 200-201.]

**November 21, 2002 Announcement of $25 Million in Additional Funding**

137.    On November 21, 2002, Universal Express issued a press release in which it announced "additional funding of $25,000,000 from Transamerica and New Millennium Financial."  Quoting Altomare, the release continued, "This funding, in addition to previously announced funding of $100,000,000 and $460,000,000 . . . is designed to advance our delivery network capabilities and obviously add revenues and personnel infrastructure. . . This $25,000,000 brings our total financial commitments to $585,000,000."  [Exh 30.]

138.    The November 2002 press release was based on letters from Transamerica Business Capital Corporation ("Transamerica") and New Millennium Financial Corp. ("New Millennium").  The Transamerica letter was merely a tentative "funding proposal letter" for a $20 million secured credit facility in connection with a proposed transaction between Universal Express and World Airways, Inc.  [Thompson at 30.]  The third

paragraph of Transamerica's letter explicitly stated: "It should be emphasized that the following is only a letter of proposal and it is not intended nor should it be construed as a commitment on the part of Transamerica Business Capital Corporation." [Exh 31.]

139.    The Transamerica proposal letter expired by its terms on December 12, 2002. [Exh 31.]

140.    Altomare never signed the proposal letter indicating his agreement to its terms. [Thompson at 27.]

141.    Altomare understood that the Transamerica proposal was limited to a potential transaction with World Airways. [Altomare 1 at 203-205.]

142.    At the time of the press release regarding the Transamerica proposal, Altomare knew that the proposal was subject to numerous unsatisfied conditions and that necessary due diligence had not been completed. [Altomare 1 at 212.]

143.    Altomare knew that the Transamerica proposal expired on December 6, 2002. [Altomare 1 at 212]. At the time of the November 21, 2002 press release which referenced Transamerica, Altomare knew there had been no extension of this deadline. [Altomare 1 at 220-221.]

144.    Under the terms of the proposal, Transamerica was to obtain a security interest in all of the assets of World Airways. [Exh 31; Thompson at 30-34.] The proposal was subject to a number of conditions and due diligence procedures, including Transamerica's review and valuation of the World Airways assets which were to secure the proposed financing [Exh 31; Thompson at 27, 31-34] These procedures were never commenced, because Universal Express and World Airways never moved beyond preliminary discussions in terms of any possible merger. [Thompson at 35-38]

145.    After becoming aware of the November 2002 press release, Transamerica stated in a December 15, 2002 letter to Altomare that the announcement "incorrectly states the facts" and that Transamerica "expects that the misstated facts in your press release will be promptly corrected." [Exh 33.] Altomare received the letter and forwarded it to Gunderson, but Universal Express failed to correct the release after receiving Transamerica's letter. [Altomare 1 at 219-220; Exh 33.]

146.    The New Millenium purported financing referred to in the November 2002 release was based upon a letter which was obtained by Neuhaus from a loan broker, who issued it with respect to the possible transaction between Universal Express and World Airways. [Bleich at 7-8, 27-39.] Altomare never met or spoke with the broker who issued the letter and never sought or obtained any financial or other information from the loan broker before issuing the press release. [Altomare 1 at 214-215.]

147.    The New Millennium letter was a tentative letter of intent, and not a commitment for a $5 million credit facility. [Exh 32.] Universal Express never provided any specific

information corroborating the possible transaction with World Airways to the loan broker, which was a predicate to the commencement of due diligence procedures. As a result, the loan broker never took any steps to pursue financing for the purported deal. Id. [Bleich at 41-48.]

**April 9, 2003 Announcement of $300 Million in Funding**

148.    On April 9, 2003, Universal Express issued a press release with the headline "USXP . . . Receives $300,000,000 For Transportation Funding." The release then asserted that the company "to-day received $300,000,000 in committed and approved funds and plans to acquire a soon to be announced nationally established transportation company. A Letter of Intent with that Company to be acquired has been signed . . . ." The release also observed: "During the developmental stages of any company, that company may receive financial commitments based on the founder's due diligence requirements . . . . To-day's commitment is far more definite and it is for that reason a press release has been issued." [Exh 34.]

149.    In December 2002, Universal Express had entered into a letter of intent with Coach USA for the sale of its assets to Universal Express. The proposed terms required Universal Express to pay half the purchase price ($300 million) in cash at the closing, which was to occur no later than March 31, 2003. [Exh 35.]

150.    In early March 2003, Millennium Capital, LLC ("Millennium Capital"), a loan broker in Texas, proposed to Universal Express a three-party financing program for the acquisition. Millennium's funding program required Universal Express to find a commercial bank that would bear the entire credit risk associated with Universal Express' ability to repay the $300 million. On March 28, 2003, Millenium Capital delivered a term sheet that was to expire in five days after delivery, or April 4, 2003. [Altomare 1 at 232-233; Exh 36a, 36b, 37.]

151.    When Altomare and Gunderson caused the issuance of Universal Express' April 9, 2003 press release, Universal Express' letter of intent with Coach USA had expired, and no bank willing to participate in the funding program had been found with respect to Millennium Capital's funding proposal. [Exh. 35, 36a-36b, 37; McGough 54-55.]

152.    Prior to issuing the release concerning Millennium Capital, Altomare did not seek or obtain any financial information from McGough about Millennium Capital. [Altomare 1 at 234-35.]

153.    At the time of the release, Millennium Capital did not lend funds of its own and did not have any funds to lend to Universal Express. [McGough at 10-11.]

**Fraudulent Statements Regarding Private Postal Network Membership**

154.    Between April 2001 and March 2004, in periodic reports with the Commission and in press releases, Universal Express falsely stated that its business operations

included various services and products being sold throughout a private postal network, called WorldPost, which had 8,000, and in later filings 9,000, members. [Exh 52a, 52b, 54, 55.] For example, in a press release dated May 22, 2003, Universal Express announced that "the WorldPost Network of over 9,000 independently owned and operated private postal stores will continue its mission of improving cash flows and building national recognition for members of its private postal system." The release projected increased revenues for Universal Express of $9,000,000 annually from new products and services being installed in or provided through member stores. [Exh 54.]

155. These statements were false. Altomare testified that any postal store existing in the United States was a member of Universal Express' WorldPost Network merely by virtue of its existence, unless it affirmatively advised Universal Express that it did not wish to be a member. [Altomare 1 at 249-50.] No arrangements existed between these purported WorldPost Network members and Universal Express. The company's website listed as members stores which, when approached by Universal Express personnel, had no knowledge of, or intention to enter into, any business arrangement with Universal Express. [Stanek at 26-27.]

156. During the time period at issue in this case, Universal Express did not have the economic strength to buy companies larger than itself. [Altomare 1 at 146.]

157. In 2001, Universal Express generated a net loss from operations of $3,177,277. It had cash of $39,316, and other assets consisting primarily of various related party receivables valued at a total of $1,755,016, with liabilities of $3,554,542. [Exh 240 (2001 Form 10-KSB), pp. 9-11.]

158. For the fiscal year ended June 30, 2001, Universal Express generated revenues of $1,780 from business operations and received $350,000 in stock sales proceeds from Mendiratta, Neuhaus and Spiga. [Exh 240, p. 10; Matticks USXP Aff. ¶ 3, Atts. A, B, C.]

159. During fiscal 2002, Universal Express generated a net loss from operations of $3,525,238. It had cash of $31,342, and other assets consisting primarily of related party receivables, a "loan to officer" and goodwill totaling $2,373,887, with liabilities of $2,355,616. [Exh 237 (2002 Form 10-KSB), pp. 14-16.]

160. During fiscal 2002, Universal Express generated revenues of $431,199 from business operations and received $1,991,500 in stock sales proceeds from Mendiratta, Neuhaus and Spiga. [Exh 237, p. 15; Matticks USXP Aff. ¶ 3, Att. A, B, C.]

161. During fiscal 2003, Universal Express generated a net loss from operations of $6,523,624. It had cash of $242,037, and other assets consisting primarily of related party receivables, a "loan to officer" and goodwill totaling $2,565,519, with liabilities of $2,434,090. [Exh 180 (2003 Form, 10-KSB, pp.19-22.]

162.    During fiscal 2003, Universal Express generated revenues of $2,435,540 from business operations and received $2,771,328 in stock sales proceeds from Mendiratta, Neuhaus and Spiga.  [Exh 180, p. 15; Matticks USXP Aff. ¶ 3, Att. A, B, C.]

163.    From April 1, 2001 through March 30, 2004, Universal Express received a total of $9,959,828 in transfers from accounts controlled by or affiliated with Mendiratta, Neuhaus, Spiga and Sandhu.  [Matticks USXP Aff. ¶ 3, Att. A, B, C.]

164.    Using the IRS rates of interest on tax underpayments to this amount, the interest due on $9,949,828 in proceeds through August 31, 2006 is $1,522,924.  The total of disgorgement plus interest is $11,482,752.  [Matticks USXP Aff. ¶4, Att. D.]

165.    From April 1, 2001 through March 30, 2004, Universal Express transferred $1,419,025.21 to Altomare.  [Matticks USXP Aff. ¶5, Att. E.]

166.    The interest due on $1,419,025.21 in proceeds through August 31, 2006 is $216,978.  The total of disgorgement plus interest is $1,636,004.  [Matticks USXP Aff. ¶ 65, Att. F.]

167.    From April 1, 2001 through March 30, 2004 Universal Express transferred $361,317 to or for the benefit of Chris Gunderson.  [Matticks USXP Aff. ¶7, Att. G.]

168.    The interest due on $361,317 through August 31, 2006 is $55,248.  The total of disgorgement plus interest is $416,565.  [Matticks USXP Aff., ¶8, Att. H.]

169.    Universal Express reported 345,923,232 shares outstanding as of December 31, 2002.  [Exh 52a.]

170.    As of December 31, 2002, Universal Express had issued 138,122,345 shares to Neuhaus.  [Exh 11d.]  Neuhaus' shares represented approximately 40 percent of the outstanding shares.  (138,122,345/345,923,232=.3992)

171.    As of December 31, 2002, Universal Express had issued 10,696,000 shares to Mendiratta's nominees.  [Exh 11a.]  Mendiratta's shares represented approximately 3 percent of the outstanding shares.  (10,696,00/345,923,232=.0309)

172.    As of December 31, 2002, Universal Express had issued 75,572,428 shares to Spiga.    [Exh 11c.]    Spiga's shares represented approximately 20 percent of the outstanding shares.  (75,572,428/345,923,232=.2097)

Dated: August 18, 2006

Respectfully submitted,

/s/ Julie K. Lutz
Julie K. Lutz
Attorney for the Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 18, 2006, I electronically filed the foregoing
PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS UNIVERSAL
EXPRESS, INC., RICHARD A. ALTOMARE AND CHRIS GUNDERSON to the Clerk
of the Court for filing and uploading to the CM/ECF system which will send notification
to the following as indicated:

Arthur Tifford, Esq.
Tifford & Tifford, P.A.
1385 NW 15th Street
Miami, FL 33125
tiffordlaw@bellsouth.net

John A. Hutchings, Esq.
Dill Dill Carr Stonebraker & Hutchings,
PC
455 Sherman Street, Suite 300
Denver, Colorado 80203
jhutchings@dillanddill.com

John B. Harris
Stillman & Friedman
425 Park Avenue
New York, NY 10022
lshalov@stillmanfriedman.com
jharris@stillmanfriedman.com

Harry H. Wise III, Esq.
500 Fifth Avenue, Suite 1650
New York, NY 10110
hwiselaw@aol.com

Marvin Pickholz, Esq.
Jason Pickholz, Esq.
Akerman Senterfitt LLP
335 Madison Avenue, Suite 2600
New York, NY 10017
Jason.pickholz@akerman.com

s/ Julie K. Lutz
Julie K. Lutz