UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                               :

U.S. SECURITIES AND EXCHANGE     :
COMMISSION,                        :
                               :
              Plaintiff,       :
                               :         04 Civ. 2322 (GEL)
      -against-                 :
                               :         **OPINION AND ORDER**

UNIVERSAL EXPRESS, INC., RICHARD A.  :
ALTOMARE, CHRIS G. GUNDERSON, MARK  :
S. NEUHAUS, GEORGE J. SANDHU, SPIGA,  :
LTD., and TARUN MENDIRATTA,      :
                               :
             Defendants.     :
                               :
-------------------------------------------------------------x

Julie K. Lutz and Leslie J. Hughes, Securities and
Exchange Commission Central Regional Office,
Denver, Colorado, and Robert B. Blackburn,
Securities and Exchange Commission Northeast
Regional Office, New York, New York, for plaintiff.

Barry Schaevitz, Jacob Medinger & Finnegan, LLP,
New York, New York, and Arthur W. Tifford, Tifford
and Tifford, Miami, Florida, for defendants Universal
Express, Inc., Richard A. Altomare, and Chris G.
Gunderson.

John B. Harris and Lara Shalov Mehraban, Stillman,
Friedman & Schectman, P.C., New York, New York,
for defendant Mark S. Neuhaus.

Jason Pickholz, Marvin Pickholz, and Jeremy A.
Shure, Akerman Senterfitt LLP, New York, New
York, for defendant George S. Sandhu.

John A. Hutchings, Dill, Dill, Carr, Stonbraker &
Hutchings, P.C., Denver, Colorado, and Harry H.
Wise, New York, New York, for defendant Tarun
Mendiratta.

GERARD E. LYNCH, District Judge:

The Securities and Exchange Commission ("SEC") has accused Universal Express, Inc., Richard A. Altomare, and Chris G. Gunderson (collectively, "Organizational Defendants") and Mark S. Neuhaus, George J. Sandhu, and Tarun Mendiratta (collectively, "Consultant Defendants") of violating certain provisions of the federal securities laws.  It now seeks summary judgment against all the defendants on claims that they offered or sold unregistered securities in violation of Section 5 of the Securities Act of 1933 and against all defendants except Mendiratta on claims that they engaged in fraud relating to the purchase, offer, or sale of securities in violation of Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  The Organizational Defendants cross-move for summary judgment with respect to Section 5 liability, and Neuhaus and Sandhu cross-move for summary judgment as to all allegations.  For the following reasons, the SEC's request for partial summary judgment against the Organizational Defendants is granted on all claims, and the Organizational Defendants' cross-motion is denied; its motion for summary against Neuhaus judgment is granted as to liability under Section 5 but denied in all other respects; and all the remaining requests for summary judgment are denied.

## BACKGROUND

I.    <u>Defendants</u>

Universal Express is a publicly traded Nevada corporation purportedly involved in shipping and transportation, and it maintains its principal place of business in Florida and an

office in New York City.[1]  Richard A. Altomare has been its chief executive officer and director

since 1992, and he currently is the company's sole officer and director.  Chris G. Gunderson is a

lawyer and has worked for Universal Express as its in-house counsel since 1995.

Mark S. Neuhaus trades securities and apparently was once a professional race car driver.

He formed and manages the company Coldwater Capital, LLC, and also helped form the

partnership, H&N LLC, the brokerage accounts of which were involved in selling Universal

Express shares.  He also formed and controlled an entity called Perfect Line Investments, which

also traded Universal Express shares.

George J. Sandhu is an investment advisor.  During times relevant to this case, he held

some degree of trading authority over certain brokerage accounts belonging to Spiga, Ltd., a

company that sold Universal Express shares and to which Sandhu provided investment advice.

Sandhu also advised a mutual fund called Target Growth Fund Ltd.

Tarun Mendiratta apparently is the nephew of two individuals, Sabita Dhingra and Veena

Kaila.  During relevant times he was authorized to buy and sell securities in brokerage accounts

belonging to Dhingra and Kaila, which received and sold Universal Express shares.  Mendiratta

is also the president of Jensen Pacific, a Nevada corporation that received funds during this time

from the accounts of Dhingra and Kaila.

---

[1] The facts described in this decision are undisputed, unless otherwise noted.  Neuhaus's
contention that the testimony he gave during the SEC's pre-litigation investigation cannot be
used against him on summary judgment is meritless.  To the contrary, "sworn testimony taken in
an SEC investigation may be used . . . on a motion of summary judgment."  SEC v. Research
Automation Corp., 585 F.2d 31, 34 n.5 (2d Cir. 1978).  His investigation testimony clearly
would be admissible at trial as party admissions, and Neuhaus does not dispute that he testified
under oath while represented by counsel or that he has had access to the transcript of his
testimony.  Moreover, Neuhaus does not actually seem to contest the substance of that
testimony.  (See Neuhaus Opp. at 3 n.1.)

3

II.    <u>Section 5 Claims</u>

Between April 2001 and January 2004, Universal Express issued more than 500 million of its shares to Neuhaus, Spiga, Dhingra, and Kaila.  The shares were issued pursuant to written agreements, drafted by Gunderson and signed by Altomare, exchanging stock purportedly for consulting services.  (<u>See</u> P. Exs. 7a-d.)  No securities-registration statement was filed by Universal Express between January 1, 2001, and March 31, 2004, except for two S-8 forms registering a total of 50 million shares – one on May 7, 2001, for 30 million shares, and another on January 22, 2002, for 20 million shares.[2]  There is no evidence that any shares were issued under the S-8 forms.

Of the more than 500 million shares, 270,698,345 were issued to Neuhaus pursuant to letters, drafted by Gunderson and reviewed and signed by Altomare, informing the company's transfer agent that the shares were "to be free trading under an S-8 registration."  (P. Exs. 257a-ii.)  Pursuant to similar letters containing the "S-8 registration" phrase, Universal Express issued 152,389,115 shares to Spiga, 40,954,000 to Kaila, and 37,903,000 to Dhingra.  (<u>See</u> P. Exs. 260, 261, 290.)  During this time, Universal Express also issued 26,233,248 restricted shares to

---

[2] The SEC's Form S-8 provides an abbreviated registration procedure for securities offered or sold to an issuer's employees, including consultants, under certain conditions.  <u>See</u> SEC website, "General Instructions, A. Rule as to Use of Form S-8," at http://www.sec.gov/about/forms/forms-8.pdf.  S-8 forms may be used to register resales of shares privately issued to employees or consultants, but in such cases the form must include a reoffer prospectus that names the selling shareholders.  <u>See</u> "General Instructions, Use of Form S-8;" <u>see also</u> <u>SEC v. Cavanagh</u>, 155 F.3d 129, 134 n.22 (2d Cir. 1998).  The May 2001 and January 2002 S-8 forms filed by Universal Express do not name any of the shares' recipients or the defendants as selling shareholders, and they do not contain reoffer prospectuses.

Neuhaus and 6,310,625 to Spiga.[3]

On approximately April 12, 2004, several months after the last issuance based on a letter mentioning "S-8 registration," the SEC advised Universal Express's transfer agent that she might be charged with participating in the issuance of unregistered securities. The transfer agent informed Gunderson of the SEC's communication and asked him about the legality of the issuance of the shares. On April 23, 2004, Gunderson wrote to the transfer agent stating that "the shares in question were properly issued pursuant to and in compliance with the 1994 Stock Option Plan of Packaging Plus Services, Inc." (P. Ex. "Drayer Wells Letter.")

The 1994 Stock Option Plan ("Option Plan") had been attached to the bankruptcy reorganization plan, judicially approved in February 1994, of Universal Express's previous incarnation, Packaging Plus Services, Inc. The Option Plan authorized the company to issue shares upon the exercise of an option to purchase by "officers, directors, employees, consultants, franchisees and professional advisors of the Company." (P. Ex. 248.) The maximum number of shares to be issued under the Option Plan was 1,250,000 in total, although that limit could be changed "by reason of any recapitalization, stock split or stock dividend," at the discretion of the plan's administrators. (Id.) The number of authorized options was reduced to 104,167 after a reverse stock split in June 1997, and there is no indication of any other change of that number during the relevant time. Under the Option Plan, all options issued were to be evidenced by an option agreement and written notice by individuals intending to exercise an option stating,

---

[3] The SEC defines "restricted securities" as "securities acquired in unregistered, private sales from the issuer . . . . Investors typically receive restricted securities through . . . employee stock benefit plans, as compensation for professional services, or in exchange for providing . . . start-up capital to the company." SEC website, http://www.sec.gov/investor/pubs/rule144.htm; see also 17 C.F.R. § 230.144(a)(3).

among other information, their investment intent; the record contains no such agreements or notices. The consulting agreements between Universal Express and Neuhaus, Spiga, Dhingra, and Kaila, do not mention the Option Plan or any possibility of exercising options. Universal Express stated in its annual reports to the SEC from 2001 through 2003, during the period of the subject transactions, that "[t]he [Option Plan] provides for the issuance of up to 104,167 shares of common stock . . . No options have been granted under the plan as of [this date]." (P. Exs. 240, 237, 180.)

Between April 2001 and March 2004, Universal Express issued 270,698,345 "S-8 registration" shares to Neuhaus, and he deposited nearly 235 million of them into brokerage accounts he opened in the names of Coldwater Capital, LLC, H&N LLC, and Perfect Line Investments. He also deposited over 5.5 million restricted shares into these accounts during the same period. In this time, Neuhaus sold 259,649,167 shares of Universal Express for proceeds of $9,786,589. From April 2002 to November 2003, $5,861,488 was transferred from bank accounts controlled by Neuhaus to Universal Express. At one point a brokerage firm where Coldwater Capital maintained accounts wrote Neuhaus to ask about the proper trading status of the Universal Express stock being sold; that firm subsequently closed the accounts. Neuhaus never checked with the SEC whether a registration statement had been filed as to the shares issued to him.

Spiga, the company associated with defendant Sandhu, sold 134,490,539 of the Universal Express shares transferred to it during this time for proceeds of $3,970,280. It transferred 9,644,333 of the shares it received to an account of Target Growth Fund, from which over 8 million of the shares were sold for $93,778. Sandhu advised Spiga about the amount, timing,

and price of certain Universal Express stock sales. During the period covering these sales, Spiga made payments to Universal Express totaling $2,604,880.

All of the "S-8 registration" shares issued to Mendiratta's aunt Dhingra were deposited into accounts at brokerage firms including NevWest Securities Corporation. Between September 1, 2002, and September 30, 2003, these accounts sold 35,703,000 shares of Universal Express for proceeds of $1,230,234. The "S-8 registration" shares issued to Mendiratta's aunt Kaila were deposited in a NevWest brokerage account; they were sold for proceeds of $2,940,009. Dhingra's and Kaila's accounts also purchased shares of Universal Express – 905,000 shares by Dhingra and 172,000 by Kaila.

Mendiratta was authorized to buy and sell securities in Dhingra and Kaila's brokerage accounts. The relevant representative of NevWest has testified that he received sales instructions for Dhingra's and Kaila's accounts only from Mendiratta; he never spoke with either account-owner about sales of Universal Express stock. From October 2002 to December 2003, NevWest was instructed to transfer money from Dhingra's accounts to third parties – over $1 million together to Jensen Pacific, an Annette Hunter, and a Joseph Powers, and $75,000 to Mendiratta himself. Mendiratta signed at least one letter, dated January 7, 2003, authorizing a transfer of funds from Dhingra's account to Jensen Pacific, a company of which he is president (P. Ex. 135); Jensen Pacific received at least $500,000 from Dhingra. Transfers were similarly ordered from Kaila's NevWest account: from October 2003 to March 2004, $805,800 to Jensen Pacific, and $160,000 together to Hunter and a Gerald Kay.

Within the relevant period Jensen Pacific transferred $1,008,460 to Universal Express. Mendiratta signed checks and wire transfer orders directing payment of over $1 million from

Jensen Pacific to Universal Express.  For instance, a check he signed on December 30, 2003, for $260,000 drawn on Jensen Pacific's Bank West account and made payable to Universal Express, was deposited into Universal Express's account at First Union National Bank.  The other transferees from Dhingra and Kaila – Hunter, Powers, and Kay – transferred some $475,000 total to Universal Express, also near the time of their receipt of the funds from Dhingra and Kaila.

III.    Statutory Fraud Claims

The SEC accuses all defendants but Mendiratta of committing federal securities fraud in connection with certain press releases issued by Universal Express about its financing, expansion, or other business operations.  Gunderson and Altomare each drafted or edited the press releases and then reviewed and approved them before their release.  Each release was immediately followed by an increase in Universal Express's share price and a significant jump – by  377 percent at the lowest and 4,770 percent at the highest – in its trading volume.

Universal Express's May 23, 2002, press release announced that it had "receive[d] over $100,000,000 in funding commitments" from "two International Hedge Funds" to finance acquisitions.  (P. Ex. 21.)  According to a quote of Altomare in the release, these hedge funds had "already invested over $5,000,000" with the company in the preceding five years.  (Id.) Prior to issuance of this press release, Altomare had asked Neuhaus and Sandhu to provide letters pledging funding to Universal Express.  According to the undisputed testimony of Neuhaus and Sandhu, Altomare essentially created the contents of these letters.  None of the releases actually mentions the names of any of the Consultant Defendants or of any individuals or entities allegedly associated with them.  Altomare has testified that, at the time, he neither possessed nor had sought to obtain any financial information about the entities purporting to

commit funding in the letters essentially created by him.

Neuhaus provided a letter – dated March 22, 2002, and addressed to Altomare – as the "Managing Member" of Coldwater Capital, stating that Coldwater Capital had "been very happy with its investments in Universal Express, investing over $2,000,000 in the company over the past 10 years" and stating that Coldwater's "Board of Directors has authorized $5,000,000 in additional seed capital for any acquisitions Universal Express may wish to undertake." (P. Ex. 22.) The letter states that Coldwater "will also provide up to $40,000,000 in long-term financing, if necessary." (Id.) However, Coldwater had not been investing in Universal Express for 10 years and had actually invested some $500,000 less than stated, it did not have $40 million on hand at the time, and it did not have a board of directors.

In a second letter, dated May 22, 2002, and also addressed to Altomare, Neuhaus on behalf of Coldwater Capital stated that his "hedge fund and partners enthusiastically commit to the funding of Universal Express's strategic acquisition of Trailway's Bus Systems and will do whatever we can to help . . . close the transaction." (P. Ex. 26.) Altomare told Neuhaus that his letters would be provided to Trailways for merger discussions. Neuhaus reiterated the statements in his letters to a representative of Trailways who called to discuss a potential merger with Universal Express. He later told the SEC that he had only a "preliminary interest" in, rather than enthusiasm for, the Trailways acquisition, but that he drafted stronger language at Altomare's behest. (Neuhaus SEC Tr. 2 at 69-70.) The day the May 23, 2002, press release issued, Neuhaus, who had previously been selling approximately 500,000 shares of Universal Express per day, sold more than 3 million shares, for proceeds totaling over $80,000.

Also at Altomare's request, Sandhu provided him a letter, dated March 25, 2002, stating, "As investment advisor to Target Growth Fund Ltd., . . . we have . . . invested over []$3,000,000 . . . . [and] are happy to continue investing in Universal Express." The letter continued, "[W]e have authorized up to []$7,500,000 in addition capital from the Fund for future approved acquisitions [of] Universal Express . . . [and] are also prepared based upon due diligence and proper collateral to arrange an additional []$50,000,000 in long term financing for such an acquisition." (P. Ex. 23.)

In May 2002, as he had with Neuhaus, Altomare solicited a letter from Sandhu expressing funding support for a potential acquisition of Trailways, for which acquisition he told Sandhu a letter of intent had been signed. Altomare drafted the May 21, 2002, funding letter, which Sandhu signed, stating: "based upon the initial proposed letter of intent, we would be committed to the funding of the combined company. Please let us know when the final terms have been negotiated so we can move our discussions to the next level." (P. Ex. 24.) Sandu permitted Altomare to name him as a reference to Trailways, and in a conversation with a Trailways representative Sandu confirmed the statements in his March and May 2002 letters. On the day of the May 23, 2002, press release and the day after, Spiga sold a total of approximately 2 million Universal Express shares for proceeds of about $64,000.

On July 10, 2002, Universal Express issued a press release announcing that it had "received a letter of intent from a funding institution for $460,000,000." (P. Ex. 28.) In a June 27, 2002, letter address to Altomare, a loan broker had written, "please accept this document as our *letter of intent* to grant you Financing in the amount of, not to exceed, Four Hundred Sixty Million Dollars ($460,000,000) USD upon mutually acceptable terms and conditions." (P. Ex.

29, emphasis in original.)  That broker wrote the letter based on his understanding, after speaking

with Altomare, that Universal Express had an agreement to purchase $950 million's worth of

assets of another corporation at half price.  There is no evidence in the record that such an

agreement actually existed.

On November 21, 2002, Universal Express issued a press release announcing that it had

received "additional funding of $25,000,000 from Transamerica and New Millennium Financial"

and stating that "[t]his $25,000,000 brings our total financial commitments to $585,000,000."

(P. Ex. 30.)  Yet Transamerica had explicitly stated conditions precedent in its November 19,

2002, letter to Altomare proposing $20 million in financing, and had stressed that the letter "is

only a letter of proposal and it is not intended nor should it be construed as a commitment."  (Id.)

After learning of the November 21 press release, Transamerica wrote Altomare that the release

"incorrectly states the facts" and that it "expects that the misstated facts . . . will be promptly

corrected."  (P. Ex. 33.)  Altomare received Transamerica's letter and forwarded it to Gunderson,

but no correction issued.  The New Millennium letter of November 20, 2002, similarly stated

various conditions for extending $5 million in funding.  (P. Ex. 32.)  There is no evidence that

any of the conditions for receiving funds from Transamerica or New Millennium was ever met,

or that any basis existed outside the proposal letters for representing these entities' intentions.

Universal Express made another funding announcement on April 9, 2003, claiming that it

had received "$300 million in committed and approved funds . . . to acquire a soon to be

announced nationally established transportation company."  (P. Ex. 34.)  It stated that a letter of

intent had been signed with the company to be acquired.  The release quotes Altomare as

representing that the receipt of funds was "far more definite" than if contingent on "due

diligence requirements," and that "our legal counsel" had deemed it "appropriate for the benefit of the general public, our shareholders and all others involved" to make the announcement despite the possibility of "unexpected setbacks." (Id.) Yet there is no evidence that Universal Express ever fulfilled the condition stated in the letter of intent – payment of $300 million of the purchase price no later than March 31, 2003, more than a week before the press release issued – to sustain the deal, and there is no evidence that such payment would have been possible.

Universal Express issued another press release on October 12, 2003, announcing that it had signed a contract to purchase North American Airlines, which "will add over $160,000,000 in revenues." (P. Ex. 41.) The release, quoting Altomare, stated that "[w]e have paid a $1,000,000 deposit . . . and the 45 day due diligence process has begun." (Id.) Neuhaus had emailed the president of the airline several days earlier, claiming that Universal Express would "have to make some sort of public filing and or announcement" to validate the funding of the deposit and telling him that Altomare would contact him about any release. (P. Ex. 40.) Neuhaus reviewed a draft of the press release announcing payment of the deposit. He had financed the deposit through a series of transfers and loans involving his shares of Universal Express. The first trading day after the statement was publicly released, Neuhaus sold 1 million shares of Universal Express stock, continuing to sell that amount on average every day for several weeks for proceeds of $1 million.

In addition to announcing purported expansions and funding commitments, Universal Express also publicly projected sizeable revenues from businesses with which it actually had no connection. In a May 22, 2003, press release, for instance, Universal Express anticipated receiving $9 million of revenue annually from "over 9,000 independently owned and operated

private postal stores" in its "WorldPost Network." (P. Ex. 54.) But there is no evidence that Universal Express actually had a relationship with any such store, and, indeed, Altomare has explained that its "network" consisted of every postal store existing in the United States that had not somehow known to opt out of it. (See Altomare Dep. 1 at 249-50.)

In 2001, the beginning of the time period relevant to this case, Universal Express operated at a net loss and had liabilities that outweighed its assets by $1,799,526. From 2001 to 2004, it generated a total of $2,868,519 in revenues from business operations and received a total of $15,072,656 from actors connected with the stock sales at issue in this case.

## DISCUSSION

I.    Legal Standards

    A.    Summary Judgment

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party. Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). The moving party bears the burden of establishing the absence of any genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). In deciding a summary judgment motion, the court must "resolve all ambiguities and draw all reasonable references in the light most favorable to the party opposing the motion." Cifarelli v. Vill. Of Babylon, 93 F.3d 47, 51 (2d Cir. 1996). In addition, the court is not to assess credibility or weigh the evidence at this stage. Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996).

The nonmoving party, however, may not rely on "conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  It "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd.,  v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and must make a "showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

B.    Section 5

Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, prohibits any person from offering or selling a security in interstate commerce unless it is registered.  To prove a violation of Section 5 requires establishing three prima facie elements: (1) That the defendant directly or indirectly sold or offered to sell securities; (2) that no registration statement was in effect for the subject securities; and (3) that interstate means were used in connection with the offer or sale. Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 124 n.4 (2d Cir. 1998); SEC v. North Am. Research & Dev't Corp., 424 F.2d 63, 65 n.1 (2d Cir. 1970).  Registration of a security is "transaction-specific," in that the requirement of registration applies to each act of offering or sale; proper registration of a security at one stage does not necessarily suffice to register subsequent offers or sales of that security.  SEC v. Cavanagh, 155 F.3d 129, 133 (2d Cir. 1998).

Liability for violations of Section 5 extends to those who have "engaged in steps necessary to the distribution of [unregistered] security issues." SEC v. Chinese Consol. Benev. Ass'n, Inc., 120 F.2d 738, 741 (2d Cir. 1941); see also SEC v. Murphy, 626 F.2d 633, 650-51

14

(9th Cir. 1980).  An indirect participant, who has not himself passed title to an unregistered

security, may nevertheless be liable for its offer or sale.  The "necessary participant test . . .

essentially asks whether, but for the defendant's participation, the sale transaction would not

have taken place" – in other words, whether the defendants' acts were a "substantial factor in the

sales transaction."  Murphy, 626 F.2d at 651-52.  A plaintiff need not also show scienter to prove

a Section 5 violation.  Aaron v. SEC, 446 U.S. 680, 714 n.5 (1980); SEC v. Spectrum, Ltd., 489

F.2d 535, 541-42 (2d Cir. 1973); Swenson v. Engelstad, 626 F.2d 421, 424 (5th Cir.1980) ("The

Securities Act of 1933 imposes strict liability on offerors and sellers of unregistered securities . .

. regardless of . . . any degree of fault, negligent or intentional, on the seller's part") (citation

omitted).

        A defendant may rebut a prima facie case by showing that the securities involved were

not required to be registered.  SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953); North Am.

Research, 424 F.2d at 71-72.

        C.    Antifraud Statutes

        Defendants are also charged with violating the antifraud provisions of the federal

securities law.  To establish liability under Section 10(b) of the Securities Exchange Act, 15

U.S.C. § 78j(b), and its associated Rule 10b-5, 17 C.F.R. § 240.10b-5, the SEC must prove, as

relevant here, that a defendant (1) made a material misstatement or employed a fraudulent

scheme or device, (2) indicating an intent to deceive or defraud – in other words, with scienter,

(3) in connection with the purchase or sale of a security.  See, e.g., SEC v. Monarch Funding

Corp., 192 F.3d 295, 308 (2d Cir. 1999); SEC v. First Jersey Securities, Inc., 101 F.3d 1450,

1467 (2d Cir. 1996); Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1031 (2d Cir. 1993).

15

Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), prohibits essentially the same conduct with respect to the offer or sale of securities, and to prove a violation of it requires the same elements. <u>Monarch Funding</u>, 192 F.3d at 308. Scienter need not be proven, however to establish a violation of Sections 17(a)(2) and (3), 15 U.S.C. § 77q(a), which respectively prohibit a person in the offer or sale of securities from obtaining money or property by material misrepresentation or omission and from engaging in any act that operates as a fraud or deceit upon the purchaser. See <u>Aaron</u>, 446 U.S. at 697.

To assess allegations against certain defendants in this case requires setting a threshold of conduct where primary liability for fraud may be imposed against indirect actors. The question of the threshold has not infrequently occupied the federal courts. <u>See</u>, <u>e.g.</u>, <u>In re Salomon Analyst AT&T Litigation</u>, 350 F. Supp. 2d 455, 472-74 (S.D.N.Y. 2004) (discussing Second Circuit decisions establishing threshold). The Second Circuit has held that, to be held liable for a material misrepresentation, "a defendant must actually make a false or misleading statement[, although] . . . . [t]here is no requirement that the alleged violator directly communicate misrepresentations to [investors]." <u>Wright v. Ernst & Young LLP</u>, 152 F.3d 169, 175 (2d Cir. 1998) (citations and internal quotation marks omitted; third brackets in original). Where the defendant clearly is a "secondary actor," he "cannot incur primary liability . . . for a statement not attributed to the actor at the time of its dissemination." <u>Id</u>. On an allegation of participation in a fraudulent scheme, primary liability "may be imposed not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration." <u>First Jersey</u>, 101 F.3d at 1471; <u>see also</u> <u>Salomon</u>, 350 F. Supp. 2d at 472-73 ("plaintiffs here charge [defendant] with a violation of subsections (a) and (c) of Rule 10b-5,

16

which describe causes of action for behavior that constitutes participation in a fraudulent

scheme, even absent a fraudulent statement by defendant.").

 Information misrepresented or omitted is material if there is a "substantial likelihood that

a reasonable person would consider it important in deciding whether to buy or sell shares."

Azrielli v. Cohen Law Offices, 21 F.3d 512, 518 (2d Cir. 1994); see also Basic Inc. v. Levinson,

485 U.S. 224, 241 (1988).  The fact need not alone have a dispositive effect on the reasonable

investor's decision; for omissions to be material, for instance, there need only be a "substantial

likelihood" that "the omitted fact would have been viewed by the reasonable investor as having

significantly altered the 'total mix' of information made available," TSC Industries, Inc. v.

Northway, Inc., 426 U.S. 438, 449, 449 n.10 (1976) (explaining the "general standard of

materiality" that promotes the "protection of investors").

 To prove violations of Section 10(b), Rule 10-b5, and Section 17(a)(1), the SEC must

establish a defendant's scienter.  See Aaron, 446 U.S. at 697.  Scienter in the context of

securities fraud violations "refers to a mental state embracing intent to deceive, manipulate, or

defraud" investors, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976), or recklessness

amounting to such scienter.  See, e.g., Healey v. Chelsea Resources, Ltd., 947 F.2d 611, 618 (2d

Cir. 1991); IIT, an Int'l Invest't Trust v. Cornfeld, 619 F.2d 909, 923 (2d Cir. 1980); Rolf v.

Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 46-47 (2d Cir. 1978) (applying recklessness

standard to charge of aiding and abetting).  The deceptive intent and recklessness standards

relate in that, "[t]here is of course no difficulty in finding the required intent to mislead where it

appears that the speaker believes his statement to be false.  Likewise, there is general agreement

that it is present when the representation is made without any belief as to its truth, or with

reckless disregard whether it be true or false." Rolf, 570 F.2d at 45 (citation omitted). In other words, "heedlessness and reckless disregard of consequence may take the place of deliberate intention" in the context of securities fraud. Id. at 46. Representing information as true while knowing it is not, recklessly misstating information, or asserting an opinion on grounds so flimsy as to belie any genuine belief in its truth, are all circumstances sufficient to support a conclusion of scienter. Id. at 48.[4]

Proof of scienter is not required to establish violations of Section 17(a)(2) or 17(a)(3) of the Securities Exchange Act. Aaron, 446 U.S. at 697. Still, where the SEC seeks injunctive relief on these bases, as it does here, the lack of a scienter requirement "is not to say . . . that scienter has no bearing at all on whether a district court should enjoin a person." Id. at 701. In the evaluation of whether there is a "sufficient evidentiary predicate" for an injunction, the "degree of intentional wrongdoing evident in a defendant's past conduct" is an "important factor." Id. Scienter, or the lack of it, may be taken as an aggravating or mitigating factor in a court's exercise of equitable discretion on the question of injunctive relief. Id.

II.    Organizational Defendants

   A.    Section 5

There can be no dispute that the prima facie elements of the Organizational Defendants' Section 5 liability have been met. These defendants do not contest, as on the existing record

---

[4] The scienter of a company's officer may be attributed to the company, where, as here, there is no dispute that the officer was acting within the scope of his apparent authority, Adams v. Kinder-Morgan, Inc., 340 F.2d 1083, 1106-07 (10th Cir. 2003) (citations omitted); in the securities fraud context, as in other spheres, "a corporation can only act through its employees and agents." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001) (citation omitted) .

they cannot, that they used interstate means to offer Universal Express securities for sale.  A wealth of documentary and testimonial evidence clearly demonstrates that they personally authorized and directed the issuance of the subject securities.  See, e.g., P. Exs. 257a-ii, 260, 261, 290; Drayer Dep. 2 at 136-37.  These defendants do not dispute that the securities they issued were then sold into the market.  There is no doubt that, without their actions, "the sale transaction[s] would not have taken place."  Murphy, 626 F.2d at 651-52.  Further, the Organizational Defendants indicate no basis whatsoever for questioning the SEC's evidence that the subject securities were not registered.[5]  Any claim that they "acted in good faith" (Organizational Ds. Opp. at 11) is irrelevant, as proof of scienter is not required to establish a violation of Section 5.  See Aaron, 446 U.S. at 714 n.5; Spectrum, Ltd., 489 F.2d at 541-42; Swenson, 626 F.2d at 424.

Defendants attempt to rebut the prima facie showing of their Section 5 liability – and also seek summary judgment themselves – by arguing that they were exempt from having to register the subject securities.  They cite two subprovisions of the bankruptcy code for their purported exemptions, 11 U.S.C. §§ 1125(e) and 1145(a).  As relevant here, these subprovisions serve essentially the same function, which is to shield from liability under the federal securities laws those individuals participating in the reorganization of an entity in bankruptcy; the purpose of

---

[5] The defendants cite no authority for their proposition that the filing of bankruptcy papers that include an employee stock option plan "constitute[s] the functional equivalent of an S-8 registration."  (Gunderson Supp. Decl. ¶ 9.)  Neither, unsurprisingly, has the Court discovered any such authority.  Despite the contemporaneous transfer letters alluding to "S-8 registration," the Organizational Defendants do not on these motions claim that they actually issued the over 500 million subject securities pursuant to the May 2001 and January 2002 S-8 forms sufficient to register only 50 million shares, or could have plausibly believed they were doing so in anything like "good faith."

protecting such activity is to encourage satisfaction of debts or other existing interests in the debtor.  See Collier on Bankruptcy, ¶ 1145.02[1][a] (15 ed. 2006); see also S. Rep. No. 95-989 at 122 (1978) (explaining that "exoneration" from liability under § 1125(e) is "coordinate with the exemption from . . . registration . . . requirements provided by Section 1145 of this title.")  The liability shield of § 1125(e) specifically applies to the disclosure and solicitation period prior to approval of a reorganization plan, when "the investment-type decision by those called upon to accept a plan to modify their claims or interests . . . typically will involve acceptance of new securities or . . . a cash payment in lieu thereof."  S. Rep. No. 95-989 at 121.  Section 1145(a) similarly exempts from the federal registration requirement the actual offer or sale of a security of the debtor under an approved reorganization plan, if that offer or sale is made at least principally in exchange for a claim against or interest in the debtor.  11 U.S.C. § 1145(a).

Given the purpose and text of these provisions, it follows that a threshold requirement to invoke them with respect to a given issuance of securities is that the recipient have held some interest in the debtor or been involved in some way with the reorganization.  Indeed, "[t]he section 1145(a) exemption is available only when the offerees are receiving the securities, at least in part, in exchange for claims against or interest in the debtor which they hold."  Collier ¶ 1145.02[1][a][iii] (citations omitted).  The § 1125(e) liability shield is intended to protect actors soliciting acceptance of a reorganization plan and therefore does not absolve any securities law violation arising outside the disclosure and solicitation processes.  See Jacobson v. AEG Capital Corp., 50 F.3d 1493, 1496 (9th Cir. 1995); see also Yell Forestry Products, Inc. v. First State Bank, 853 F.2d 582, 584 (8th Cir. 1988).

The Organizational Defendants attempt to immunize their challenged conduct by asserting that the 500 million unregistered shares were issued "in accordance with and pursuant to Exhibit 'I' [the Option Plan]" of the bankruptcy reorganization plan.  (Gunderson Decl. ¶4.) The SEC persuasively rebuts the factual sufficiency of the claim.  It points to the complete lack of evidence that the subject securities were, in fact, issued under the Option Plan: the authorized limit of shares under that plan, 104,167, fell far short of the more than 500 million shares in question;[6] none of the required documentation of an exercise of options exists as to any of the defendants; and none of the consulting agreements with the shares' recipients mentions options. Universal Express, moreover, affirmatively stated in annual reports to the SEC that no options had been granted under the Option Plan during the relevant period.  (See P. Mem. for S.J. against Organizational Ds. at 9-11; P. Opp. to Organizational Ds. at 7.)[7]  Defendants' argument also fails because under the law of bankruptcy-related exemptions, as discussed, as there is no evidence that the recipients of the subject securities ever held any interest or claim in bankruptcy against

---

[6] Gunderson's statement that the Option Plan was "amended . . . to directly issue[] shares of free-trading stock in exchange for consulting . . . services" does not describe  any increase in the number of authorized shares, but rather describes an intended legal effect – to bring the subject issuances within a purported exemption from registration requirements.  (Gunderson Supp. Decl. ¶¶ 9, 10)  As already discussed, the availability of such an exemption does not turn on how an actor unilaterally labels an issuance of securities.

[7] The SEC further argues that the Option Plan cannot be considered to be a part of the judicially approved 1994 bankruptcy reorganization plan, to which it had been attached as an exhibit.  (See P. Mem. for S.J. against Organizational Ds. at 10-11.)  However, as it is unnecessary to this decision, the Court declines to reach this issue and assumes without deciding that the Option Plan did constitute part of the reorganization plan.  Even if the Option Plan constituted part of the bankruptcy reorganization plan and entitled defendants to some sort of liability exemption relevant to this case, given the undisputed disparity between the authorized limit and the number of actually issued shares, it would still be beyond dispute that the Organizational Defendants issued vast quantities of shares as to which no conceivable exemption could apply.

Universal Express or its prior incarnation, Packaging Plus Services, Inc.  It is the defendant who bears the burden of proving an exemption from the transaction-specific registration requirement.[8] See Ralston Purina, 346 U.S. at 126; Cavanaugh, 155 F.3d at 133.  On the existing record, no reasonable factfinder could conclude that the securities in question were issued pursuant to the Option Plan and therefore exempted from registration, or even that defendants have raised a genuine issue of fact about whether they were.

For these reasons, this Court could not reasonably conclude that the Organizational Defendants were exempt from having to register the hundreds of millions of securities that they undisputedly caused to issue and which were offered or sold in the public market.  Summary judgment as to the Organizational Defendants' Section 5 liability is therefore granted to the SEC and denied to these defendants.

B.     Statutory Fraud

Summary judgment for the SEC is also clearly warranted on the claim that the Organizational Defendants violated antifraud provisions of the federal securities law.  These defendants do not dispute that they created and issued press releases publicly announcing hundreds of millions of dollars in financing commitments and heralding acquisitions of other companies.  Nor do they dispute that these statements were, as the SEC demonstrates (see citations to record at P. R. 56.1 Stmt. against Organizational Ds. ¶¶ 91-156), at best misleading and sometimes wholly fantastical.  They do not, as they cannot, claim that statements

---

[8] By logic and by their letter, the bankruptcy code's liability exemptions do not operate as automatic, blanket absolution of all securities transactions involving a relevant actor.  Rather, they require analysis of the circumstances surrounding any particular, unregistered issuance of "a security."  11 U.S.C. § 1125(e); see also 11 U.S.C. § 1145(a).

about a company's finances, acquisitions, and revenues are not material in the context of securities sales or purchases, see SEC v. Blavin, 760 F.2d 706, 711 (6th Cir. 1985), or that as the company's CEO and general counsel who undisputedly participated in creating and disseminating these material misstatements they are not clearly subject to liability for securities fraud. Neither do they contest the SEC's showing that each challenged press release was immediately followed by increases in the share price and trading volume of Universal Express stock.

Rather, the Organizational Defendants oppose summary judgment of their liability for securities fraud by denying that they acted with the requisite scienter. Their argument consists solely of the statement that "Gunderson has declared that he, [Universal Express] (and, by inference, Altomare) acted in good faith." (Organizational Ds. Opp. at 11.) Gunderson swears that, "[a]s to each and every press release," he and Altomare "steadfastly maintained an orderly process which included verifying the accuracy of the titles to the press releases and the operative language contained below the title in the body of the press releases." (Gunderson Suppl. Decl. ¶ 4.) But defendants markedly do not identify any basis in truth that they discovered or relied on in the midst of all of their orderly verifying. The conclusory claim that they verified "titles" and "operative language" does nothing to demonstrate their reasonable belief in the truth of their statements. See Rolf, 570 F.2d at 45, 48. Indeed, Altomare has testified that, at the time, he neither possessed nor had sought to obtain any financial information about the entities purporting via Neuhaus's and Sandhu's solicited letters to commit funding (Altomare Dep. 1 at 150, 161), and Gunderson has not testified otherwise.

Instead, Gunderson further swears that, "[a]t all times the press releases were based upon documents received from the various funding sources and substantive conversations referenced in the press releases substantiating a good faith basis for the language employed in the press release." (Id.) This statement, however, on its face fails to dispute the SEC's showing that these supposedly substantiating documents were created at the behest of the Organizational Defendants, and that these documents themselves were misleading at best. The defendants do not indicate any purportedly substantiating material other than the solicited letters. That misleading statements superficially served as a "basis" for the language of the press releases does not render that language true or remotely suggest good faith on the part of those who solicited and then used those statements. To the contrary, any *appearance* of substantiation created by mention of such statements in the press releases only underscores defendants' wrongdoing, as press releases that purport to be substantiated would seem more likely to mislead the reasonable investor than those that do not. The defendants submit nothing to show that their "disregard of [such a] consequence" was not at the least reckless. Rolf, 570 F.2d at 45.

Nor do the Organizational Defendants create an issue regarding their scienter by submitting that they harbored their own, subjective understandings of perfectly common words used in their press releases. For instance, Gunderson swears that a "commitment" actually meant, to him, "a commitment to fund, subject to due diligence." (Gunderson Decl. ¶ 4.) As the source for his special lexicon, he mentions only his "43 year career as an attorney" and "reasonable and realistic commercial practices and reasonable and realistic business-like practices." (Id. ¶¶ 4, 5.) He offers nothing, however, to demonstrate that a "reasonable investor" would share his understandings of such terms. See, e.g., Azrielli, 21 F.3d at 518. Moreover,

24

Gunderson's denial of acting with scienter, based on his purported understanding of the term "commitment," is squarely negated by the text of the April 9, 2003, press release: "During the developmental stages of any company, that company may receive financial commitments based on the funder's due diligence requirements . . . . Today's commitment is far more definite and it is for that reason a press release has been issued."  (P. Ex. 34.)  Gunderson cannot claim to have believed that a press release touting a commitment that expressly claimed to be "more definite" than others subject to due diligence checks actually meant "a commitment . . . subject to due diligence."

Defendants provide no reason to think they would be able to rescue these unsupported assertions from seeming flatly ludicrous if permitted to go to trial.  Therefore, summary judgment as to the Organizational Defendants' liability for securities fraud is granted the SEC.

     C.    <u>Appropriate Relief</u>

The Organizational Defendants submit nothing to oppose the SEC's requests for relief, which the Court independently finds to be reasonable and warranted by the record.  The Court will address here the bases for awarding such relief, but the SEC is directed to submit an updated, proposed order as to the current amounts of disgorgement and interest, and as to the logistics for defendants to comply with the order.

The SEC's request for a permanent injunction against Universal Express, Altomare, and Gunderson from violating the federal securities laws relevant to this case is granted pursuant to 15 U.S.C. §§ 77t(b) and 78(d)(1).  It is clear, as discussed, that these defendants violated these laws and, if not enjoined, likely would do so again.  <u>See</u> <u>SEC v. Commonwealth Chem. Secs., Inc.</u>, 574 F.2d 90, 99-100 (2d Cir. 1978).  They committed these violations deliberately or at

least recklessly and on repeated occasions; they not only deny culpability but do so with incredible and contorted arguments; and as the present CEO and general counsel to Universal Express, Altomare and Gunderson remain in a position to commit possible violations in the future. For these reasons, a permanent injunction is appropriate. See Cavanagh, 155 F.3d at 135.

It is also appropriate on the existing record to order disgorgement of ill gotten gains and additions of prejudgment interest against the Organizational Defendants. Disgorgement is important to enforce the securities laws and deter other would-be violators. See First Jersey, 101 F.3d at 1474-75. The amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation," and "any risk of uncertainty [in calculating the amount] should fall on the wrongdoer." SEC v. Patel, 61 F.3d at 139-40 (2d Cir. 1995) (internal quotation marks omitted). As it is difficult in many cases to separate "legal from illegal profit, . . . it is proper to assume that all profits gained while defendants were in violation of the law constituted ill-gotten gains." SEC v. Bilzerian, 814 F. Supp. 116, 118 (D.D.C. 1993) (citations omitted). An order to pay prejudgment interest on any disgorgement amount may also be proper, further to ensure that violators do not profit from illegal activity. See First Jersey, 101 F.3d at 1476. Courts possess broad discretion to decide whether to order disgorgement in any particular amount and whether to order payment of interest. See, e.g., SEC v. Lorin, 76 F. 3d 458, 462 (2d Cir. 1996); see also First Jersey, 101 F.3d at 1476.

The SEC has demonstrated a reasonable approximation of the profits gained by the Organizational Defendants in connection with their substantiated violations. The company received proceeds totaling $9,959,828 for issuing securities, which were then sold, without

registration. (See P. R. 56.1 Stmt. against Organizational Ds. ¶ 163.) As these proceeds constituted the bulk of Universal Express's operating revenues throughout the period of violations (see id. ¶¶ 157-162), it is reasonable to conclude that the $1,419,025 the company paid Altomare and the $361,311 it paid Gunderson during this period were ill gotten gains properly ordered disgorged. (See id. ¶¶165, 167.) It is sensible, moreover, that these repeated and remorseless violators be ordered to pay prejudgment interest on their gains, calculated at the tax underpayment interest rate. See First Jersey, 101 F.3d at 1476. The SEC may further be entitled to a future award of postjudgment interest against these defendants pursuant to 28 U.S.C. § 1961, upon demonstrating the appropriateness of such an order.

The record also justifies an order of so-called "third tier" civil penalties against the Organizational Defendants, pursuant to 15 U.S.C. § 77t(d), fully to prevent illegal profit and deter these violators and generally to deter such conduct in the public interest. See, e.g., SEC v. Palmisano, 135 F.3d 860, 866 (2d Cir. 1998). Because, as described, these defendants engaged in numerous and inexcusable instances of securities law violations over the course of at least four years and gained substantial monies in relation to these violations – which included fraud at the likely expense of Universal Express shareholders and the investing public – it is appropriate to order civil penalties at the "gross amount of pecuniary gain to [each] defendant as a result of the violation." 15 U.S.C. § 77t(d)(2)(C).

Further, it is appropriate that Altomare be barred pursuant to 15 U.S.C. § 78u(d)(2) from serving as an officer or director of a publicly held company, because the record demonstrates his "substantial unfitness" to hold such a position. Patel, 61 F.3d at 141. As discussed, there is no dispute that he as CEO personally directed the issuance of over 500 million shares of Universal

27

Express stock that were not registered, over the course of several years during which millions of dollars were flowing to the company in connection with those unregistered issuances.  Neither is there any dispute that Altomare solicited and essentially drafted funding letters purporting to substantiate fraudulent press releases that announced major financing commitments and likely acquisitions on behalf of Universal Express – which press releases he not only drafted and released but bolstered by supplying encouraging quotations.  (P. Exs. 21, 28, 30, 34, 41.)  Nor is it contested that the price and trading volume of Universal Express shares rose following issuance of each of the challenged press releases.

As CEO of a publicly held company, Altomare occupied and continues to occupy a position of significant power, which he abused by repeatedly and brazenly committing fraud and flouting investor-protecting registration requirements.  He has not only opposed the SEC's request for summary judgment without pointing to a single piece of evidence sufficient to create a genuine issue as to any material fact of his liability, but he has also had the chutzpah on an overwhelming unfavorable record to seek summary judgment himself.  The defendant's professional position and apparent refusal to acknowledge the types of conduct that violate securities laws raise serious concerns that he will engage in such misconduct in the future.  For these reasons, the Court, applying the multi-factor inquiry typically employed on such requests, Patel, 61 F.3d at 141, concludes that Altomare should be barred from serving as a company officer or director within the meaning of 15 U.S.C. § 78u(d)(2).

Finally, the record also justifies an order pursuant to 15 U.S.C. §77t(g) barring Altomare and Gunderson from participating in any future activity involving the offer of penny stock, which is any equity security bearing a price of less than five dollars except as provided in 17

C.F.R. § 240.3a51-1.  The standard for imposing such a bar essentially mirrors that for imposing

an officer-or-director bar.  See SEC v. Wolfson, No. 02 Civ. 1086 (TC), 2006 WL 1214994, *10

(D. Utah, May 5, 2006) (citing SEC v. Steadman, 603 F.2d 1126, 1140 (5th Cir.1979)).

Imposition of a penny stock bar is therefore warranted as to Altomare, for reasons discussed with

respect to his prohibition from serving as a company officer or director.  These same reasons

justify barring Gunderson from engaging in future offers of penny stock.  Although he did not

directly solicit assistance with fraud and was not personally quoted in the materially misleading

press releases, as general counsel of Universal Express he also occupied a position of significant

power at the time of the violations and, as discussed, repeatedly approved and contributed to acts

of fraud and noncompliance with investor-protecting registration requirements.  His apparent

disregard for the law, evinced both by the repeated nature of his illegal conduct and his joining

with Altomare in the meritless summary judgment motion, is particularly egregious given his

position as the chief lawyer for a publicly held company.  For these reasons, there is as much

cause to expect future misconduct by Gunderson as there is with respect to Altomare, and an

order barring both from offering penny stock is appropriate.

III.    Neuhaus

        A.    Section 5

        Summary judgment is granted to the SEC and necessarily denied Neuhaus on the claim

that Neuhaus violated Section 5 of the Securities Act, because the existing record suggests no

genuine factual dispute that Neuhaus sold unregistered securities via interstate means or that the

challenged transactions were not exempt from the prohibitions of Section 5.

There is no dispute that Neuhaus offered and sold millions of shares of Universal Express stock using interstate means.  His claim that others told him that the shares were properly registered (see Neuhaus Mem. for S.J. at 3,5-7), even if true, would fail to create an issue as to the shares' undisputedly unregistered status.  Scienter is irrelevant to Section 5 liability.  See Aaron, 446 U.S. at 714 n.5; Swenson, 626 F.3d at 424.  Nor does Neuhaus indicate any basis on which his reliance on others could somehow be deemed reasonable; for instance, while he claims to have relied "particularly" on the assurances of Gunderson, Universal Express's general counsel (Neuhaus Mem. for S. J. at 3), he does not suggest that Gunderson served as his own attorney.

Thus Neuhaus's only hope for avoiding Section 5 liability is to indicate evidence sufficient to prove that his sales of Universal Express stock were exempt from the registration requirement.  See Ralston Purina, 346 U.S. at 126.  Not only does he fail to show an exemption, however, but he also fails to indicate any genuine issue as to the facts showing he does not qualify for the relevant exemption.

Neuhaus claims exemption from Section 5 liability pursuant to Section 4(1) of the Securities Act, which absolves from the registration requirement transactions where the seller was a "person other than an issuer, underwriter, or dealer."  15 U.S.C. § 77d(1).  The SEC does not dispute that the evidence fails to show that Neuhaus was a dealer (see Neuhaus Mem. for S. J. at 22-23), and it is doubtful that he may be considered to be an issuer,[9] but it successfully

---

[9] The SEC argues that "Neuhaus cannot claim a [Section] 4(1) exemption because he was an affiliate of Universal Express, which includes a controlling shareholder of the issuer."  (SEC Mem. for S. J. against Neuhaus at 11).  It is correct that a "controlling shareholder" is an "affiliate of the issuer" and thus "ordinarily may not rely upon the Section 4(1) exemption." Cavanagh, 155 F.3d at 134.  Yet the SEC fails to provide any authority for deeming someone to

shows that Neuhaus was an underwriter.  (See SEC Rep. to Neuhaus at 2-4.)

An underwriter is defined by statute to be "any person who has purchased [a security] from an issuer with a view to . . . distribution,"[10] "offers or sells for an issuer in connection with . . . [a] distribution," or directly or indirectly "participates . . . in any such undertaking [or] . . . in the direct or indirect underwriting of any such undertaking."  11 U.S.C. § 77b(a)(11).[11]  The term should be "broadly defined to include anyone who directly or indirectly participates in a distribution of securities from an 'issuer' to the public." North Am. Research, 424 F.2d at 72. Considerations for determining if a person was not an underwriter, because he did not engage in a distribution, are described in the associated federal Rule 144, 17 C.F.R. § 230.144.  As the preliminary note to Rule 144 explains, the purpose of the rule is to "permit[] the public sale in

_____

be a controlling shareholder based solely on the evidence it submits as to Neuhaus's "controlling" status: that at one point during the relevant time he held approximately 40 percent of the outstanding shares of Universal Express.  (See  P. R. 56.1 Stmt. for S. J. against Neuhaus ¶ 101.)  Neuhaus vigorously contests the sufficiency of this evidence to establish his control.  (See Neuhaus Opp. at 6-7.)  While noting that it is unclear that Neuhaus actually held this much stock for more than a brief period, the Court declines to resolve the question of Neuhaus's control regarding Universal Express, as it is not necessary to do so for this decision.  Despite defendant's elaborate attempts to suggest otherwise (see id. at 4-6), a showing of control is not required to prove Section 5 liability.  See, e.g., SEC v. Softpoint, Inc., 958 F. Supp. 846, 859-60 (S.D.N.Y. 1997).  The question of control is relevant in this context only to whether the accused is precluded from qualifying for an exemption under Section 4(1) because he is equivalent to an issuer.  See Cavanagh, 155 F.3d at 134.  Here, the record shows Neuhaus to be precluded from qualifying for such an exemption, but not because he was an issuer – rather, because he was an underwriter.

[10] A "distribution" has been described as "continuing throughout the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public."  SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005).

[11] The underwriter category, however, excludes any "person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission."  15 U.S.C. § 77d(1).  Neuhaus does not refer to this qualification, but it is relevant to defendant Mendiratta's opposition to the SEC's request for summary judgment against him.

ordinary trading transactions of limited amounts of securities owned by . . . persons who have acquired restricted securities of the issuer." Id.  In other words, "a person reselling securities under Section 4(1) . . . must sell . . . in such limited quantities and in such a manner as not to disrupt the trading markets." Id.

Rule 144 explains that "[t]he interpretation of this definition [of underwriter] has traditionally focused on the words [']with a view to . . . distribution['] . . . .  Since it is difficult to ascertain the mental state of the purchaser at the time of his acquisition, subsequent acts and circumstances have been considered to determine whether such person took with a view to distribution at the time of his acquisition."  17 C.F.R. § 230.144.  The Rule 144 inquiry does not encompass evidence of the individual's subjective intent, but rather focuses on objective circumstances surrounding the disputed sale.  Certain conditions for complying with the regulation relate to the timing, volume, and reporting of sales: the securities must have been held by the purported seller for at least one year; the number of shares to be sold during any three-month period cannot exceed the greater of one percent of the outstanding shares in that same class or of the average weekly trading volume during the preceding month for a share class as listed on an exchange; and a notice must be filed with the SEC for sales to exceed 500 shares or $10,000 in total transactions in any three-month period.  See 17 C.F.R. § 230.144(d),(e),(h); see also Kern, 425 F.3d at 148.

Neuhaus argues that he was not an underwriter and therefore qualifies for Section 4 exemption, because he sold the shares not with the purpose of distributing for Universal Express

but rather to convert compensatory shares he received into cash for himself.[12]  (See Neuhaus

Opp. at 4-7.)  Apparently, although not at all clearly, he claims that his transferring nearly $6

million to Universal Express did not constitute "funnel[ing] . . . of proceeds" in connection with

a distribution as the SEC would have it (P. Rep. Mem. for S. J. against Neuhaus at 4), but rather

occurred in exercise of options to purchase shares that he claims constituted part of his

consulting agreement.  (See Neuhaus Opp. at 5.)  Even if his factual claims were true, however,

they would not suffice to save him, as the uncontested facts overwhelmingly show that, whatever

his subjective intentions, Neuhaus acted as a statutory underwriter.[13]

    The undisputed record shows that Neuhaus's sales of Universal Express shares did not

meet any of the timing, volume, or reporting requirements to classify him as a non-underwriter

under Rule 144.[14]  To the contrary and as is not disputed, Neuhaus sold 259,649,167 shares of

_____

    [12] It is irrelevant whether Neuhaus actually provided "bona fide consulting services" to Universal Express.  (Neuhaus Opp. at 3.)  Rule 144 and the Section 4 exemption already contemplate that any securities in question may have been issued in exchange for such services.  See 17 C.F.R. § 230.144 (a)(3).  It is assumed for purposes of these motions that Neuhaus legitimately provided services to Universal Express.

    [13] Neuhaus's claim that his transfers of funds to Universal Express constituted exercises of options, not the passing on of proceeds, is accepted strictly for argument's sake in the context of these motions.  It is noted, however, that the record does not actually support his claim.  As he himself avers, his consulting agreement with Universal Express was "silent regarding options" (Neuhaus Aff. ¶ 4.)  He does not indicate any evidence that should be taken to fill that silence in his favor.  The company did file two S-8 forms, which could conceivably be taken to indicate its general intention to offer incentive options; but, as described earlier, the S-8 registrations were not used for issuances to the Consultant Defendants and in any event, on their face, covered only a fraction of the issuances to Neuhaus.  A reasonable factfinder would have little trouble inferring that Neuhaus was enlisted to cooperate in selling shares of Universal Express to the general public and funneling the bulk of these proceeds to the company while retaining a substantial profit for himself – in other words, acting as a classic underwriter.

    [14] While Neuhaus is correct that compliance with Rule 144 is not the exclusive means for achieving exemption from Section 5 liability, as the regulation itself states (see Neuhaus Rep. Mem. at 9, citing 17 C.F.R. § 230.144(j)), he fails to indicate any other exemption for which he

unregistered Universal Express stock typically within 30 days and sometimes as soon as four

days after receiving them, for proceeds of $9,786,589. (See Morgan Aff. against Neuhaus ¶ 12

and Attachs. E, F.) At one point during the relevant period, the shares issued to Neuhaus

constituted approximately 40 percent of Universal Express's outstanding shares. (See P. R. 56.1

Stmt. against Neuhaus ¶ 101.) There is no indication that Neuhaus filed a notice with the SEC as

to any of these sales.

Neuhaus may have been unaware that these acts constituted participation in a distribution

and may have intended otherwise (see Neuhaus Aff. ¶ 20), but the underwriter inquiry is

objective and markedly does not incorporate consideration of the actor's subjective

understandings. See 17 C.F.R. § 230.144; Kern, 425 F.3d at 148. Disregard of such subjective

evidence is sensible, as otherwise it would be easy enough for a Section 5 violator to claim non-

underwriter exemption for massive sales of unregistered securities – defeating the purpose of the

Securities Act – by swearing that he never meant to facilitate distributions of the issuer.

As the existing record cannot reasonably support any conclusion but that Neuhaus acted

as a statutory underwriter, summary judgment is granted as to the SEC's claim that he is liable

under Section 5 and denied as to Neuhaus's claim that he is not.

   B.    Statutory Fraud

Summary judgment must be denied both parties on the claims that Neuhaus violated the

antifraud provisions, chiefly because issues of fact remain as to his knowledge and state of mind

at the time of his alleged conduct.

---

qualifies on this record. It is the defendant's burden to demonstrate an exemption from the
registration requirement. See Ralston Purina, 346 U.S. at 126.

Neuhaus is charged with participating in a fraudulent scheme by providing Universal Express two letters that allegedly were used as the basis for drafting certain uncontestedly fraudulent press releases described earlier, and also by contributing to the preparation of a press release announcing Universal Express's payment of a deposit to purchase an airline. Neuhaus is incorrect that he is wholly absolved of liability under <u>Wright</u>, at the least because the evidence of his extended involvement with the principals of Universal Express precludes deciding at this stage that he was a mere "secondary actor" who "cannot incur primary liability . . . for a statement not attributed to [him] at the time of its dissemination." 152 F.3d at 175. It is true that none of the statements released to the public mentions Neuhaus or any of his business entities by name, yet he is not being accused merely of issuing false statements as a secondary actor but rather of participating in a fraudulent scheme. <u>Cf</u>. <u>id</u>. at 170-76. He does not dispute that he provided the March 22 and May 22, 2002 letters, or that he reviewed and commented on the October 12, 2003, press release announcing payment of a $1 million deposit that was financed via unregistered shares of Universal Express issued to him, or that he confirmed the contents of these letters in conversations relating to Universal Express's expansion prospects. (<u>See</u> P. R. 56.1 Stmt. against Neuhaus ¶¶ 60, 73, 75-76, 80-88, 91-92.)

Defendant attempts to dispute the materiality or misleading nature of his admitted conduct by offering his own legal conclusions and belittling the significance of isolated phrases within his statements. (<u>See</u> Neuhaus Rep. at 2-6.) There is no need to resolve questions of materiality or falsity at this stage, as summary judgment must be denied on this count in any case. It must be noted, however, that a conclusion of participation in fraud could be sustained on the basis of the uncontested facts of Neuhaus's conduct, given the repeated nature of this conduct

and defendant's undisputedly sizeable, nearly simultaneous sales of Universal Express stock. (See P. R. 56.1 Stmt. against Neuhaus ¶¶ 77-78, 90.)

It could be inferred from these circumstances that Neuhaus committed the alleged acts with the requisite scienter of at least recklessness. Defendant, however, successfully raises issues as to his knowledge and state of mind, precluding judgment at this stage. For instance, regarding the 2002 letters, he swears that "Altomare never told me that he was planning to use – or that he did in fact use – my letters as the basis for a press release." (Neuhaus Aff. ¶ 17.) He also swears that he "viewed" the letters as expressing only "support, not . . . a binding commitment by Coldwater" (id. ¶¶ 14-15); and the SEC does not dispute his testimony that his statements, while not true, had at least some relationship to reality. (See P. R. 56.1 Stmt. against Neuhaus ¶¶ 62, 64, 66, 67, 69, 81. These submissions amount to more than mere assertions of good faith, and they preclude a judgment at this stage that Neuhaus "inten[ded] to deceive, manipulate, or defraud" investors, Ernst & Ernst, 425 U.S. at 193, or that he acted with "heedlessness and reckless disregard of consequence" in connection with the sale or offer of securities. Roth, 570 F.2d at 46. A trial will permit assessments of credibility and weighing of evidence, as is necessary to resolve this issue. Although proof of scienter is not required to establish a violation of Section 17(a)(2) or (3), scienter is pertinent to whether certain remedies, such as those the SEC seeks against Neuhaus, should be granted. See Aaron, 446 U.S. at 697, 701. Therefore, summary judgment is denied both parties on all the fraud allegations against Neuhaus, as critical issues remain to be resolved.

C.     Appropriate Relief

The question of appropriate relief against Neuhaus clearly must be addressed after a trial. As the SEC itself points out, its requests for various forms of injunctive relief and civil penalties against Neuhaus all require the Court to consider, to some extent, the defendant's scienter.  Only Neuhaus's violation of Section 5, which does not require scienter, is indisputably established at this stage.  While it might not be error to order the requested amount of disgorgement on the Section 5 violation, disgorgement and the additions of interest the SEC seeks are equitable remedies premised on the powers and discretion of the Court to prevent unjust gain and to deter others.  See SEC v. First City Financial Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989); SEC v. Tome, 833 F.2d 1086, 1096 (2d Cir. 1987).  As with the other requested forms of relief, therefore, the decision to order any particular amount of disgorgement is best made on the fullest possible understanding of the scope of wrongdoing, especially where a trial is required in any case as to  certain allegations.

IV.     Sandhu

A.     Section 5

Summary judgment must be denied both Sandhu and the SEC on the claim that Sandhu violated Section 5 of the Securities Act, because there is a genuine issue as to defendant's participation in unregistered sales of Universal Express securities.  While the SEC presents a strong case for drawing inferences to link Sandhu with sales by Spiga, defendant identifies evidence creating sufficient uncertainty about his involvement that a trial is required to determine whether such inferences should indeed be drawn.

37

There are no genuine issues as to two of the elements of the prima facie Section 5 case against Sandhu.  Sandhu does not dispute that the subject sales occurred via interstate means, and the SEC submits ample evidence to prove this element.  Nor is there any doubt about the registration status of the 152 million shares issued by Universal Express to Spiga purportedly pursuant to "S-8 registration[s]."[15]  (P. Ex. 290.)  Yet an issue remains as to whether Sandhu was a "necessary participant" or "substantial factor" in Spiga's sales of Universal Express stock.  Murphy, 626 F.2d at 651-52.

The SEC claims that these sales were "orchestrated by Sandhu."  (P. Mem. for S. J. against Sandhu at 4.)  Yet the evidence it proffers in support, while abundant, requires drawing disputable inferences to conclude that Sandhu so participated.  The SEC submits undisputed evidence that Sandhu negotiated the consulting agreement between Universal Express and Spiga pursuant to which shares were issued and himself performed the contemplated consulting services; that he held trading authority over some of Spiga's brokerage accounts and instructed

---

[15] Each of several undisputed facts independently precludes any genuine dispute that the shares were unregistered.  As already discussed, no shares were issued to any consultants under the only two S-8 forms in the record.  Even if they had been, these forms covered only 50 million shares and therefore could not account for at least 100 million shares issued to Spiga.  Nor could the S-8 forms, as they uncontestedly lacked a reoffer prospectus or any mention of the possibility of resale, have served to register any subsequent sales by Spiga of shares issued under them.  See SEC website, "General Instructions, A. Rule as to Use of Form S-8," at http://www.sec.gov/about/forms/forms-8.pdf; see also Cavanaugh, 155 F.3d at 134 n.22.  Finally, S-8 forms may only be used to compensate a "natural person," not business entities such as Spiga.  See "General Instructions, A. Rule as to Use of Form S-8."

Sandhu's lengthy protestations that he "had no knowledge that [Universal Express] had not registered its securities," and that he reasonably believed based on others' representations or inaction that the securities were registered, are inapposite.  (Sandhu Mem. for S. J. at 8-10.)  No showing of scienter or negligence is necessary to prove a Section 5 violation, as the provision carries strict liability.  See Aaron, 446 U.S. at 714 n.5; Spectrum, Ltd., 489 F.2d at 541-42; Swenson, 626 F.2d at 424.  Moreover, like Neuhaus, Sandhu fails to present evidence suggesting any reasonable basis for his reliance on others.

38

one brokerage firm at some point about the price at which to sell Universal Express shares; that he advised Spiga about the amount, price, and timing of Universal Express stock sales; and that he advised trades in a brokerage account of Target Growth Fund, which sold Universal Express shares.  (See citations to record at P. R. 56.1 Stmt. against Sandhu ¶¶ 21-22, 56, 60, 68.)  These facts strongly imply that Sandhu played a substantial role in Spiga's sales of some 139 million unregistered shares of Universal Express stock for $3,970,280, but they do not indisputably establish that he did.

Sandhu points to some evidence that could support a contrary conclusion.  For instance, he submits evidence that a different individual  – one Clive Dakin, apparently a director of Spiga – not he, received significant communications from a major Spiga brokerage account for which the SEC claims Sandhu "controlled . . . the trading" (P. Mem. for S. J. against Sandhu at 4), and that Dakin signed off on authorizations to transfer funds to Universal Express from the account. (See Sandhu Opp. at 3; P. Ex. 177; P. Resp. to Sandhu R. 56.1 Stmt. ¶ 53.)  He also indicates that instructions to transfer Universal Express shares from one of Spiga's accounts to another were also signed by Dakin. (See id. at 3-4; P. Ex. 175.)  The SEC concedes that Sandhu "did not have . . . trading authority" over Spiga's accounts at three brokerage firms that traded Universal Express stock.  (See P. Opp. to Sandhu at 4-5.)  It also does not contend that Sandhu had trading authority over the Target Growth Fund (id. at 5), where it nevertheless claims he "directed sales" of Universal Express stock.  (P. Mem. for S.J. against Sandhu at 4.)  There is no evidence that Sandhu was an officer or employee of Spiga.

Even despite the ambiguities Sandhu indicates, it is difficult to imagine that he, who claims to serve as investment advisor to clients of enormous commercial wealth (see Sandhu

Resp. to P. R. 56.1 Stmt. ¶ 56), will turn out only to have played a negligible role in the subject sales. Indeed, the uncontested evidence alone would permit a reasonable factfinder to conclude that he is liable for the sales. Yet Sandhu has successfully raised enough of an issue as to the extent of his participation to warrant deferring any such a conclusion until the evidence may be more fully evaluated at trial.

As there can be no resolution at this stage of the prima facie Section 5 case against Sandhu, questions of any exemption from liability or of any appropriate penalty also are properly deferred. It is worth noting, however, as Sandhu's briefs suggest a misunderstanding of the issue, that the burden of proving any exemption – and specifically, as to each challenged transaction, see Cavanagh, 155 F.3d at 133 – lies with defendant. See Ralston Purina, 346 U.S. at 126. It is also worth noting, in order to narrow the issues for trial, that any claim that the shares Spiga sold were exempt from having to be registered under Universal Express's 1994 bankruptcy reorganization plan would fail for reasons already discussed with respect to other defendants.

B.     Statutory Fraud

The SEC's fraud case against Sandhu is extremely thin and survives his motion for summary judgment only because most of the evidence affirmatively showing his lack of knowledge about a false press release, allegedly created based on misleading letters he provided, consists of testimony by two confirmed defrauders. Should that evidence be discounted for credibility reasons at trial, and after a fuller presentation of the facts regarding Sandhu's knowledge and state of mind at the relevant times, the record conceivably could permit an inference that Sandhu participated in fraud in connection with the purchase or sale of Universal

40

Express securities.  At the moment, however, such a conclusion seems unlikely, as the present

record falls far short of establishing that Sandhu provided the letters with the requisite scienter.

    Sandhu is charged with securities fraud for supplying two letters to Universal Express,

which purportedly were used by the Organizational Defendants to create a press release

announcing on May 23, 2002, that it had "receive[d] over $100,000,000 in funding

commitments" from "two International Hedge Funds" (P. Ex. 21), and another claiming it had

"received a letter of intent from a funding institution for $460,000,000."  (P. Ex. 28.)  In his first,

March 2002 letter, Sandhu stated, "As investment advisor to Target Growth Fund Ltd., . . . we

have . . . invested over []$3,000,000[,]. . . . have authorized up to []$7,500,000 in addition capital

from the Fund for future approved acquisitions [of] Universal Express . . . [and] are also

prepared based upon due diligence and proper collateral to arrange an additional []$50,000,000

in long term financing for such an acquisition."  (P. Ex. 23.)  The second letter, dated May 21,

2002, addressing a proposed merger between Universal Express and a bus company, stated that,

"based upon the initial proposed letter of intent, we would be committed to the funding of the

combined company.  Please let us know when the final terms have been negotiated so we can

move our discussions to the next level."  (P. Ex. 24.)  Presumably based on these letters,

Universal Express issued the two press releases.  Sandhu's letters were supplied to the bus

company during merger negotiations, with his knowledge.

    The parties vigorously dispute whether Sandhu's representations about funding actually

were materially misleading, but resolution of that question requires a fuller development of the

context of his actions.  Sandhu does not deny that the press releases themselves constitute

material misrepresentations to investors or that he provided the two letters, but he has testified

that he provided the letters without any knowledge or intent that they might form the basis for the press releases.[16]  He submits deposition testimony by Altomare and Gunderson that Sandhu was not told of the press statements prior to their release.  (Sandhu Exs. 11, 15.)  The SEC indicates no evidence directly contradicting Sandhu's submissions, but it urges an inference of Sandhu's scienter based on evidence that, as a general matter, he spoke frequently with Altomare about preparation of press releases and about financing, that he provided the second letter just two days before Universal Express issued its May 2002 press release, and that Spiga sold significant volumes of Universal Express stock shortly after issuance of that press release.[17]  Such an inference is not impossible to draw from the existing record, yet it is hardly inexorable.  Judgment must therefore be deferred until a fuller testing of the evidence at trial.  Given the remedies the SEC seeks against Sandhu, such deferral is appropriate even as to the fraud claims that do not require proof of scienter at the liability stage.  See Aaron, 446 U.S. at 697, 701.

---

[16] The SEC spills much ink attempting to articulate an act of securities fraud out of Sandhu's knowing provision of the letters for the bus company.  But the antifraud provisions prohibit statements or omissions that would likely mislead "a reasonable person . . . in deciding whether to buy or sell shares."  Azrielli, 21 F.3d at 518.  It is simply too great a stretch to say that the antifraud provisions, intended to protect average investors from misinformation they cannot practically vet, see, e.g., Laird v. Integrated Resources, Inc., 897 F.2d 826, 831 (5th Cir. 1990), also protect businesses' industry peers from empty posturing in merger negotiations.  The SEC cites absolutely no authority for the latter application, instead conclusorily dubbing the potential merging company in this case "a potential investor."  (P. Rep. against Sandhu at 4 n.6.)  The Court therefore restricts its inquiry to any actions of Sandhu's that may have been misleading to "the reasonable investor."  TSC Industries, 426 U.S. at 449.

[17] The SEC appears to claim that Sandhu's scienter should be inferred from his testimony that he did see the May 23, 2002, press release *after* it was made public.  It argues that "Sandhu was reckless in that he either knew from the statements in the press release that it referred to his letter or it was so obvious that he must have been aware of it."  (SEC Rep. to Sandhu at 6.)  But Sandhu's reaction to the already released public statement cannot – for obvious reasons of sequence and logic – by itself demonstrate his knowledge or intent at the time he provided the two funding letters.

V.    <u>Mendiratta</u>

Unlike the other defendants, Mendiratta stands accused only of violating Section 5, and not of engaging in securities fraud.  There is no dispute that the SEC has shown evidence sufficient to establish a prima facie case that Mendiratta participated in the offer or sale of unregistered securities. As has been discussed, there is no question that the Universal Express shares issued to Dhingra and Kaila purportedly under their consulting agreements, which Mendiratta is accused of helping to sell, were not the subject of any registration statement. Mendiratta does not dispute that the shares were unregistered, nor does he dispute that interstate means were used in their offer or sale.  He attempts to raise an issue as to his participation in the sale of these shares, by insisting that he did not "control[]" Dhingra or Kaila's accounts. (Mendiratta Opp. at 6.)  But even if his assertion were accepted, such a fact alone would not save him from liability, as it need not be shown that a defendant exercised control over a trading account to establish that he "engaged in steps necessary to the distribution of [unregistered] security issues." <u>Chinese Consol. Benev. Ass'n, Inc.</u>, 120 F.2d at 741.  The SEC has shown, among other evidence, that Mendiratta repeatedly instructed Dhingra's and Kaila's main brokerage firm when to make sizeable sales of unregistered Universal Express stock from their accounts, and that no one else communicated with the broker about these trades.  (<u>See</u> P. R. 56.1 Stmt. against Mendiratta ¶¶ 49, 61, 65, 66, 71, 81, 82, 84.)  Mendiratta submits nothing to dispute that only he was actively involved in trading Universal Express stock from Dhingra's and Kaila's accounts.  The record suggests no other conclusion but that Mendiratta engaged in steps necessary to an unregistered sale, even if as an indirect participant. <u>See</u> <u>Cavanaugh</u>, 155 F.3d at 135.

43

Yet an issue remains as to whether Mendiratta is exempt from the Section 5 prohibition under Section 4(1) of the 1933 Act, because in the relevant transactions he was a "person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(1). Mendiratta argues that he lacked any interest in the subject stock sales beyond earning a customary commission, and that he therefore did not act as an underwriter.[18] (Mendiratta Opp. at 7-8; see also 15 U.S.C. § 77d(1).) He claims that his gain from the Universal Express transactions, $384,239, amounts to ten percent of the relevant sales, a percentage "consistent with the receipt of a commission from an underwriter." (Mendiratta Opp. at 8.) The SEC neither disputes this amount nor indicates that it would not constitute a customary commission by the meaning of the statute.[19]

Instead, the SEC argues that Mendiratta "acted as an underwriter," in that he "acquired

---

[18] The Second Circuit has explained that, to qualify for the Section 4 exemption, "a person who complies with Rule 144 [and therefore is not an underwriter] must still show that he is neither an issuer nor a dealer." SEC v. Kern, 425 F.3d 143, 148 (2d Cir. 2005). Mendiratta neglects on this motion to address his categorization as an issuer or dealer, but the existing record does not justify concluding at this stage that he should be classified as either. It should be noted for purposes of trial that it is defendant's burden to demonstrate an exemption from the registration requirement, and that demonstration of the relevant exemption requires a showing as described in Kern. It is also worth noting that Mendiratta has failed to contest evidence suggesting that the Dhingra and Kaila sales constituted part of distributions within the meaning of Rule 144, 17 C.F.R. § 230.144. For instance, the record shows that the shares issued to Dhingra and Kaila were held for times – an average of 13 days, with the longest period measuring 21 days – far briefer than the required holding period. See id. As it is undisputed that these sales formed part of a distribution, Mendiratta's only hope of winning Section 4 exemption from liability is to prove that he held at most a modest, commission-only interest in these sales.

[19] The SEC cites no authority for its proposition that one who is a statutory seller within the meaning of Section 12(1) of the Securities Act, 15 U.S.C. § 77l(a), is also an underwriter for purposes of Section 5 liability, nor does it show that Mendiratta solicited purchases of the subject securities such that he should be classified as a Section 12(1) statutory seller in the first place. (See P. Rep. against Mendiratta at 4, citing Pinter v. Dahl, 486 U.S. 622 (1988), for the rule that one who solicits purchases merely for a commission may nevertheless be liable as a statutory seller under Section 12.)

44

the shares in his aunts' names as a part of a distribution or he sold securities for Universal Express in connection with a distribution." (P. Mem. against Mendiratta at 8.) So to conclude on the existing record, however, would require certain inferences the Court deems imprudent to draw without the opportunity to assess credibility and weigh evidence.[20] The evidence that Mendiratta initiated the relationship between the company and his aunts "to hide his involvement with Universal Express" (id. at 11) – that *he* acquired the shares, to sell them *for Universal Express* – consists solely of the word of Altomare and Gunderson (see P. R. 56.1 Stmt. against Mendiratta ¶¶ 10, 22, 23), individuals against whom the SEC has successfully sought summary judgment not only as to Section 5 liability but also as to fraud. The SEC alleges that "Mendiratta negotiated" both aunts' consulting agreements with Universal Express, citing the deposition testimony of Altomare and Gunderson. (P. Mem. against Mendiratta at 4.) To accept these witnesses' testimony at this stage would assume their credibility. A reasonable factfinder could no doubt accept their testimony, but it need not. Whether or not to do so is a question requiring trial.

Even putting aside questions of credibility, these witnesses' testimony on its face does not establish Mendiratta's secret orchestration of the sales, since each witness's testimony is based primarily on hearsay. Altomare and Gunderson, in a circular fashion, respectively base their testimony against Mendiratta on purported knowledge of the other. Altomare testified that

---

[20] The SEC is correct that an adverse inference may be drawn in this civil suit from Mendiratta's assertion of his Fifth Amendment right not to testify, see Baxter v. Palmigiano, 425 U.S. 308, 335 (1976); LiButti v. United States, 107 F.3d 110, 121 (2d Cir. 1997). But the Court is not *required* to draw such an inference, even at trial. The balance of inferences may well work out in the SEC's favor, but what inferences the factfinder will ultimately draw is a question of fact for trial.

Menditratta "had requested that agreements, consulting agreements, be put in [Dhingra's] name" and that Menditratta "had that discussion with Mr. Gunderson, and I'm sure Mr. Gunderson can [explain the basis of Menditratta's request]." (Altomare Dep. 1 at 104-05.) Asked why Menditratta would have sought an agreement between Universal Express and Dhingra, Altomare answered, "I had that discussion with my general counsel [, Gunderson];" when asked if he himself had ever had such a discussion with Menditratta, Altomare answered "no." (Id. at 106.) Similarly, Gunderson testified that "Mr. Menditratta would have indicated to Mr. Altomare that he wished the agreement to be in the name of a nominee of his, [Dhingra,] who I believe was related was a relative." (Gunderson Dep. 2 at 28.) When asked whether he himself had ever discussed with Menditratta the terms of Dhingra's agreement, Gunderson answered, "no." (Id.) Altomare and Gunderson's testimony regarding any involvement of Menditratta with Kaila's consulting agreement is similarly circular and no more substantial.

On the present record, it hardly appears likely that Menditratta will be able to prove he served merely as an unremarkably compensated go-between in repeated sales of unregistered Universal Express stock. But neither does it seem impossible that he will. Reservation of judgment is especially appropriate given the relief the SEC requests as to Menditratta. For instance, plaintiff insists that the Court should issue a permanent injunction against him, as "it is reasonable to infer that his conduct involved a high degree of scienter because he engaged in deception by requesting the shares be issued to his nominees who provided no services to [Universal Express], depositing the shares into the nominee accounts, directing the sales, and then using third-parties to hide the transfer stock proceeds back to [Universal Express]." (P. Rep. Mem. against Menditratta at 6.) Yet to conclude on the current record that Menditratta

committed any of these alleged acts at all, much less as deliberately as the SEC claims, requires numerous inferences. All of these inferences may well become appropriately drawn after a full presentation at trial, but that possibility cannot justify summary judgment. Plaintiff's motion for summary judgment against defendant Mendiratta is therefore denied.

## CONCLUSION

For the foregoing reasons, the SEC's motion for partial summary judgment against the Organizational Defendants (doc. # 123) is granted on all claims, and the Organizational Defendants' cross-motion (doc. # 127) is denied; the SEC's motion for summary judgment against Neuhaus (doc. # 135) is granted as to Section 5 liability, but otherwise denied; and all the other motions for summary judgment (docs. ## 113, 115, 119, 128) are denied. Plaintiff is directed to submit an updated proposed order of remedies as to defendants Universal Express, Altomare, and Gunderson, within ten days of the date of this order.

SO ORDERED.

Dated: New York, New York
        February 21, 2007

                                        _____
                                        GERARD E. LYNCH
                                        United States District Judge