UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                                   :

U.S. SECURITIES AND EXCHANGE     :
COMMISSION,                           :
                                   :

              Plaintiff,       :
                                   :       04 Civ. 2322 (GEL)

   -against-                  :
                                   :       **OPINION AND ORDER**

UNIVERSAL EXPRESS, INC., RICHARD A.  :
ALTOMARE, CHRIS G. GUNDERSON, MARK :
S. NEUHAUS, GEORGE J. SANDHU, SPIGA, :
LTD., and TARUN MENDIRATTA,     :
                                   :

             Defendants.     :
                                   :
--------------------------------------------------------------x

Julie K. Lutz and Leslie J. Hughes, Securities and
Exchange Commission Central Regional Office,
Denver, Colorado, and Robert B. Blackburn,
Securities and Exchange Commission Northeast
Regional Office, New York, New York, for plaintiff.

Barry Schaevitz, Jacob Medinger & Finnegan, LLP,
New York, New York, and Arthur W. Tifford, Tifford
and Tifford, Miami, Florida, for defendants Universal
Express, Inc., Richard A. Altomare, and Chris G.
Gunderson.

GERARD E. LYNCH, District Judge:

      In light of the alleged failure of defendants Universal Express Inc., Richard A. Altomare,

and Chris G. Gunderson ("defendants")[1] to comply with the orders of this Court, the Securities

and Exchange Commission ("SEC") has moved for an order finding these defendants in civil

------

[1] Although there are other defendants in this case, Universal Express, Altomare, and
Gunderson are the only three defendants to whom this motion applies.

contempt.  For the following reasons, this Court finds that the SEC has met their burden, and orders these defendants to appear on October 12, 2007, at 2:30 p.m., either to demonstrate exactly how they have complied with the orders of this Court, or to show cause why they should not be held in contempt, and, in the case of Altomare and Gunderson, incarcerated to compel compliance.  The SEC also moves for the appointment of a receiver, and in light of the inability of Universal Express, Altomare, or Gunderson to find qualified individuals to serve as officers of Universal Express, this Court will appoint a receiver to provide the company with needed stewardship, help the company satisfy the judgments against it, and determine how the company should proceed in light of those judgments.

The Court's opinion today also disposes of all arguments made by Defendants in their pleadings seeking a stay of enforcement of the judgment against them pending their appeals. The repeated actions of defendants demonstrate not only defendants' clear lack of respect for the orders of this Court and federal securities laws, but also the necessity of this Court's judgments remaining in full force pending appeal.

## BACKGROUND

I.    <u>Parties and Procedural History</u>

Universal Express is a publicly-traded Nevada corporation purportedly involved in shipping and transportation, and it maintains its prinicipal place of business in Florida and an office in New York City.  <u>SEC v. Universal Express</u>, 475 F. Supp. 2d 412, 415-16 (S.D.N.Y. 2007).  Richard A. Altomare has been its chief executive officer and director since 1992, and is currently the company's sole officer and director.  <u>Id</u>. at 16.  Chris G. Gunderson is a lawyer who has served as in-house counsel for Universal Express since 1995.  <u>Id</u>.

In this action, the SEC charged defendants (and several others) with violating various provisions of the federal securities laws.  On February 21, 2007, this Court granted summary judgment in favor of the SEC, holding that the defendants violated Section 5 of the Securities Act by issuing unregistered shares absent any applicable exception, Universal Express, 475 F. Supp. 2d at 424-26, and by violating the antifraud provisions of the federal securities laws, id. at 426-28.  Since March 24, 2004, by order of this Court, the defendants have been enjoined from violating, inter alia, sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), e(c), and 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240].  (Order of March 24, 2004, at 3.)  The defendants were also enjoined from violating various related provisions.  (Id.)

The February 21 order granted the SEC's request both for summary judgment, and for a permanent injunction against the defendants, finding it clear that "these defendants violated [federal registration and anti-fraud securities] laws, and if not enjoined, likely would do so again."  Universal Express, 475 F. Supp. 2d at 428.  The Court noted that the defendants "not only deny culpability but do so with incredible and contorted arguments."  Id.  The Court outlined the sanctions to be imposed against the various defendants, and directed the SEC to submit an updated, proposed order of final judgment and permanent injunction.  Id. at 428-30.

On March 8, 2007, the Court entered judgment against defendants on the SEC's claims that defendants violated Sections 5(a), 5(c), and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5.  (Judgment of March 8, 2007, at 1.)  The permanent injunction prohibits (i) violations of Section 5 of the Securities Act, including the

"direct[] or indirect[]" sale, via interstate commerce, of "any [unregistered] security" in the absence of any applicable exemption[2] (id. at 2); (ii) violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, or Rule 10b-5 [17 C.F.R. § 240.10b-5], including the offer or sale of any security via interstate commerce by use of any means "to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading" (id. at 2-3); (iii) Altomare or Gunderson's participation in an offering of penny stock (id. at 9); and (iv) Altomare's acting as an officer or director of any company, including Universal Express, that issue certain types of securities (id. at 10).

In addition, all three defendants were ordered to pay certain sums to the Clerk of the Southern District of New York by April 16, 2007: Universal Express was ordered to pay $21,906,483, consisting of $9,959,828 in disgorgement, $1,986,827 in prejudgment interest, and $9,959,828 in civil penalties (Judgment of March 8, 2007, at 4); Altomare was ordered to pay a total of $3,121,123, consisting of $1,419,025 in disgorgement of ill-gotten gains, $283,073 in prejudgment interest, and $1,419,025 in civil penalties (id. at 6.); Gunderson was ordered to pay $794,711, consisting of $361,317 in disgorgement, $72,077 in prejudgment interest, and $361,317 in civil penalties (id. at 8).

---

[2] More specifically, defendants were ordered to refrain, in the absence of an applicable exception, from "directly or indirectly," (i) "making use of any means or instruments of transportation or communication in interstate commerce to or of the mails to sell [unregistered] securit[ies]"; (ii) "carrying or causing to be carried through the mails or in interstate commerce . . . [unregistered] securit[ies] . . . for the purpose of sale or for delivery after sale"; and (iii) "[m]aking use of any means . . . [of] interstate commerce . . . to offer to sell . . . [unregistered] securit[ies]." (Judgment of March 8, 2007 at 2.)  This language is functionally identical to that of the preliminary injunction that has bound the defendants since March 24, 2004.  (See Order of March 24, 2004, at 4.)

After judgment was entered, Defendants appealed and moved this Court to stay any proceedings to enforce the judgment entered against them pending appeal.  (D. Mot. to Stay.) That motion was denied, <u>SEC v. Universal Express, Inc.</u>, No. 04 Civ. 2322, 2007 WL 2245509, *3 (S.D.N.Y. August 3, 2007), though the Court noted that certain arguments raised in that motion would be dealt with in discussing the merits of the instant SEC motions for the enforcement of the judgment.  <u>Id</u>. at *2.

In one such SEC motion for enforcement, the SEC seeks an entry of civil contempt against these defendants, for the following alleged violations of this Court's orders:

 (a) Universal Express, with the participation of Altomare and Gunderson, has issued over 5.4 billion shares of Universal Express stock during the first three months of 2007 and issued an additional 15.5 billion shares since April 2, 2007;

 (b) Altomare and Gunderson have continued to participate in the offering of penny stock;

 (c) Universal Express and Altomare have continued to make materially false and misleading statements in reports filed with the Securities and Exchange Commission;

 (d) Universal Express, Altomare, and Gunderson have failed to pay disgorgement and prejudgment interest by April 16, 2007;

 (e) Altomare has remained as an officer of Universal Express.

In a separate motion, the SEC also moves the Court to appoint a receiver to take control of the assets and operations of Universal Express, arguing that appointing a receiver is also necessary to enforce the Court's judgment.

**DISCUSSION**

I.    <u>Legal Standards</u>

    A.    <u>Civil Contempt</u>

In the Second Circuit, to support a finding of contempt, "a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." <u>Perez v. Danbury Hosp.</u>, 347 F.3d 419, 423-424 (2d Cir. 2003), quoting <u>King v. Allied Vision, Ltd.</u>, 65 F.3d 1051, 1058 (2d Cir. 1995); <u>EEOC v. Local 638</u>, 753 F.2d 1172, 1171 (2d Cir. 1985) (internal quotation marks omitted).  Though the violation need not be willful, the movant seeking the contempt order must demonstrate that "the contemnor was not reasonably diligent in attempting to comply." <u>City of New York v. Local 28, Sheet Metal Workers' Intern. Ass'n</u>, 170 F.3d 279, 282-83 (2d Cir. 1999), quoting <u>EEOC v. Local 638</u>, 81 F.3d 1162, 1171 (2d Cir. 1996), in turn quoting <u>U.S. v. Local 1804-1</u>, 44 F.3d 1091, 1096 (2d Cir. 1995) (internal quotation marks omitted).

    B.    <u>Receivership</u>

Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] confer general equity powers upon the district courts, <u>SEC v. Manor Nursing Ctrs., Inc.</u>, 458 F.2d 1082, 1103 (2d Cir. 1972), and "despite the absence of explicit statutory authority" the district court may appoint a receiver "to effectuate the purposes of the federal securities laws." <u>Id</u>. at 1105.  <u>See also</u> <u>SEC v. Am. Bd. of Trade, Inc.</u>, 830 F.2d 431, 436 (2d Cir. 1987); <u>SEC v. Materia</u>, 745 F.2d 197, 200-01 (2d Cir. 1984).


The appointment of a receiver is an "extraordinary remedy to be invoked only in cases of

necessity and upon a clear showing that an emergency exists." SEC v. Am. Bd. of Trade, Inc.,

645 F. Supp. 1047, 1052 (S.D.N.Y. 1986), quoting Petersen v. Federated Development Co., 387

F. Supp. 355, 361 (S.D.N.Y. 1974). However, federal district courts "ha[ve] the equity power to

appoint a receiver when necessary to prevent a diversion or waste of assets to the detriment of

those for whose benefit . . . [the] injunctive action is being brought." Id. (internal quotations

omitted).

II.      The Standards Applied

         A.      Civil Contempt

                 1.      Issuance of Unregistered Shares

         As was explained in the Court's opinion on summary judgment, see Universal Express,

475 F. Supp. 2d at 422, Section 5 of the Securities Act prohibits any person from offering or

selling an unregistered security in interstate commerce.[3]  In that opinion, this Court rejected the

---

[3]A person violates Section 5 when that person uses interstate transportation, communication, or the mails in connection with the offer to sell or the sale of a security when no registration statement was in effect for the securities being offered or sold. SEC v. Cavanagh, 445 F.3d 105, 111 n.13 (2d Cir. 2006); Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London, 147 F.3d 118, 124 n.4 (2d Cir. 1998); SEC v. North Am. Research & Dev't Corp., 424 F.2d 63, 65 n.1 (2d Cir. 1970). Registration is "transaction-specific"– the requirement of registration applies to each act of offering or sale. SEC v. Cavanagh, 155 F.3d 129, 133 (2d Cir. 1998).

Liability for Section 5 violations extends to those who participate in an offer to sell or engage in steps necessary to the distribution of the securities. SEC v. Chinese Consol. Benevolent Ass'n, 120 F.2d 738, 741 (2d Cir. 1941); SEC v. Murphy, 626 F.2d 633, 650-51 (9th Cir. 1980); SEC v. Holschuch, 694 F.2d 130, 139-40 (7th Cir. 1982). The participation must be necessary and substantial, and not de minimis. Murphy, 626 F.2d at 650-52; accord SEC v. Softpoint, Inc., 958 F. Supp. 846, 860 (S.D.N.Y. 1997). A plaintiff need not show scienter to prove a Section 5 violation by an attorney. SEC v. Spectrum, Ltd., 489 F.2d 535, 541-42 (2d Cir. 1973); Swenson v. Engelstad, 626 F.2d 421, 424 (5th Cir. 1980).

Once the SEC makes out a prima facie case, the burden shifts to the defendant to show that the securities transactions at issue fall within one of the exemptions from registration. SEC v. Cavanagh, No. 98 Civ. 1818, 2004 WL 1594818, at *16 (S.D.N.Y. July 16, 2004), citing SEC

defendants' contention that they were exempt from having to register over 500 million securities allegedly issued pursuant to an employee stock option plan approved by the bankruptcy court as a part of Universal's 1994 plan of reorganization.  Id. at 425-26.

The SEC contends that defendants have issued billions of additional unregistered securities in continued violation of this Court's orders.  The SEC submits evidence, unchallenged by any defendant, that Universal Express has not filed any registration statements with the SEC since January 22, 2002.  (Decl. of Leslie J. Hughes, dated June 29, 2007, ("Hughes Decl.") ¶ 7.)  The SEC also submits overwhelming evidence that since that time, Universal Express has issued billions of shares (see PX 1 at 10; PX 7),[4] and done so with the central and necessary involvement of Altomare and Gunderson (PX 8, 9).

By the SEC's calculations, from January 2007 to March 2007, in apparent violation of this Court's preliminary injunction, Universal Express issued 5.4 billion shares in exchange for money or services, with the vast majority of the shares, 4.7 billion, being exchanged for deferred services.  (P. Mot. for Contempt at 7 n.3.)  The SEC also submits persuasive evidence that from April 2, 2007, through June 18, 2007, in apparent violation of this Court's permanent injunction, Altomare instructed the transfer agent of Universal Express to issue billions more new shares of Universal Express stock.  (Hughes Decl. ¶ 17; PX 7, 8.)  The SEC also provides evidence that Gunderson helped to facilitate the issuance of the securities by offering opinion letters to accompany Altomare's instructions to the transfer agent, and by faxing both the instructions and

---

v. Ralston Purina Co., 346 U.S. 119, 124 (1953), and Cavanagh, 155 F.3d at 133; North Am. Research, 424 F.2d at 71-72.

[4] The designation "PX" refers to exhibits to the SEC's motion for contempt.

the opinion letters to the agent.  (Hughes Decl. ¶¶ 17-18; PX 8, 9).

Defendants do not contest that these shares were issued or that Altomare or Gunderson facilitated their issuance.  Further, notwithstanding representations to the contrary in certain Altomare instructions and Gunderson opinions (Hughes Decl. ¶ 17; PX 8), no defendant now claims that these securities are exempt from registration because they were issued pursuant to the option plan contained in the bankruptcy plan of reorganization.  They cannot do so, because this Court explicitly rejected, months before billions of these shares were issued, this purported exemption.  Universal Express, 475 F. Supp. 2d at 425-26.

Defendants instead argue that much of the unregistered stock issued was not "sold" but exchanged for services.  (Ds. Resp. to Mots. for Contempt and Receiver at 5-6.)  Specifically, defendants claim that: (1) the 5.4 billion shares issued between January 1, 2007, and March 31, 2007, mentioned in Universal Express's Form 10Q for the period ending March 31, 2007, were not "sold" (id. at 5); (2) the 68 million shares issued between June 1, 2006, and March 31, 2007, were not "sold" but issued in exchange for various services (id. at 6); (3) the 15.5 billion shares issued after April 2, 2007, were not sold, but exchanged for the services of "public relations firms" (id.); (4) and some 670 million shares that defendants admit were sold between June 1, 2006, and March 31, 2007, "involved only restricted shares that were part of a single subscription agreement" (id. at 5-6).

Defendants' primary argument, made without legal support, is that exchanging unregistered shares for services is somehow different, for purposes of federal securities law and this Court's order, than exchanging unregistered shares for money.  Even accepting defendants' version of the facts, their legal assertions fail.  The Securities Act makes clear that the exchange

9

of unregistered securities for services which have value constitutes a sale.  Section 2(3) of the

Securities Act defines the term "sale" or "sell" to include every contract of sale or disposition of

a security or interest in a security "for value."  15 U.S.C. § 77b(a)(3).  See Falkowski v. Imation

Corp., 309 F.3d 1123, 1129-1130 (9th Cir. 2002) ("The grant of an employee stock option on a

covered security is . . . a 'sale' of that covered security."); West v. Innotrac Corp., 463 F. Supp.

2d 1169, 1180 (D. Nev. 2006) (exchanging stock options for three years of employment

constituted a transfer for value, and was therefore a sale); Stephenson v. Deutsche Bank AG, 282

F. Supp. 2d 1032, 1065 (D. Minn. 2003) ("the definition of 'sale' under Section 2 of the 1933

Act is quite broad"); see also McKesson HBOC, Inc. v. New York State Common Retirement

Fund, Inc., 339 F.3d 1087, 1092 (9th Cir. 2003) ("the term 'offer' has a different and far broader

meaning in securities law than in contract law"), citing Hocking v. Dubois, 885 F.2d 1449,

1458-59 (9th Cir. 1989) (en banc); S.E.C. v. Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998) (the

definition of "offer" in 15 U.S.C. § 77b(a)(3) "extends beyond the common law contract concept

of an offer"); S.E.C. v. Cavanagh, 1 F. Supp. 2d 337, 368 (S.D.N.Y. 1998) (the definition of

"offer" goes "well beyond the common law concept of an offer" because the "creation of legally

enforceable contracts for the sale of unregistered securities" is often "immaterial for purposes of

determining whether the harm with which Section 5 is concerned occurs.")

Defendants do not suggest that these alleged services did not provide "value" to the

company.  (Cf. Decl. of Chris G. Gunderson, dated July 26, 2007, ("Gunderson Decl.") ¶ 24,

describing "[d]eferred [c]ompensation" where the stock issued is "valued at market price on the

date of issuance.")  These stock transactions, which inject unregistered securities into the

marketplace to the detriment of the investing public, are precisely the types of transactions that

10

this Court's orders, and the federal securities laws, are intended to prevent.[5]

Thus, the preliminary and permanent injunctions against the sale of unregistered securities are clear and unambiguous, and the SEC has demonstrated defendants' violations of those injunctions by clear and convincing evidence.  The SEC has also demonstrated the defendants' complete lack of reasonable diligence.  Defendants do not contest that in the months after the Court's grant of summary judgment against defendants for their issuance of *millions* of unregistered securities, Universal Express, 475 F. Supp. 2d at 416-17, 439, they issued *billions* more unregistered securities.  The substantial increase in the issuance of unregistered securities, combined with the specious justifications that the defendants now attempt to hide behind, demonstrate not only lack of reasonable diligence on behalf of the defendants, but active and willful disobedience of court orders.

### 2.    Violation of Penny Stock Bar

Gunderson and Altomare, by order of this Court entered on April 2, 2007, were "permanently barred from participating in an offering of . . . any equity security that has a price of less than five dollars," except as provided in non-applicable provisions.  (Judgment of March

---

[5] Notwithstanding defendants' baseless argument that billions of unregistered shares exchanged for services were not in fact sold, defendants admit that at least 670 million of the 8.7 billion shares issued between June 1, 2006, and March 31, 2007, were in fact sold.  (Ds. Resp. to Mots. for Contempt and Receiver at 5-6.)  They contend, though, that the sale involved only restricted shares as part of a subscription agreement sanctioned by the SEC's Division of Corporation Finance.  (Id.)  The SEC contests the existence of such a subscription agreement, stating that the staff of the SEC's Division of Corporation Finance never agreed that securities exchanged for "stock rights" contained in subscription agreements did not constitute an offer to sell a security.  (P. Reply Mot. for Contempt and Receiver at 6.)  The SEC further disputes that any comments by the staff of that division could create such a binding agreement on the SEC.  (Id. at 6-7.)  Given the overwhelming evidence that defendants have already violated clear provisions of the injunction and federal securities laws through the sale of *billions* of unregistered securities, it is unnecessary to determine the status of these 670 million securities.

8, 2007, at 9.)  By its terms, this injunction was not limited to the *sale* of *unregistered* securities, but prohibited the *offering* of *any* penny stock.

The order is clear.  The SEC provides clear evidence that Altomare and Gunderson participated in the offering of penny stock in the form of Universal Express stock in contravention of the permanent injunction.  (Hughes Decl. ¶¶ 17-18; PX 8, 9.)  Altomare and Gunderson do not even attempt to provide any explanation for the violation.  Their active participation in the issuance of billions of unregistered shares of penny stock demonstrates that their violation of the Court order was due not to lack of reasonable diligence or even recklessness, but to sheer willfulness.

     3.    <u>Statutory Fraud</u>

Since March 24, 2004, the defendants have been enjoined from violating certain anti-fraud provisions of the securities laws: Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5]. (Order of March 24, 2004, at 3; Judgment of March 8, 2007, at 2-3.)  The Court's Summary Judgment Opinion sets out in detail the standards for violation of the relevant anti-fraud statutes. <u>Universal Express</u>, 475 F. Supp. 2d at 422-24.

In that opinion, the Court specifically discussed examples of fraudulent behavior by Universal Express and Altomare, describing certain statements as "at best misleading and sometimes wholly fantastical."  <u>Id</u>. at 426.  One such example was Universal Express's "public[] project[ion] [of] sizeable revenues from businesses with which it actually had no connection." <u>Id</u>. at 421.  The Court pointed to a Universal Express press release anticipating $9 million in annual revenue from its "WorldPost Network," which was described in the press release as "over

9,000 independently owned and operated private postal stores," but which was in fact every postal store in the United States that had not somehow known to opt out of it.  Id.  The Court noted that there was "no evidence that Universal Express actually had a relationship with any such store."  Id.

The SEC contends that Universal Express and Altomare continue to make false and misleading statements in violation of this Court's orders, relating to: (i) the status of litigation with the SEC, (ii) Altomare's status as officer of the company, and (iii) the relationship of Universal Express to the "WorldPost Network."  (P. Mot. for Contempt at 9-11.)  At this point and on this issue, the SEC does not seek a finding of contempt against Gunderson.

(i) The SEC contends that Universal Express and Altomare made multiple false and misleading statements about the status of Universal Express's litigation with the SEC.  First, the SEC points out that Universal Express's federal securities filings in 2006 and 2007, signed by Altomare, discuss a "pending" lawsuit filed by Universal Express against the SEC, seeking damages resulting from the SEC's failure to prevent the "naked shorting" of its shares.  (See PX 1 at 11-12; PX 5 at 5.)  The SEC points out that this suit was in fact dismissed on March 30, 2005 (see PX 6), and that the dismissal was affirmed by the Eleventh Circuit on April 18, 2006.  See Universal Express, Inc. v. SEC, 177 Fed. Appx. 52, 2006 WL 1004381 (11th Cir. 2006).

Second, the SEC notes that, in the same filings, Universal Express and Altomare describe the pleadings before this Court as an "SEC . . . action . . . against certain officers of the Company."  (See PX 1 at 11; PX 3 at 5.)  The SEC notes that the filings fail to disclose that the Company itself, and not merely "certain officers," is a defendant in the lawsuit.  (P. Mot. for Contempt at 11.)

Defendants concede that these statements were "inartful," but insist that they were not "false and misleading," claiming that the SEC is merely "nit picking" and "splitting hairs." (Ds. Resp. to Mots. for Contempt and Receiver at 6-7.) Defendants appear to suggest that these misstatements, even if false, are immaterial. However, as defendants were reminded in February, Universal Express, 475 F. Supp. 2d at 423, information misrepresented or omitted is material if there is a "substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares." Azrielli v. Cohen Law Offices, 21 F.3d 512, 518 (2d Cir. 1994); see also Basic Inc. v. Levinson, 485 U.S. 224, 240-41 (1988). The fact need not alone have a dispositive effect on the reasonable investor's decision; for omissions to be material, there need only be a "substantial likelihood" that "the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) (explaining the "general standard of materiality" that promotes the "protection of investors").

The cited statements were clearly false. They were also clearly material. It would matter to a reasonable investor that a lawsuit against the SEC was not "pending," but had been dismissed. It would also matter to a reasonable investor that the problem at Universal Express is not limited to one or two rogue officers, but encompasses the corporation itself. Moreover, as defendants were unquestionably aware of the true facts, the false statements can only have been intentional.

Defendants claim that it was a matter of "widespread public knowledge" that these reports were inaccurate (Ds. Resp. to Mots. for Contempt and Receiver at 7), suggesting, without any support, that this should somehow neutralize the effect of what were, in fact, materially false

14

filings signed by Altomare in the name of Universal Express.  That certain materially false company filings may be contradicted by publicly available facts merely demonstrates the brazenness of defendants' mendacity; it does not absolve defendants of their reporting requirements under federal securities law.  See e.g., In re Apple Computer Sec. Litig., 886 F.2d 1109, 1114 (9th Cir.1989) ("Ordinarily, omissions by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public."); see also Fisher v. Plessey Co., 559 F. Supp. 442, 445 (S.D.N.Y. 1983); Endo v. Albertine, 812 F. Supp. 1479, 1488 (N.D. Ill. 1993).

(ii) The SEC also contends that Universal Express and Altomare further engaged in statutory fraud through filings made after March 8, 2007, when Altomare signed the filings as president, CEO, chairman of the board, and chief accounting officer of Universal Express without disclosing the entry of this Court's February 21, 2007, order finding Altomare unfit to remain as an officer at Universal Express, and March 8, 2007, judgment barring him from acting as an officer or director of a public company.  (See Hughes Decl. ¶ 9.)  Inexplicably and incomprehensibly, defendants assert that the SEC's allegation "violate[s] the law of contradiction."  (Ds. Resp. to Mots. for Contempt and Receiver at 8.)

Failure of Universal Express to disclose this Court's orders against Altomare in its securities filings would be a material falsehood even if Altomare were not still at the Company.  But the failure to disclose becomes especially egregious given Altomare's refusal to remove himself from Universal Express.  Surely, the reasonable investor would want to know that the individual in charge of the company in which the investor holds stock is doing so in blatant violation of a court order.  Defendants are violating this Court's injunction not only by allowing

Altomare to remain in office, but also by identifying him as a corporate officer while failing to disclose to investors that he has been ordered removed.

(iii) The SEC also contends that Universal Express has continued to issue false and misleading statements discussing "revenue streams" from "9,000 private postal centers in a network called UniversalPost."  (PX 1 at 10.)  This network, defendants concede, is the same network as the "WorldPost Network" (Ds. Resp. to Mots. for Contempt and Receiver at 6-7), the network for which this Court found that Universal Express had provided "no evidence that [they] actually had a relationship with any such store."  Universal Express, 475 F. Supp. 2d at 421.

Contrary to this Court's previous findings, defendants insist that this network is an "existing business activity which was the invention of Mr. Altomare and [Universal Express]" (Ds. Resp. to Mots. for Contempt and Receiver at 6-7), claiming that the Court's finding is "simply contrary to historical, well documented facts" (id. at 7, citing Gunderson Decl. and Cungerson Decl. Ex. ("DX") 1, 2).  However, the "well-documented facts" that defendants can muster are not contracts with or affidavits from members of the supposed network, or indeed any credible evidence at all, but: (i) the declaration of Gunderson, an attorney this Court has already found to have "apparent disregard for the law" evinced by his "repeated[] approv[al] and contribut[tion] to acts of fraud and noncompliance with investor-protecting registration requirements," Universal Express, 475 F. Supp. 2d at 430; (ii) a propaganda piece from an online publication, filled with self-serving unsworn statements by Altomare, an individual who has "repeatedly and brazenly committ[ed] fraud and flout[ed] investor-protecting registration

16

requirements," id. at 429;[6] and (iii) an article from the Miami Herald, filled with unsworn statements by Altomare, that says *absolutely nothing* about the "WorldPost" or "UniversalPost" Network (DX 2).

None of this material plausibly supports the truthfulness of the representations. The second and third items are essentially inadmissible hearsay. Gunderson, who potentially has first-hand knowledge of Universal Express's business, provides no information whatsoever about actual revenues, offering instead a totally abstract, and rather fanciful, description of a business model that provides no justification for the challenged revenue projections. (Gunderson Decl. ¶ 8.)

Again, a reasonable investor would want to know that there is much less substance to the "UniversalPost" Network than defendants and filings would have one believe. Once again, the statements in question can only have been deliberately false. Defendants were clearly on notice that their earlier statements about the "WorldPost Network" had been determined to be false. Moreover, the reports were specifically modified from "WorldPost" to "UniversalPost," demonstrating an active and willful effort to repeat the false statements while disguising the fact that nearly identical statements had been previously found fraudulent.[7]

---

[6] According to the publication's disclaimer, "[r]eferences made to third parties . . . are not guaranteed as being accurate." (DX 1 at 4.)

[7] The press releases at issue in the Summary Judgment Order anticipated revenues of $9 million from the "WorldPost Network." Universal Express, 475 F. Supp. 2d at 421. The allegedly fraudulent statements here, made in the Universal Express 10-Q filed on March 31, 2007 described the "UniversalPost" network as producing "growing streams of revenue." PX 1 at 10. The problem with both statements has not only to do with the estimation of the revenue booked, but also, and more centrally, with the representations that this network exists at all, and that it creates any revenue at all.

The injunctions against the commission of statutory fraud are clear.  Equally clear are the fraudulent statements that the SEC identifies.  As these repeated false statements were intentional, or at a minimum highly reckless, it follows that Universal Express and Altomare failed to act with reasonable diligence to comply with this Court's orders against the commission of statutory fraud.

                4.     <u>Failure to Disgorge</u>

To date, the record reflects no disgorgement payment made by any defendant in any amount.  Defendants have not produced any evidence describing any defendant's efforts to pay the Court fines.  The Court's order is clear, as is its violation by the defendants.  As a preliminary matter, in their pleadings on their motion for a stay, defendants claim that enforcement of the civil-penalty and disgorgement aspects of the judgment will cause Universal Express irreparable injury, as "the financial demands . . . will bankrupt the company."  (Ds. Reply Mot. to Stay at 6.)  Even if compliance with the judgment would bankrupt Universal Express, and even if bankruptcy could be viewed as an irreparable injury – although defendants provide absolutely no authority on this point – a stay on this ground alone would not be warranted.  Defendants have failed to make any showing of a likelihood of succeeding on the merits or of any other reason to conclude that maintaining the pre-judgment status quo would constitute anything other than permission to retain millions of dollars in ill-gotten gains.  Even if there were some basis for staying the disgorgement order as to Universal Express, the individual defendants offer no reason why the order should be stayed as to them.

Defendants bear the burden of producing evidence of their inability to comply with the Court's order requiring them to pay disgorgement and prejudgment interest.  <u>Huber v. Marine</u>

18

Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995).   To meet this burden, the alleged contemnor must

prove "plainly and unmistakably that compliance is impossible."  U.S. v. Rylander, 460 U.S.

752, 757 (1983).  An alleged contemnor who "offers no evidence as to his inability to comply . .

. or stands mute" fails to meet that burden.  Huber, 51 F.3d at 10, quoting Maggio v. Zeitz, 333

U.S. 56, 75 (1948).

        The SEC contends that defendants have made no efforts to comply with the Court's

judgment directing disgorgement.  (P. Mot. for Contempt at 13).  The SEC points to the assets

and income of the various defendants that could be used to make payments toward satisfaction of

the judgment.  (Id.)  Defendants fail to provide any evidence either of their efforts to make

disgorgement and prejudgment interest, or of their inability to pay.  Instead, they claim that, at a

projected evidentiary hearing, they will present evidence relating to efforts by each of the

defendants to make disgorgement and prejudgment interest.  (Ds. Resp. to Mots. for Contempt

and Receiver at 9.)  The credibility of this claim is undermined by defendants' failure to proffer

any such evidence in reply to the SEC's motion, at which time they did submit evidence on

various other issues.  (See Decl. of Richard A. Altomare, dated July 26, 2007, ("Altomare

Decl."); Gunderson Decl. and accompanying exhibits.)  Thus again, the SEC appears to have met

its burden with respect to its motion for contempt.

                    5.      Violation of Officer Bar

        On March 8, 2007, this Court enjoined Altomare from acting as an officer or director of

any issuer of registered securities.[8]  (Judgment of March 8, 2007, at 10.)  Defendants admit, as

_____

        [8] The relevant language is: "IT IS FURTHER ORDERED, ADJUDGED, AND
DECREED that . . . Altomare is prohibited from acting as an officer or director of any issuer that
has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78*l*

                                              19

they must,[9] that Altomare has remained in office as chief executive officer, chief accounting

officer and director following entry of this Court's Final Judgment.  (Ds. Resp. to Mots. for

Contempt and Receiver at 8-9.)

      In their motion to stay proceedings pending appeal, defendants argue that they will be

irreparably injured by enforcement of the officer-or-director bar against Altomare, because it

will prevent him from directing the daily operations of Universal Express, which defendants

claim employs 85 people and is a "multi-faceted, developing company."  (Ds. Reply Mot. to Stay

at 8.)  This argument is meritless.  The legitimate interests of any shareholders or employees are

not best – or at all – protected by preserving the authority of an individual shown on undisputed

evidence to have repeatedly violated federal laws applicable to precisely such publicly-held

companies as Universal Express.  Defendants have not even hinted at any evidence, nor offered

any persuasive argument, suggesting error in the Court's conclusion that Altomare engaged in

securities fraud and impermissibly distributed massive numbers of unregistered securities.  Nor

have they even claimed that Altomare, despite his history of federal law violations, is somehow

uniquely suited to running Universal Express as a legitimately successful business.  There is thus

no showing of an "injury" to result from the removal of Altomare from leadership of the

corporation, let alone of an irreparable one.

---

or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. §
78o(d)." (Judgment of March 8, 2007 at 10.)

    [9] On numerous occasions after March 8, 2007, Altomare has signed filings with the SEC
representing himself as the CEO and Chief Accounting Officer of Universal Express or as the
company's president and Chairman of the Board of Directors.  (Hughes Decl. ¶ 6; PX 1 at 16;
PX 3 at 12-13; PX 5 at 4-6.)

The Court's order could not be clearer.  The SEC demonstrates, and defendants admit, that Altomare is in violation of this Court's Order.  (See Ds. Resp. to Mots. for Contempt and Receiver at 8-9.)  Notwithstanding their admitted violation of a Court order, defendants insist that they have been unable to replace Altomare despite "good faith" efforts.  (Id. at 9.)  However, as of yet, the defendants have not presented any evidence of such efforts, notwithstanding their opportunity to do so.  (See e.g., Altomare Decl.; Gunderson Decl. and accompanying exhibits.)

      6.      Contempt Adjudication

Though the SEC appears to have made its case with respect to all parts of its contempt action, this Court recognizes that a contempt order is a "potent weapon." King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir.1995), quoting International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76 (1967).  As such, instead of immediately finding all three defendants in contempt, a judgment this record would amply support, the Court will give the defendants one last opportunity to comply with the order or to rebut the SEC's strong case for a finding of contempt.  For that reason, the Court orders all three defendants to appear before this Court on October 12, 2007, at 2:30 p.m., to show cause why they should not be held in contempt.

However, regardless of the outcome of that proceeding, the clarity of the record demonstrates why it is absolutely essential that, to preserve the integrity of the public securities markets, this Court's judgment cannot be stayed pending defendants' appeal.  Defendants do not even attempt to support their conclusory statements that "there cannot be any argument advanced in good faith . . . that the issuance of a stay will substantially harm either the [SEC] or the other parties interested," (Ds. Mot. to Stay at 7-8), and that "the public interest will be best served . . .

through this Court's stay" of the judgment insofar as it enjoins Altomare from continuing directorship and requires payment of penalties by Universal Express (Ds. Reply Mot. to Stay at 8).  To the contrary of these perfunctory arguments, a stay of any portion of the judgment would both substantially injure the SEC and undermine the public interest.  As the chief regulator of the public securities markets, the SEC holds a substantial interest in having the results of its meritorious actions to protect investors enforced, and defendants show nothing to suggest that this case is an exception.  Because defendants provide no reason to doubt the conclusion that they repeatedly and extensively violated the federal laws and this Court's orders prohibiting securities fraud and distribution of unregistered securities, it is clear that the public interest would be ill served by any stay of the judgment or of proceedings related thereto.

      B.      <u>Receivership</u>

      The SEC argues that this Court should appoint a receiver because absent a receivership, the Court's judgment is "likely to be eviscerated by the continuing conduct of Universal Express, Altomare and Gunderson" (P. Mot. for Receiver at 3).  Though there appears to be some dispute about the total assets available to Universal Express,[10] it is uncontested that the $21 million judgment against the company far exceeds the company's assets.

      As the SEC points out, there is no Universal Express officer or director authorized to comply with the company's reporting responsibilities with the SEC.  (<u>Id</u>. at 2.)  Altomare and Gunderson appear incapable of complying with federal securities laws and this Court's orders.  Altomare and Gunderson frivolously insist that Altomare's indefinite employment with

---

[10] Defendants represent that the Company has total assets "slightly in excess of approximately $11 million" (Ds. Reply Mot. for Stay at 6 n.3).  The SEC is skeptical that Universal Express has such assets (<u>see</u> P. Reply Mots. for Contempt and Receiver at 2).

Universal Express is an integral part of the reorganization of the company as envisioned by the bankruptcy plan of reorganization. (Altomare Decl.; Gunderson Decl. ¶¶ 4, 31-33.) Gunderson claims that Altomare's employment was "directed by the Bankruptcy Court to continue long-term" and "continue[s] to date, except to the extent this Court's judgment may be affirmed as properly encroaching upon the final order of the Bankruptcy Court." (Gunderson Decl. ¶ 32.) These arguments and assertions are specious and have already been rejected by this Court. (Universal Express, 475 F. Supp. 2d at 425-26). Altomare and Gunderson cannot use a decade-old bankruptcy order as an indefinite license to break federal securities law and commit fraud with impunity.

Altomare insists, without any convincing detail, that he has searched within and without the company to find someone able and willing to replace him. (See Altomare Decl. ¶¶ 4-5.) However, Altomare provides no indication of when or how he may find a replacement. Though Altomare claims that his efforts to find a replacement continue (id. ¶ 6), this Court has as little confidence in Altomare's ability to find his replacement as it has in Altomare's ability to run Universal Express. Indeed, Altomare's confessed inability to find a substitute merely demonstrates the need for the Court's intervention.

Appointing a receiver is an extraordinary remedy, but this is an extraordinary situation. Defendants continue to violate court orders, and there is no one who is responsible, willing, and able to manage Universal Express. Defendants had an opportunity to find a replacement for Altomare, and they have demonstrated either their inability or unwillingness to do so. Therefore, the Court will appoint a receiver, and anticipates that the receiver, as a responsible officer of the Court, will be able to determine Universal Express's actual financial state, to collect and

23

conserve what assets the company has, and to report its findings to the Court.  See SEC v.

Koenig, 469 F. 2d 198, 202 (2d Cir. 1972); SEC v. S&P Nat'l Corp., 360 F.2d 741, 750-51 (2d

Cir. 1966).

<h2 style="text-align:center">CONCLUSION</h2>

For the foregoing reasons, the SEC's motion to appoint a receiver is granted.  This Court

orders defendants Universal Express, Altomare, and Gunderson to appear on October 12, 2007,

at 2:30 p.m., to show cause why they should not be held in contempt.

SO ORDERED.

Dated: New York, New York
       August 30, 2007

GERARD E. LYNCH
United States District Judge

24