UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
:
U.S. SECURITIES & EXCHANGE :
COMMISSION, :
:
:
                Plaintiff, :
: 04 Civ. 2322 (GEL)
         -v.- :
: **OPINION AND ORDER**
:
UNIVERSAL EXPRESS, INC. et al., :
:
               Defendants. :
------------------------------------------------------------x

Julie K. Lutz and Leslie J. Hughes, Securities and Exchange Commission Central Regional Office, Denver, Colorado, and Robert B. Blackburn, Securities and Exchange Commission Northeast Regional Office, New York, New York, for plaintiff.

Arthur W. Tifford, Tifford and Tifford, Miami, FL, for defendant Richard A. Altomare.

GERARD E. LYNCH, District Judge:

      The Securities and Exchange Commission ("SEC") moves for an order finding defendant Richard Altomare in contempt for failing to disgorge and pay prejudgment interest on ill-gotten gains from violating federal securities laws, as mandated more than a year ago by order of this Court. For the following reasons, that motion will be granted, and Altomare will be incarcerated until he pays the disgorgement and prejudgment interest in full, or produces documentation to show categorically and in detail that any further payment is impossible.

## BACKGROUND

      On February 21, 2007, this Court granted summary judgment in favor of the SEC in its action charging Altomare with violating various provisions of the federal securities law. See

SEC v. Universal Exp., Inc., 475 F. Supp. 2d 412, 415 (S.D.N.Y. 2007).  Thereafter, Altomare was permanently enjoined from selling unregistered securities and from engaging in securities fraud (see Judgment of March 8, 2007, at 1-3), effectively extending a temporary restraining order issued against him in 2004 (see Order of April 19, 2004).  Altomare was also permanently enjoined from participating in an offering of penny stock (Judgment of March 8, 2007, at 9), and from acting as an officer or director of any company, including Universal Express, that issued certain types of securities (id. at 10), and was ordered to pay $1,419,025 in disgorgement of ill-gotten gains and $283,073 in prejudgment interest (id. at 6).

On June 29, 2007, the SEC moved for sanctions and a judgment of contempt against Altomare for his failure to disgorge any funds and to otherwise comply with the Court's orders.  By opinion dated August 31, 2007, this Court held that Altomare had willfully continued to issue unregistered stock, to issue penny stock, to engage in fraudulent activities, and to remain as an officer of Universal Express, all in clear violation of this Court's orders.  SEC v. Universal Express, Inc. ("Universal Express II"), No. 04 Civ. 2322, 2007 WL 2469452, at *1, 4-10 (S.D.N.Y. Aug. 31, 2007).  Moreover, Altomare had not, as of August 2007, disgorged any of his ill-gotten gains.  Id. at 9.[1]  Altomare was ordered to appear before the Court on October 12, 2007, to show cause why he should not be held in contempt.  (Id. at 12.)  Since the Court also appointed a receiver for Universal Express (see Order of August 31, 2007), effectively

---

[1] Although the total judgment against Altomare includes civil penalties (see Judgment of March 8, 2007, at 6), the SEC has limited its contempt application to his failure to pay the disgorgement and prejudgment interest amounts (see P. Summary of Evidence at 28).  Since Altomare had paid nothing as of the time of the SEC's application, and to this date has paid only $60,000, the limitation is not material to whether Altomare is in contempt, and bears only on the remedy to be imposed.

preventing Altomare from continuing to violate most provisions of this Court's orders through his position as an officer of Universal Express, the primary focus of the contempt proceedings became Altomare's failure to disgorge and his ability to pay the judgment. Subsequent hearings were held on January 18 and February 4, 2008, with Altomare testifying at the February hearing. On March 21, 2008, the SEC and Altomare submitted supplemental papers.

## DISCUSSION

I.      Legal Standards

A party may be held in civil contempt for failure to comply with an order of the Court "if the order being enforced is clear and unambiguous, the proof of noncompliance is clear and convincing, and the defendant[] ha[s] not been reasonably diligent and energetic in attempting to accomplish what was ordered." See EEOC v. Local 638, 753 F.2d 1172, 1178 (2d Cir. 1985) (citation and internal quotation marks omitted). "It is not necessary to show that defendant[] disobeyed the district court's orders willfully." Id. (citations omitted).

Altomare, as an alleged contemnor who claims that he is unable to pay a judgment, "bears the burden of producing evidence of his inability to comply" with the disgorgement order. Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995), citing United States v. Rylander, 460 U.S. 752, 757 (1983); McPhaul v. United States, 364 U.S. 372, 379 (1960); Maggio v. Zeitz, 333 U.S. 56, 75-76 (1948). Altomare's "burden is to establish his inability clearly, plainly, and unmistakably." Huber, 51 F.3d at 10. In other words, Altomare must clearly establish "that compliance is impossible." Rylander, 460 U.S. at 757. If Altomare "offers no evidence as to his inability to comply . . . or stands mute," he fails to meet that burden. Huber, 51 F.3d at 10, quoting Maggio, 333 U.S. at 75. Altomare "must demonstrate his inability to comply

categorically and in detail." SEC v. Bankers Alliance Corp., No. 95 Civ. 0428, 1995 WL 590665, at *2 (D.D.C. May 5, 1995) (citation and internal quotation marks omitted). Moreover, proof that Altomare cannot pay the entire amount would not absolve him from paying as much as is possible to pay under the circumstances:

> When an order requires a party to pay a sum certain, a mere showing that the party was unable to pay the entire amount by the date specified is insufficient to avoid a finding of contempt. When a party is absolutely unable to comply due to poverty or insolvency, inability to comply is a complete defense. [Citation omitted.] Otherwise, the party must pay what he or she can.

SEC v. Musella, 818 F. Supp. 600, 602 (S.D.N.Y. 1993) (citations omitted). The court will presume a present ability to comply with an order where at some point in the past a defendant could have complied with that order. SEC v. Princeton Econ. Int'l Ltd., 152 F. Supp. 2d. 456, 459 (S.D.N.Y. 2001).

II.     Legal Standards Applied

In recent years, Altomare has had a substantial income. His 2006 W-2 from Universal Express recorded wages of $1.67 million (P. Ex. 13; 2/4/08 Tr. at 87-88), and his 2007 W-2 recorded wages of $1.745 million (D. Ex. 22). As would be expected under these circumstances, Altomare's personal bank accounts reflect the receipt and disbursal of substantial sums, with millions of dollars passing through those accounts in recent years. (See P. Exs. 11, 14, 18, 19, K.) For example, between January 9, 2007, and January 8, 2008, Altomare deposited $1.57 million in his Wachovia bank account, with $1.18 million deposited on or after March 8, 2007. (P. Ex. 19; P. Ex. K, ¶¶ 2-5.)

In addition to having millions in income and a substantial cash flow, Altomare also has substantial assets, some of which appear to be relatively liquid. As of March 2007, the month of

this Court's judgment, Altomare claimed to own $6 million in artwork and jewelry, to have a life insurance policy with a cash value of $7 million, and to have $850,000 cash on hand and in banks, $900,000 in equity in his first home and $2.7 million in equity in his second home, and no credit card debt. (P. Ex. H.)[2] In addition to artwork and jewelry, Altomare has other property of value, such as high-end audio visual equipment. (D. Ex. 10.) In September 2007, Altomare sold some jewelry and watches for $571,000, but little if any of the cash generated by the sale went to pay off the judgment. (See P. Exs. 38A-38B, 57.)[3]

Although certain aspects of Altomare's financial situation are clear, such as his substantial income and assets, other aspects are far from clear. For example, in his testimony, Altomare insisted that his only source of income over the past 16 years has been Universal Express. (2/4/08 Tr. at 103.) However, many deposits in his bank account simply do not correspond in date or amount to recorded payments made by Universal Express to Altomare.[4] In addition to failing to account for the source of certain funds, Altomare has failed to account

---

[2] The record does not reflect for what purpose Altomare prepared the March 2007 financial statement or to whom it was given. When asked to discuss this document, marked as Receiver's Exhibit 11, during the course of his deposition, Altomare invoked his privilege against self incrimination and refused to even identify the document. (See P. Ex. 58 at 72.)

[3] Altomare did not notify either the SEC or the Court before the liquidation, and has not adequately documented where the proceeds from that cash sale have gone. Since Altomare has paid only $60,000 towards the judgment, and nothing at all until October 2007, it is clear that little, if any, of the jewelry proceeds were used to satisfy the judgment.

[4] By the SEC's calculation, $747,175.46 in deposits to Altomare's bank account in 2007 did not originate from Universal Express. (P. Ex. K, ¶ 9.) When confronted with examples of suspicious deposits, Altomare was unable to identify the sources of those funds. (See 2/4/08 Tr. at 113-15.)

adequately for the disposition of other funds.[5] Furthermore, although Altomare claimed that he only has one checking account (2/4/08 Tr. at 103), it appears that Altomare has made use of at least one other checking account, and a prime equity line of credit.[6] Even in light of these troubling gaps and inconsistencies, Altomare has yet to provide a full sworn accounting of his financial situation, and, at his deposition, invoked his Fifth Amendment privilege against self-incrimination in response to many questions about his financial situation.

Altomare has received millions of dollars in income in recent years, has declared millions of dollars in assets, has a substantial cash flow, and has recently liquidated more than $500,000 in jewelry, but as of yet has only disgorged $60,000 to the Court. In October of last year, after having failed to pay a cent on the judgment for more than seven months (during which time

---

[5] For example, Altomare has been unable to account for $160,466 obtained from a second mortgage from Washington Mutual on January 30, 2007 (D. Ex. 8 at 270-79; 2/4/08 Tr. at 64-66) and much of the $571,000 received in the September 2007 sale of jewelry and watches. In general, Altomare also has been unable to explain to where the millions in his bank account have gone. During 2007, the Altomares spent approximately $1.6 million from their checking account. (P. Ex. 19; P. Ex. G; P. Ex. K, ¶¶ 4-5.) Altomare has yet to provide a detailed accounting for these expenditures. Altomare testified that his wife handled all the checks and that he had never written a check. (See P. Ex. 58 at 10.) However, professed ignorance of to whom and for what his wife writes checks does not absolve Altomare of the obligation to account for his financial situation and to demonstrate an inability to pay the judgment. For example, Altomare could have called his wife to testify at the contempt hearing, but did not.

[6] Altomare appears to have a Washington Mutual checking account number ending in 1791 that is in use. (D. Ex. 8 at 261, 280.) The existence of this checking account may explain the apparent disappearance of funds, such as the $160,466 in proceeds from the Washington Mutual second mortgage. (Id. at 270.) Altomare has produced no records for this account. Moreover, Altomare has a prime equity line of credit at Wachovia Bank. (See P. Ex. D at 54; P. Ex. K, ¶ 10.) Altomare never produced records for this account identifying disbursements from and payments to the credit line. However, the Receiver was able to obtain bank statements for the account, which show that the balance on October 13, 2006, five months before the judgment, was $10,481.38. (P. Ex. D at 54; P. Ex. K, ¶ 10.) Since January 1, 2007, Altomare has drawn at least $288,900 against that credit line. (P. Ex. E; P. Ex. K, ¶ 10.)

Altomare had substantial assets and cash flow), Altomare paid $30,000 towards the judgment and pledged to pay each month thereafter either 20% of his gross monthly earnings, or $10,000, whichever is greater. (10/12/07 Tr. at 37.) Altomare has already missed two payments in his self-imposed schedule. Perhaps in order to excuse his nonpayment, he claims that there is little, if any, equity in both of his homes, and that his current payments on those properties are substantial. He also points to lease obligations for three luxury vehicles. Altomare's effort to depict his luxurious living arrangements as liabilities, or as necessary living expenses, is a classic example of chutzpah.

Altomare and his wife own at least two properties. Their primary residence is in the Bocaire development in Boca Raton, Florida. On November 3, 2006, Altomare estimated the value of the house to be $1.4 million. (D. Ex. 3 at 172.) In March 2007, the month of the judgment, Altomare valued the house at $1.6 million, with $900,000 in equity. (P. Ex. H.) Testifying before this Court in February 2008, without providing a real estate appraisal for the property, Altomare valued the residence at approximately $1.1 million, with a double mortgage that exceeds the value of the house by approximately $80,000. (2/4/08 Tr. at 25.)[7] While Altomare claims that the house is encumbered by a second mortgage of approximately $178,000 in the form of a Wachovia line of credit (2/4/08 Tr. at 25, 45), he has not provided any documentation demonstrating that the credit line is actually secured by the property. Altomare

---

[7] The Court can take judicial notice of the widespread decline in property values over the past year. See, e.g., Abby Goodnough, More Election Troubles in Florida, but That Doesn't Bother the Governor, N.Y. Times, March 17, 2008, at A15 ("Florida is facing its worst financial crisis in decades, mostly because of the housing downturn."). Whatever the present value of Altomare's properties, the fact is that he failed to liquidate these assets when ordered to pay disgorgement more than a year ago.

has not documented any efforts to reduce his expenses or generate income from this residence, such as by renting the property and moving to less extravagant quarters.

The Altomares' secondary residence is a condominium in Highland Beach, Florida. At the October 2007 hearing, Altomare and his wife committed to putting this second home on the market, with the proceeds gained from the sale going to pay down the judgment. (10/12/07 Tr. at 37.)[8] At that time, Altomare's attorney represented that the property had $300,000 to $800,000 in equity. (Id. at 37.) On October 4, 2006, the property was appraised at $3.3 million. (D.Ex. 2 at 80.) In March 2007, Altomare valued the property at $4.7 million, with $2.7 million in equity. (P. Ex. H.) In his February 2008 testimony before this Court, without providing a recent appraisal, Altomare estimated the property to be currently valued at somewhere between $2.5 and $2.8 million, and testified that the property was double mortgaged in excess of $2.8 million. (2/4/08 Tr. at 27-28.)[9] Although Altomare represents that the property is on the market, it has yet to be sold. Even assuming the property is eventually sold, it is unclear whether such a sale would satisfy any portion of Altomare's disgorgement obligations, assuming Altomare's testimony that the property has negative equity is accurate. In the interim, Altomare has not documented any efforts to try to rent the condo or to otherwise make productive use of the property while it is on the market. Moreover, Altomare may be in a better position to satisfy the judgment of this Court by simply giving up the property, as he would be able to divert those

---

[8] Again, while Altomare credibly testified that the sale of this property in the current market is difficult, he had taken no action to dispose of the property in the seven months preceding the October 2007 hearing.

[9] As of November 29, 2007, the current balance owed on the first mortgage was $2,099,222 (D. Ex. 5 at 250), and as of January 9, 2008, the current balance owed on the second mortgage was $747,801 (D. Ex 6 at 252).

funds that now go to its maintenance and mortgage to the Clerk of the Court. Nevertheless, Altomare continues to expend funds (of uncertain origin) to maintain this second luxury residence, rather than to use such funds to pay the disgorgement and prejudgment interest amounts.

In addition to basic house payments, the record reflects other substantial expenditures. For example, Altomare contracted to "build out" and furnish the Highland Beach condominium. (2/4/08 Tr. at 29.) Altomare has payed $673,425.35 to the Weinstein Design Group to remodel and furnish that property (D. Ex. 9 at 395), but has not demonstrated that all of the post-judgment expenditures were mandated by pre-judgment contractual obligations.[10]

A similar pattern is reflected in Altomare's expenditures on vehicles. Despite the fact that Altomare apparently has no dependent children of driving age and he and his wife "don't drive that much" (2/4/08 Tr. at 42), he maintains three cars – a 2006 Bentley Continental GT, a

---

[10] Altomare insists that he was contractually obligated to make these payments. (2/4/08 Tr. 29-30, 35-36, 68; D. Exs. 9, 10, 11.) However, the documentation provided by Altomare does not demonstrate that he was contractually obligated to make all the payments that he did. Pursuant to the contract between Altomare and the Weinstein Design Group, Altomare paid an upfront "design fee" of $20,000, and agreed to thereafter pay the cost of materials and labor of the renovation plus a certain premium payment based on the cost of the materials and labor. (See D. Ex. 9.) The Altomares would appear to be obligated to cover the costs of those materials and labor they chose to order, plus a markup based on a percentage of total costs. (Id.) However, the initial contract does not appear to obligate the Altomares to pay anything beyond the initial design fee, to obligate the Altomares to purchase any furniture or materials that were recommended by the designer, or to prevent the Altomares from scaling down the project and its costs where possible. (Id.) In fact, it appears that after the judgment of the Court was entered, the project expanded rather than contracted. After March 31, 2007, the total cost of the project increased by $99,266. (Compare D. Ex. 9 at 335 (listing a grand total of $591,225.99 on the March 21, 2007 invoice) with id. at 395 (listing a grand total of $690,492.14 on the November 26, 2007 invoice).) Altomare has not produced any documents or other evidence demonstrating that he was unable to control these costs, or would have been unable to revise the design plans to decrease the total cost of the project.

2007 Mercedes Benz ML350, and a 2007 Mercedes Benz S550V – pays in excess of $6,000 per month to maintain the leases on these cars (D. Exs. 13, 14, 15), and appears to pay in excess of $2,000 per month to insure them (see D. Ex. 1 at 54 (9/21 payment to GEICO); id. at 55 (9/28 payment to GLAIC)). Together, these costs approach $100,000 per year.

Altomare treats these extravagances as ordinary living expenses. However, profligate spending does not shield one from a judgment of contempt. Altomare has not documented any efforts, let alone adequate efforts, to negotiate an end to the automobile leases and to secure a less ostentatious form of personal mobility. Similarly, Altomare is not required to maintain two luxury properties as he does today, with their substantial mortgages and maintenance fees, and has not demonstrated adequate efforts to scale back on those expenditures, to renegotiate whatever contractual obligations he may have had related to the design of the Highland Beach property, or to ensure that his spending was limited to those and only those expenses that were contractually necessary. (See supra note 10.) Notwithstanding the judgment, Altomare continued the installation of almost $100,000 in designer lighting, flat screen televisions, and other audio-visual equipment, paying tens of thousands of dollars towards the purchase of these goods after the entry of the Court's judgment. (D. Ex. 10; 2/4/08 Tr. at 70-72.) In any event, even assuming Altomare had been contractually obligated to purchase a $33,000 chandelier (P. Ex. 22; 2/4/08 Tr. at 116), and $50,000 in flat screen televisions and accessories (D. Ex. 10), he was under no obligation to keep them, and could have converted this personal property into cash to help satisfy the judgment.

Altomare insists that he is unable to pay more on the judgment, but instead of scaling back on his living expenses (or at least documenting his efforts to do so), he chooses to maintain

10

these properties and automobiles with undisclosed or questionable sources of income. Altomare's claim that he is (and has been) unable to disgorge more, in light of this extravagance, is without merit.

Since this Court's judgment, Altomare has continued to live an expense-account lifestyle. In the months following entry of the judgment, Altomare's credit card statements reflect thousands of dollars of payments for what appear to be meals at fine restaurants, rooms in luxury hotels, and consumer electronics goods. (See D. Ex. 24 at 536-45).[11] Altomare's line of credit reflects a payment on June 18, 2007, of $10,000 to Steinway Piano Gallery in Boca Raton. (P. Ex. D at 73.) Even more disturbing, on or after March 8, 2007, the date of the judgment ordering Altomare to disgorge funds and barring him from remaining as an officer of Universal Express, Altomare directed Universal Express to transfer $58,100 from its accounts to his two adult sons, Brian and Scott Altomare, neither of whom apparently worked for the company at the time. (P. Ex. 23.) Altomare has claimed that payments by Universal Express to his sons were drawn from Altomare's personal account, and were effectively payments from him. (2/4/08 Tr. at 103-104.)

---

[11] In addition to expenditures that appear to be personal, Altomare's credit card reflects payments that he insists were business expenses, for which he has sought reimbursement from the Receiver. (D. Ex. 24.) For example, a mere twelve days after entry of the judgment, Altomare's credit card reflects a payment of $2,572.78 to the Wynn Las Vegas. (Id. at 536-37.) Months later, his card reflects a payment of $5,945.40 to the Ritz Carlton. (Id.) His card also reflects cash advances of $35,000 on July 24, 2007, and $10,000 on August 8, 2007. (Id. at 540.) On the somewhat heroic assumption that these expenditures were properly categorized as expenditures of Universal Express and not Altomare, they still may be relevant to the issue of Altomare's contempt of court orders, because, at the time Altomare incurred these obligations (allegedly on behalf of Universal Express), he was in violation of a court order for remaining as an officer of the company. In any event, it is unclear that trips to Las Vegas constitute appropriate expenditures by an officer under the circumstances, after his company had been ordered to pay in excess of $21 million in disgorgement and civil penalties. (See Judgment of March 8, 2007, at 4.)

Assuming that these post-judgment funds were his in the first instance, he must explain why he chose not to use them to pay the judgment. Assuming that these post-judgment funds were not his, then he must explain why the transfer of these funds did not constitute theft. See Fla. Stat. § 812.014. Similar concerns arise from a May 16, 2007, wire payment from Universal Express to a Boca Raton jeweler in the amount of $20,000. (See infra note 12.) No matter how one views these transactions, it is clear that Altomare has spent funds in blithe disregard of this Court's judgment.

Altomare owns numerous valuables, including jewelry and artwork, that could be converted into cash to help satisfy the judgment. However, as of yet, Altomare has not sold any valuables to make a meaningful payment on the judgment. Moreover, Altomare's recent fire sale of jewelry and watches for over half a million dollars provides the Court with little comfort that the proceeds from any subsequent sale would be used to pay down the Court's judgment in any meaningful amount.[12]

---

[12] Universal Express wired substantial sums to Les Bijoux for the purchase of jewelry that Altomare ultimately sold to a secondhand dealer for his own benefit. (See P. Ex. 36 (spreadsheet of certain purchases made by Altomare at Les Bijoux); P. Ex. 37 (list of property transferred by Altomare to the secondhand dealer and seized by United States Marshals Service of the Southern District of Florida); P. Ex. 41 (reflecting payments of $80,000 from Universal Express to Les Bijoux between December 2006 and August 2007). In fact, since this case has been pending, Universal Express, on Altomare's apparent direction and for his benefit, has wired Les Bijoux at least $588,900. (See Declaration of Leslie J. Hughes in Support of the SEC's Motion for an Order Directing Marshal to Sell Property Being Held by the Receiver, dated Nov. 5, 2007, Ex. D (Universal Express's checking account listing payments of $325,000 on April 13, 2006, $30,000 and $40,000 on April 26, 2006, $33,900 on June 5, 2006, $30,000 on June 27, 2006, $50,000 on August 21, 2006, $20,000 and $40,000 on January 26, 2007, and $20,000 on May 16, 2007).) By far the most valuable pieces sold by Altomare appear to have been purchased at least in part with funds wired directly from Universal Express to Les Bijoux. (See Intervenor's Supp. Answer to SEC's Turnover Motion, Ex. A; Deposition of Gregory Osipov, Les Bijoux, dated December 10, 2007, at 9-29.)

Altomare has been given plenty of time – perhaps too much time – to comply with the judgment or adequately to explain his noncompliance. Further delay is made all the more troubling because of evidence in the record suggesting that he may have failed to disclose the existence of other bank accounts or sources of income, because substantial sums of money remain unaccounted for and seem to disappear from his checking account, and because he continues to spend vast sums despite having disclosed no current legitimate source of income. Altomare is not entitled to satisfy the disgorgement judgment at his convenience and only insofar as it does not cause him any discomfort. Instead, he is obligated to use make all reasonable efforts to pay down the judgment, or clearly to document his inability to comply, an obligation that he has failed to meet by any measure.

Altomare's documentation is far from sufficiently thorough to demonstrate an inability to pay. Moreover, he has not sworn to the completeness and accuracy of the financial statements that he has submitted, and his records contain troubling inconsistencies. Furthermore, even if generalized assertions of poverty could be sufficient to demonstrate an inability to pay in some circumstances, which they are not, Altomare's testimony to that effect lacks credibility.

First, Altomare has been adjudicated to have violated the antifraud provisions of the federal securities laws – twice, see Universal Express, 475 F. Supp. 2d at 426; Universal Express II, 2007 WL 2469452, at *9, and has willfully and with bravado disobeyed numerous provisions of multiple prior Court orders. For example, after being enjoined from selling unregistered securities because of his participation in the company's effort to issue millions of unregistered securities, Altomare participated in an effort to issue billions more. See Universal Express II, 2007 WL 2469452, at *5. Moreover, despite an order prohibiting him from serving as an officer,

he continued to operate Universal Express until contempt proceedings were brought against him and a receiver was appointed to replace him. Id. at *12.

Second, documentation in the record signed by Altomare raises serious questions about Altomare's willingness to make (at best) misleading statements. In November 2006, in connection with a mortgage application, Altomare represented that he owned $32 million in stocks and bonds, and had a net worth of $33.5 million, with $33.168 million in liquid assets. (D. Ex. 3 at 172.) In a signed financial statement dated March 2007, Altomare claimed to have a net worth of $57.87 million based in part on his ownership of 33 million shares of Universal Express stock that he valued at $37 million. (P. Ex. H.) By Altomare's own calculations, his net worth increased by $24 million in four months. However, Altomare claims that, essentially immediately thereafter, he was in such a state of financial destitution that he was unable to pay anything at all towards the judgment. This trajectory is unconvincing. If accurate, Altomare's financial statements rebut key aspects of his testimony. For example, while Altomare testified that his life insurance policy has no cash value, his March 2007 financial statement declared that his life insurance policy has a cash value of $7 million. (P. Ex. H.) If inaccurate, they reflect Altomare's willingness to lie about his finances, in potential criminal violation of federal law, see 18 U.S.C. § 1014, when it suits his purposes to do so.[13]

Third, much of Altomare's testimony at the trial was simply incredible. When asked to explain why he valued his share of Universal Express in excess of $30 million when the stock

---

[13] While Altomare claims to have no sources of funds available to pay down the judgment, he has not adequately explained why, for example, liquidation of some portion of his jewelry and artwork (valued at $6 million by his own account) would not provide such a source. (P. Ex. H.)

was in fact trading at less than a penny per share and had a market value that was a fraction of Altomare's valuation, Altomare claimed that the $32 million figure reflected his "perceived value of the Universal Express valuation and the future of Universal Express." (2/4/08 Tr. at 51.) Altomare insists that Universal Express's stock was undervalued; however, Altomare's only explanation for this massive disconnect between his valuation and the market valuation was vaguely to reference unidentified documents purportedly shown to him by his former general counsel, Chris Gunderson, that he was unable to describe, identify, or explain. (2/4/08 Tr. at 57-58.) While Altomare testified that he "rel[ied] on" and "ha[d] confidence in the judgment of my general counsel" (id. at 58), evidence in the record clearly demonstrates that Altomare did not consistently defer to the advice of his general counsel, even on legal issues, and played nowhere near the passive role that his testimony may imply. (See, e.g., P. Ex. 29.)

      Fourth, Altomare has steadfastly refused to provide an adequate accounting and a sworn financial statement, and when deposed by the Receiver regarding his financial situation and relationship to Universal Express, Altomare asserted his Fifth Amendment privilege against self-incrimination throughout the vast majority of the questioning. (See P. Ex. 58.) Altomare's sudden decision to testify in the more constrained context of the contempt hearing, after having utilized his constitutional privilege to deny the SEC the necessary discovery to investigate his claims and prepare for the hearing, does little to demonstrate his credibility.

      Finally, Altomare's credibility is undermined by the fact that Universal Express has apparently been operated as little more than a scam for his personal benefit and for the benefit of a handful of other insiders. Although millions of dollars in equity has been raised by Altomare from investors throughout the world, and a great deal of that money has found its way into

Altomare's possession, when the Receiver took over the company, it had virtually no assets and no meaningful business operations. (See First Report of the Receiver at 6-11.) Purported assets such as substantial judgments and Michael Jackson memorabilia have proved to be worthless, and are unrelated to the asserted core business of Universal Express.[14] Sadly, Altomare has driven the company into the ground, with little regard for its employees or investors.

Even assuming Altomare is unable immediately to pay in full the disgorgement and prejudgment interest, he has not demonstrated that he is unable immediately to pay some significant amount. The record conclusively demonstrates that, at various points since the judgment has been docketed, Altomare has been in a position easily to pay substantial sums on the judgment, but has refused to do so. Altomare's duty to satisfy this judgment is not optional. He has not even begun to account fully for his financial situation or to demonstrate insolvency, and it is clear that he is not living in poverty.

The Court is constrained to find, again, that Altomare is in willful contempt of this Court's orders. Because Altomare has been given every opportunity to comply, and has chosen not to do so, he will be incarcerated until he pays the disgorgement and prejudgment interest in full, or produces evidence demonstrating categorically and in detail that any further payment is

---

[14] Altomare initially insisted in writing that he, not Universal Express, owned the master tapes of the Jackson recordings, and did not turn over those tapes to the Receiver until ordered to do so by this Court. (See Order of Jan. 11, 2008.) In any event, the cost of the litigation over the memorabilia, in addition to the cost of the memorabilia's maintenance and preservation, will likely turn out to be more of a liability than an asset for Universal Express. (See First Report of the Receiver at 16-17; 1/18/08 Tr. at 14; Second Report of the Receiver at 6-9.) In addition, it is unclear whether the monetary judgments secured by Universal Express are substantially collectible (see Second Report of the Receiver at 1-5), and when asked about these funds, Altomare's counsel, who has a contingency fee arrangement to recover them, was unable to provide the Court with any sense that any meaningful recovery from these judgments will ever be forthcoming (See 1/18/08 Tr. at 15-16).

impossible. No lesser coercive sanction could conceivably produce compliance. Imposing escalating fines on a defendant who has brazenly refused to pay an already large judgment would be an empty gesture. Only the most powerful coercive sanction offers any prospect of producing compliance.

## CONCLUSION

Accordingly, for the reasons stated above, the SEC's motion for an adjudication of contempt is granted. The Court finds that defendant Altomare is in contempt of this Court's Order of March 8, 2007. Defendant Altomare is ordered to surrender to the United States Marshal for the Southern District of New York on May 2, 2008, to be incarcerated until such time as he purges himself of the contempt, unless he has paid the disgorgement amount in full by that date. Failure to surrender will result in the issuance of a warrant for his arrest.

SO ORDERED.

Dated: New York, New York
      April 18, 2008

                                                        GERARD E. LYNCH
                                                        United States District Judge