UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                 :

U.S. SECURITIES & EXCHANGE     :
COMMISSION,
                                   :

                Plaintiff,   :

                                 :

          -v.-             :

                                 :

UNIVERSAL EXPRESS, INC., et al.,   :

                                 :

               Defendants.  :
-------------------------------------------------------------x

04 Civ. 2322 (GEL)

**OPINION AND ORDER**

Leslie J. Hughes and Julie K. Lutz, Securities and
Exchange Commission Central Regional Office,
Denver, CO, Robert B. Blackburn, Securities and
Exchange Commission Northeast Regional Office,
New York, NY, for plaintiff.

Carl Francis Schoeppl, Schoeppl & Burke, P.A.
Boca Raton, FL, for intervenor The Estate
Department, Inc.

GERARD E. LYNCH, District Judge:

      The present application for attorney's fees stems from a dispute arising from the sale by

Richard Altomare, a defendant in the above-captioned Securities and Exchange Commission

("SEC") enforcement action, of jewelry purchased in part with funds originating from defendant

Universal Express, Inc.

      In September 2007, six months after judgment was entered against him, Altomare sold

several pieces of jewelry, some watches, and two bars of silver to intervenor The Estate

Department, Inc. ("TED"), in exchange for cash. After being apprised of the transaction and

developing suspicions that the transaction was fraudulent, the SEC seized the property. The

property was ultimately turned over to Universal Express's receiver (the "Receiver"), and on

November 5, 2007, the SEC moved to set aside the transaction, to direct the Marshal to sell the seized property and deposit the proceeds into the registry of the Court, and to determine the proper application of the proceeds. Pursuant to 28 U.S.C. § 2361, the SEC also sought an order restraining all claimants from instituting or prosecuting proceedings affecting the property until further order of the Court.

In an April 30, 2008, Opinion and Order, this Court concluded that resolution of the SEC's motion hinged on whether TED was a good faith purchaser for value; that is, whether TED took the property without fraudulent intent and for fair value. SEC v. Universal Express, Inc., No. 04 Civ. 2322, 2008 WL 1944803, at *8 (S.D.N.Y. Apr. 30, 2008). Because such a determination presented factual issues, an evidentiary hearing was held on November 17, 2008. At the conclusion of the hearing, the Court held that TED was a purchaser for fair value and was therefore the rightful owner of the seized property.

Pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d), TED now moves for an award of reasonable attorney's fees and costs. For the reasons discussed below, the motion will be granted in part and denied in part.

## BACKGROUND

### I.    TED's Purchase of the Jewelry

In mid- to late 2006, defendant Richard Altomare and his wife purchased certain jewelry and watches from Les Bijoux, a retail jeweler in Boca Raton, Florida. See Universal Express, 2008 WL 1944803, at *1. Among the items purchased were an eleven-carat diamond ring and a seven-carat fancy yellow diamond ring, which sold for $485,000 and $85,000, respectively. See id. Between April 13, 2006, and May 16, 2007, Altomare caused Universal Express to wire at least $588,900 from its accounts to Les Bijoux, and Les Bijoux subsequently applied these

2

payments to the outstanding balance on his purchases. See id. at *1 & n.3.

In September 2007, after being ordered to pay $1,419,025 in disgorgement of ill-gotten gains, $283,073 in prejudgment interest, and $1,419,025 in civil penalties, Altomare conducted two separate transactions with TED in which he exchanged a portion of his watch and jewelry collection, including the eleven- and seven-carat diamond rings,[1] for $571,000 in cash.[2] See id. at *1-2. The transactions were registered on secondhand dealer's property forms. See id. at *2. Although there is no dispute that one of the transactions occurred on September 24, 2007, the date of the other transaction is unclear. See id. According to TED, it occurred on September 5, 2007. The SEC, however, contends that the proper transaction date is September 25, 2007. See id.

## II.   Procedural History

On October 4, 2007, after obtaining information from Gregory Osipov that led it to believe that Altomare had fraudulently conveyed jewelry to TED (see Hughes 11/5/07 Aff. ¶ 13), the SEC obtained a writ of execution from this Court on the "goods and chattels of Richard A. Altomare (including jewelry possessed by Kravit Estate Buyers, Inc. and/or money owed by Kravit Estate Buyers, Inc. to Richard A. Altomare[)]." (Schoeppl 12/4/07 Aff. Ex. A.) The

---

[1] The record suggests that the eleven-carat diamond was sold as a loose stone. See, e.g., Universal Express, 2008 WL 1944803, at *2 n.4.

[2] In addition to the eleven- and seven-carat diamonds, Altomare also transferred a thirteen-carat diamond necklace, a nine-carat diamond bracelet, a 1.85-carat pear-shaped diamond ring, a set of pearl earrings and necklace, a nine-carat diamond eternity band, an eighteen-carat yellow gold necklace, a two-carat diamond bracelet, a diamond and pearl necklace, a five-carat aquamarine brooch, a 17.50-carat diamond straight line bracelet, two bars of silver, two A. Lange Sohne watches, a Jaeger Le Coultre watch, a Franck Voller steel watch, a Breguet yellow gold watch, two Rolex watches, an Arnold and Sons steel watch, a Corum yellow gold watch, an F.P. Journe watch, and an Audemors Piaget watch. See Universal Express, 2008 WL 1944803, at *2 & n.4.

same day, the writ was transmitted to the United States Marshals Service in Boca Raton, Florida. (Hughes 11/5/07 Aff. ¶ 4.) On October 10, 2007, the U.S. Marshal served the writ on TED and seized twenty-four items ("the Jewelry"), including jewelry, watches, and various precious metals (Schoeppl 12/4/07 Aff. Ex. B), much of which TED purchased from Altomare and his wife in the September 2007 transactions. The Receiver subsequently took custody of the Jewelry and retained possession until this Court issued its November 18, 2008, Order directing that the Jewelry be returned to TED.

In an October 11, 2007, letter from TED's counsel to the Receiver's counsel, TED argued that it was entitled to the Jewelry under New York's debtor and creditor law because it was a "purchaser for fair consideration without knowledge of the fraud at the time of the purchase." (Id. Ex. D-1 at 2 (emphasis omitted).) Although TED demanded that the Jewelry be returned by October 12, 2007 (id.), the SEC did not comply. In an attempt to ascertain the nature of TED's transactions with Altomare, however, the SEC requested additional facts pertaining to the sale of the Jewelry. (Cf. id. Ex. D at 1.) TED complied with this request on October 23, 2007, by providing a detailed recitation of the facts surrounding its purchase of the Jewelry. (See generally id. Ex. D.) As evidentiary support for its recitation of the facts, TED attached, among other things: information from its website and various company advertisements; the sworn statement of its president, Andrew Kravit, explaining the nature of its business and advising that Mrs. Altomare came to TED after seeing one of its advertisements, supposedly because she had exceeded the jewelry budget allotted to her by her husband and needed funds to decorate a new penthouse that she and her husband had recently purchased; the sworn statements of Marc Kravit, an expert consultant to TED, Richard Revesz, another TED consultant, and Eric Monath, a Sergeant with the Palm Beach County Sheriff's Office, all of which corroborated facts

4

set forth in Andrew Kravit's affidavit; and an appraisal of the Jewelry by TED's expert, Ben Adams, which valued the jewelry at $384,535. (See id. Ex. D-2-D-13.)

On November 5, 2007, the SEC filed a Motion in the Nature of Interpleader for an Order Directing Marshal to Sell Property Being Held by the Receiver (the "Motion to Sell"). In the Motion to Sell, the SEC argued that the transfer of the Jewelry from Altomare to TED constituted a "fraudulent transfer" and should therefore be set aside. (Mot to Sell 5-8.) It also sought permission to sell the Jewelry and determine the proper allocation of the proceeds. (Id. 1-2.) Although the SEC had not obtained an expert appraisal at the time it filed the Motion to Sell, it noted that Gregory Osipov – the retail jeweler who sold much of the Jewelry to the Altomares in the first instance – had opined that the market value of the twenty-four items was greater than that assessed by TED's expert appraiser.[3] (Mot. to Sell Reply Mem. 6-7.)

To protect its claimed interest in the Jewelry and to respond to the Motion to Sell, TED moved to intervene on December 4, 2007. In support of its motion, it supplied most of the evidence and affidavits previously provided to the SEC (see Mot. to Intervene Ex. A), including the expert appraisal finding the fair market value of the Jewelry to be significantly lower than the price paid by TED. (Id. Ex. A-13.) The Court granted TED's motion to intervene on February 13, 2008.

On April 30, 2008, following full briefing of the Motion to Sell, the Court concluded that resolution of the dispute hinged on whether TED was a good faith purchaser for value, and that such a determination required an evidentiary hearing. See Universal Express, 2008 WL

---

[3] As TED notes in its motion for attorney's fees, Osipov has conceded that he is neither a certified gemologist, nor a certified jewelry appraiser. (See TED Mem. 8 n.4; see also Osipov Dep. 66.) To the contrary, his only expertise is in the area of metals. (Osipov Dep. 66-67.)

1944803, at *6-10. In reaching this conclusion, the Court rejected the notion that Altomare

"[could] not, under any circumstances, have title to convey the jewelry." Id at *6. To the

contrary, it found that "[a]lthough Altomare may have held the jewelry subject to a constructive

trust in favor of Universal Express, TED, as long as it was a good faith purchaser for value,

would have taken good title to the property free of any constructive trust." Id.

The Court also rejected the SEC's claim that the fifteen-day hold mandated by Florida's

statutory scheme regulating "Secondhand Dealers and Secondary Metals Recyclers," Fla. Stat. §

538.03 et seq., prevented the passage of title during the holding period. Id  After noting that the

SEC "cit[ed] no cases, and engag[ed] in no real form of statutory construction," it reasoned that

reading the statute in a way that would "alter[] the passage of title in all transactions involving

secondhand goods" was inadvisable. Id. at *7. This was particularly so where such a reading

was not compelled by any explicit provision and "would make no sense for a subset of the

transactions to which the provision at issue applies," and where "the legislature ha[d]

demonstrated its ability to understand and regulate the passage of title at various points in the

legislative scheme" when it intended to do so. Id.

Ultimately, whether the SEC could unwind the transaction as a fraudulent conveyance or

pursue other relief based on the view that Altomare held the jewelry subject to a constructive

trust depended on TED's status as a good faith purchaser for fair value. See id. at *8. In

explaining the need for an evidentiary hearing on this question, the Court noted that the SEC had

proffered evidence raising questions about TED's good faith. See id. In particular, it cited the

testimony of Osipov, which not only suggested that Marc Kravit knew at the time of the sale that

Altomare was being sued, that Altomare's sale of the Jewelry was a consequence of his legal

troubles, and that "Altomare did not pay for [the fancy yellow] ring," but also provided a basis

upon "which a reasonable factfinder could conclude that[,] as part of the transaction with Altomare, Kravit misled Osipov into giving up a diamond of Altomare's being held by Les Bijoux as part of the transaction involving the seven-carat yellow diamond." Id. In addition to this testimony, the Court identified other evidence that might lead a reasonable factfinder to conclude "that TED may have known or suspected that Altomare was attempting to hide his funds from his present and future creditors, and [thus may have] willfully participated in the transaction with the hope that [it] could purchase the jewelry at an unfairly low price." Id. at *9. This evidence included Osipov's testimony that Altomare did not take final possession of the fancy yellow ring from Les Bijoux until several weeks after he sold it to TED, as well as the discrepancy between a $400,000 sales receipt produced by Barbara Altomare for the eleven-carat diamond and a $485,000 sales receipt produced for the same diamond (which was set in a ring) later on in the course of discovery. See id.

Although the Court found that the issue of fair value also presented questions of fact, it noted that

> [t]he present record contains little evidence suggesting that fair
> consideration was not paid. In contrast to TED, which puts forth
> the affidavit of a licensed jewelry appraiser, the SEC fails to
> provide any evidence from a qualified appraiser regarding the
> value of the jewelry. Instead, [it] merely points to the testimony of
> Osipov, the retail jeweler who originally sold much of the jewelry,
> that the property sold by Altomare was 'worth' much more than
> the $571,000 paid by TED.

Id. at *10. The Court proceeded to identify numerous problems with Osipov's testimony, including that "the amount a retail purchaser pays for an item is often substantially more than that purchaser could obtain by reselling that item in a secondhand market," that "Osipov ha[d] a clear interest in not having customers think that they ha[d] been or [would] be gouged by paying

7

full retail price at his high-end shop," and that "Osipov admitted that Les Bijoux routinely 'appraise[d]' the pieces they [sold] in amounts in excess of their current market price, largely for reasons of insurance coverage." Id. The Court concluded that "[t]he determinative issue, about which the SEC has provided little evidence, is what a willing buyer and a willing seller at arm's length would have agreed upon as a price for the jewelry sold by Altomare, and whether, on that basis, the consideration paid by TED was unfair." Id.

In anticipation of the evidentiary hearing originally scheduled for August 25, 2008, the SEC obtained an expert appraisal of the Jewelry from Robert C. Aretz.[4] (SEC Opp. 6.) According to the appraisal, which was not completed until August 8, 2008 (id.), the value of the Jewelry was $626,400.00 (id. 7), less than 9% higher than the $571,000 paid by TED. Although TED subsequently requested that the SEC stipulate that – based on Aretz's appraisal – it paid fair value for the Jewelry, the SEC declined to do so. (TED Mem. 12.)

In contrast to TED, which not only obtained an expert appraisal of the Jewelry, but also deposed Altomare, Osipov, and Aretz, the SEC conducted minimal discovery – if any at all – beyond the August 2008 appraisal. It noticed the depositions of TED witnesses Marc Kravit and Eric Monath for August 20, 2008, but cancelled them due to a hurricane warning and never rescheduled.[5] (SEC Opp. 7 n.5.) By the date of the hearing, the SEC had not deposed any of TED's witnesses, nor had it deposed TED's valuation expert.[6] (TED Mem. 3.)

---

[4] Because Aretz's wife died unexpectedly less than two weeks before the August 25, 2008, hearing, the hearing was postponed until November 17, 2008.

[5] According to the SEC, it failed to reschedule these depositions because of "litigation obligations in other matters." (SEC Opp. 7 n.5.)

[6] At the November 17, 2008, evidentiary hearing, the Court commented on this failure to take discovery:

On November 17, 2008, the parties appeared before this Court for an evidentiary hearing. Given that TED paid "better than 91 percent of what the [SEC's] appraiser sa[id] is the fair market value of the jewelry," the Court expressed uncertainty "as to how [it] would be able or at least how [it] would be likely to find that [TED] did not pay fair value for th[e] material if that[ calculation was] the best estimate that the SEC [could] come up with to challenge [TED's] payment." (Tr. 5.) In response to the Court's invitation to discuss the testimony or evidence that would alter this reading of the SEC's appraisal (id.), the SEC argued that its expert's valuation was thirty percent lower than it should have been because the expert did not account for the auction fees the Altomares would have paid had the sale of the Jewelry not been private. (Tr. 7-8.) The Court later rejected this argument, noting that

> [f]or the purposes of whether this was a fraudulent conveyance or whether there is a constructive trust or whether The Estate Department acted as a bona fide purchaser for fair value, the issue is what a willing buyer would pay a willing seller and not how much money it would take a willing buyer to actually acquire these items if, for example, there were brokerage fees or auction fees involved.

> a lot of this might well have been avoided or a resolution arrived at sooner if the parties really seriously sat down and discussed this situation with each other. I don't know why Mr. Kravit wasn't deposed. I don't know why the discovery in this matter was all one sided. But it seems to me that if Mr. Kravit had been deposed it would have been possible for the SEC to evaluate how he appeared as a witness. It seems to me he's someone that appeared to be very credible and very forthright and very strong as a witness, and some of the legitimate questions that existed here might have been cleared up. I don't know whose fault that is, whether the SEC didn't ask or there was some resistance on the intervenor's part, and that's not particularly my business, I'm just pointing out that I think we spent a lot of time here today sort of spinning wheels on something that could have been resolved.

(Tr. 136-37.)

9

(Tr. 126.)  In addition, in commenting on the SEC's attempt to discredit its own expert witness,

the Court stated:

> You went out and got a guy who is supposed to know his business.
> You got a guy who has no stake in this matter whatsoever, who is
> totally independent, who by his resume, by his deposition, seems
> to be a very credible expert in this field, and he came back with
> numbers on each of these items.  And you're telling me I should
> not accept that estimate but I should instead hear from Mr. Osipov
> who sold this in the first place to Mr. Altomare that he thinks he
> could get more money for it?  I don't see it.

(Tr. 122.)

Ultimately, after hearing the arguments of counsel and Kravit's testimony, the Court

concluded that TED had "conclusively established" that Kravit acted "as a reasonable business

person in the business of buying and selling jewelry," and in "good faith in the relevant sense,"

when he paid Altomare $571,000 for the Jewelry.  (Tr. 132.)  Accordingly, the Court held that

TED was "the owner of th[e] jewelry, that it gave fair consideration for the property, and that in

consequence, neither the SEC nor the Receiver ha[d] any rights to the property."  (Tr. 133.)  A

November 18, 2008, Order memorialized this ruling and directed that the Jewelry "be returned to

TED forthwith."  (11/18/08 Order at 1.)

Although TED petitioned the Court for fees and costs at the conclusion of the hearing,

the application was denied.  (Tr. 134.)  On December 15, 2008, however, the Court granted

TED's November 26, 2008, motion for reconsideration "to the extent of clarifying that [its]

denial of [the] prior application [for fees was] without prejudice to [TED's] filing . . . a properly-

supported, timely application for fees under the EAJA."  (12/15/08 Order at 2.)  On February 13,

2009, TED renewed its request for fees by filing the instant application.

10

## III.    The Parties' Contentions

TED argues that, in attempting to seize the jewelry at issue, the SEC at all times acted without substantial legal or factual justification. (TED Mem. 2, 24.) In particular, it notes that even after it provided the SEC with evidence demonstrating the bona fides of its transaction with Altomare, the SEC refused to return the Jewelry and filed the Motion to Sell without first investigating the accuracy of TED's factual assertions. (Id. 3.) TED emphasizes that the SEC's lack of substantial justification is underscored by its refusal to take discovery that would have revealed the weakness of its position, its failure to hire an appraiser until ten months after it seized the Jewelry and four months after this Court held that resolution of the dispute would hinge on valuation, and its insistence on proceeding with an evidentiary hearing even after its own expert appraisal was essentially consistent with what TED paid for the Jewelry. (Id. 3, 26)

The SEC argues that TED's application for fees should be denied on two grounds. First, the SEC contends that because TED has advanced no admissible evidence that its net worth was less than $7,000,000 at the time the Motion to Sell was filed, it has failed to demonstrate that it is a "party" within the meaning of the EAJA. (SEC Opp. 1, 3-4.) Second, it argues that even if TED is a "party" within the meaning of the EAJA, its application still fails because the SEC's position was substantially justified. (Id. 1, 4-8.) Assuming that TED's application is granted, the SEC further asserts that TED's fees should be limited to the statutory rate of $125 per hour and its request for costs denied on account of applicable statutory law prohibiting such an assessment. (Id. 9-10.)

## DISCUSSION

Congress enacted the Equal Access to Justice Act ("EAJA") "to eliminate the barriers that prohibit small businesses and individuals from securing vindication of their rights in civil

11

actions and administrative proceedings brought by or against the Federal Government."

Scarborough v. Principi, 541 U.S. 401, 406 (2004), quoting H.R. Rep. No. 96-1005, at 9.

According to its terms, "[e]xcept as otherwise specifically provided by statute, a court shall

award to a prevailing party other than the United States fees and other expenses . . . unless the

court finds that the position of the United States was substantially justified or that special

circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). In order to recover such fees

and expenses, a corporate party must file an application within thirty days after final judgment,

including (1) proof that it is a prevailing party within the meaning of the EAJA, (2) proof that it

is eligible to receive an award (*i.e.*, that its net worth did not exceed $7,000,000 at the time the

action was filed and that it had no more than 500 employees),[7] (3) a statement of the amount

sought, together with an itemized account of the time expended and rates charged, and (4) an

allegation that the position of the United States was not substantially justified. See, e.g.,

Scarborough, 541 U.S. at 407-08; see also 28 U.S.C. §§ 2412(d)(1)(B), (d)(2)(B).[8]

Here, it is undisputed that TED filed an application for fees and expenses within thirty

---

[7] The net worth limitation effects the EAJA's express purpose of encouraging those with limited resources to seek vindication of their rights.

[8] According to § 2412(d)(1)(B), "[a] party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed. The party shall also allege that the position of the United States was not substantially justified. Whether or not the position of the United States was substantially justified shall be determined on the basis of the record . . . which is made in the civil action for which fees and other expenses are sought."

days after final judgment,[9] and that it submitted an appropriate itemized account of the time

expended, rates charged, and costs incurred during the course of this litigation.[10]  Accordingly,

the primary issues for resolution are whether TED is a "prevailing party" within the meaning of

the EAJA and whether it has demonstrated that the position taken by the SEC was not

substantially justified.  Assuming that TED is entitled to an award, the applicable fee rate and the

availability of costs must also be addressed.

## I.      TED's Prevailing Party Status

"A prevailing party is one that has 'succeeded on any significant issue in litigation which

achieved some of the benefit the part[y] sought in bringing suit,' such that the party is able to

'point to a resolution of the dispute which changes the legal relationship between itself and [its

adversary].'"  Kerin v. United States Postal Service, 218 F.3d 185, 189 n.1 (2d Cir. 2000).  At

the crux of the dispute regarding the Motion to Sell was TED's ownership of the Jewelry.  As

TED succeeded in establishing its rights to the Jewelry, the SEC does not dispute that TED has

"prevail[ed]" within the meaning of the EAJA.  (See SEC Opp. 3.)  It does, however, assert that

TED is not a "party" within the meaning of the EAJA because it has not proven that its net worth

was less than $7,000,000 at the time the Motion to Sell was filed.  (Id. 1, 3-4.)  This argument is

unpersuasive.

---

[9] For purposes of an EAJA award, a judgment is not "final" until the time to appeal the
judgment has run.  See 28 U.S.C. § 2412(d)(2)(G) (noting that "final judgment" is "a judgment
that is final and not appealable").  In an action to which the government is a party, a party has 60
days to file a notice of appeal.  See Fed. R. App. P. 4(a)(B).  Accordingly, the November 18,
2008, Order deeming TED the lawful owner of the Jewelry became a final judgment on January
20, 2009.  As TED's motion for fees was filed on February 13, 2009, it is timely.

[10] In support of its request for an award of $208,935.01, TED has submitted an itemized
account of the time expended, rates charged, and expenses occurred during the pendency of the
litigation.  (See TED Mem. Ex. B.)

According to TED, when the Motion To Sell was filed in November 2007, it had seven employees and a net worth of $515,361.16. (Ted Mem. 19.)  In support of this contention, TED cites the sworn statement of Marc Kravit, as well as a balance sheet prepared by its accountants. (Ted Mem. Ex. A.)  The SEC, however, argues that Kravit's affidavit and the balance sheet constitute hearsay and are therefore inadmissible. (SEC Opp. 3 n.1.)  It also asserts that TED's claims regarding its net worth are undermined by its failure to provide corroborating business records,[11] by advertisements calling it "The Nations Largest Estate Buyers" and representing that it is capable of paying $10,000,000 in instant cash for diamonds, gold watches, antique jewelry, and silver, and by two September 2007 checks for $225,000 and $920,000 used, in part, to purchase Altomare's jewelry.  (Id.)

Although TED bears the burden of demonstrating by a preponderance of the evidence that it is eligible for an award of fees under the EAJA, numerous courts have emphasized that this burden should not be so stringent that it "result[s] in a second major litigation."  Broaddus v. U.S. Army Corps of Engineers, 380 F.3d 162, 168 (4th Cir. 2004), quoting Hensley v. Eckerhart, 461 U.S. 424, 437 (1983) (internal quotation marks omitted).  Accordingly, "some informality of proof is appropriate."  Broaddus, 380 F.3d at 168; see also Sosebee v. Astrue, 494 F.3d 583, 589-90 (7th Cir. 2007); U.S. v. Heavrin, 330 F.3d 723, 732-33 (6th Cir. 2003); U.S. v. 88.88 Acres of Land, 907 F.2d 106, 108 (9th Cir. 1990).  Given this informality of proof, the balance sheet prepared by TED's accountants should be considered.[12]  As the balance sheet clearly puts TED's

---

[11] In particular, the SEC complains that TED has provided no tax returns, bank statements, inventory reports, jewelry purchase logs, or insurance records supporting its claimed net worth.

[12] The courts' provision for informality of proof also undermines any claim by the SEC that the balance sheet should be excluded for its failure to conform to generally accepted

14

net worth well below the $7,000,000 threshold established by the EAJA, TED has met its burden.

The SEC attempts to rebut TED's showing by citing advertisements in which TED states "The Nations [sic] Largest Estate Buyers!" and "FIVE DAYS ONLY 10 MILLION DOLLARS IN U.S. CASH FIVE GENERATIONS OF BUYING!!!", as well as two checks written by TED, one of which is larger than the amount of its asserted net worth. This evidence, however, has limited probative force. As their exclamatory language demonstrates, the advertisements are precisely the sort of exaggerated claims that a reasonable consumer would consider mere puffing and not literal statements of fact. See, e.g., Hubbard v. General Motors Corp., No. 95 Civ. 4362, 1996 WL 274018, at *6 (S.D.N.Y. May 22, 1996) ("'Puffing' has been described as 'making generalized or exaggerated statements such that a reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely.'") (quotation omitted). In addition, as TED has persuasively argued (TED Reply Mem. 4 n.1, 5-6), its business is highly leveraged, and it is therefore entirely plausible that, as indicated by the debt that appears on the balance sheet, the cash it spends on jewelry is borrowed, thus requiring it to promptly resell the items it obtains to maintain its profit margins. Accordingly, even assuming that TED were the nation's largest estate buyer, that it did, in fact, have $10 million to spend purchasing jewelry, or that it drew checks on its bank account in the amounts of $225,000 and $920,000, these facts do not themselves establish that its net worth is greater than $515,361.16, much less that its net worth is

---

accounting principles ("GAAP") or to other standards established by the American Institute of Certified Public Accountants. (See SEC Opp. 3.) While these factors do reduce the weight to be given to the balance sheet, the SEC offers no persuasive account of how any alleged departure from GAAP affected the bottom line to such an extent that the firm's actual net worth is 14 times what TED's accountants conclude it is worth.

greater than $7,000,000.

Finally, it is highly unlikely that even the documents the SEC criticizes TED for failing to provide would change the calculation of TED's net worth by a factor of 14. Indeed, in its reply brief, TED provides a copy of its 2007 tax return (id. Ex. A), which is in no way inconsistent with its position that its net worth is $515,361.16.[13] For the foregoing reasons, TED has demonstrated that it employs fewer than 500 employees and has a net worth of less than $7,000,000. It has therefore satisfied the eligibility requirements for corporations seeking an award of fees and expenses under the EAJA and will be deemed a prevailing party.

**II.     Substantial Justification**

    A.     <u>Legal Standard</u>

Because TED has demonstrated that it is a prevailing party within the meaning of the EAJA, the burden shifts to the SEC to demonstrate that its position was "substantially justified." Healey v. Leavitt, 485 F.3d 63, 67 (2d Cir. 2007). In order to meet this burden, the SEC "must make a 'strong showing' that its action was 'justified to a degree that could satisfy a reasonable person.'" Id., quoting Pierce v. Underwood, 487 U.S. 552, 565 (1988). This requires that its position have had a "reasonable basis both in law and fact." Pierce, 487 U.S. at 565. In applying these standards, the Second Circuit has made clear that "the Government's prelitigation conduct or its litigation position c[an] be sufficiently unreasonable by itself to render the entire Government position not 'substantially justified.'" Healey, 485 F.3d at 67, quoting United States v. $19,047.00 in U.S. Currency, 95 F.3d 248, 252 (2d Cir. 1996) (internal quotation marks

---

[13] Although TED's 2007 tax return does not undermine its contention that it is an eligible party under the EAJA, the Court places minimal weight on the document, as TED did not come forward with it until it filed its reply brief. Nevertheless, it should be noted that the SEC has not sought leave to file a surreply to comment on, or to challenge, the contents of the tax return.

omitted).  Even if the government's initial position is substantially justified, it must "abandon its

opposition to the other party as soon as it becomes apparent that its litigation stance is not

substantially justified."  Environmental Defense Fund, Inc. v. Watt, 722 F.2d 1081, 1086 (2d Cir.

1983).  In the event it fails to do so, a court may award fees for those segments of the litigation

during which the government lacked substantial justification.  See Smith by Smith v. Bowen,

867 F.2d 731, 735 (2d Cir. 1989).

> B.      The Parties' Contentions

TED argues that at no point in this litigation did the SEC have a reasonable basis for its

position.  (TED Mem. 24.)  In support of this argument, it notes that the SEC failed to take any

discovery of TED or TED's expert and that it did not obtain an appraisal until ten months after

seizure of the Jewelry and four months after issuance of the April 30, 2008, Opinion and Order

identifying fair value as the "critical question" in resolving the Motion to Sell.  (Id. 26.)  TED

also emphasizes the unreasonableness of "the SEC's stubborn persistence in contesting the

dispositive issue of 'fair value' even after [the SEC's] own expert issued a well reasoned opinion

valuing the Jewelry at roughly the value paid by TED and [the SEC's] continuing in that

obdurate persistence through the entire evidentiary hearing on November 17, 2008."  (Id.

(emphases omitted).)  While TED acknowledges that the SEC survived its motion for summary

judgment, it cites case law concluding that the government "is not exempt from liability under

[the] EAJA merely because it prevailed at some interim point in the judicial process."  (Id. 25,

quoting SEC v. Zahareas, 374 F.3d 624, 626 (8th Cir. 2004) (internal quotation marks omitted);

see also id., citing SEC v. Morelli, No. 91 Civ. 3874, 1995 WL 9387, at *3 (S.D.N.Y. Jan. 11,

1995).)

In response to these arguments, the SEC contends that its levy of the writ of execution upon TED was substantially justified because, after securing a valid judgment against Altomare for more than $3 million, it received information from Osipov that: (1) Altomare had transferred jewelry purchased from Osipov to TED for less than half the purchase price originally paid by Altomare, (2) Kravit – the TED employee who negotiated the purchase of the jewelry – had told Osipov that Altomare was the subject of a lawsuit involving allegations that he had taken money from shareholders, and (3) Kravit knew from his discussion with Osipov that Altomare was selling a fancy yellow diamond ring purchased from Les Bijoux for which he had not yet paid $65,000 of the $85,000 purchase price. (SEC Opp. 4.) On these facts, the SEC contends that it was substantially justified not only in believing that Altomare had made a fraudulent conveyance to TED, but also in seizing the conveyed property. (Id.) As an alternative basis for the substantial justification of its initial position, the SEC further argues that it "had a good faith belief that the language of the Florida second hand dealer statute, Fla. Stat. § 538.03 et seq., which contained a holding period similar to the pawn broker statute, Fla. Stat. §§ 539.001(1) and 539.001(16)(b), could be interpreted to read that title to second hand goods does not pass until expiration of [a] fifteen day holding period." (SEC Opp. 4-5.)

Presumably in support of its contention that its position continued to be substantially justified throughout the course of the litigation, the SEC notes that it began the process of retaining an expert appraiser as soon as the Court issued its April 30, 2008, Opinion and Order identifying TED's status as a purchaser for fair value as the central inquiry in resolution of the dispute. (Id. 6.) It also notes that it forwarded the appraiser's report to TED on August 8, 2008, as soon as the report was completed. (Id. 6-7.) Although the valuation of the Jewelry was remarkably similar to the amount paid by TED, the SEC asserts that its expert unjustifiably

18

discounted the value of the Jewelry by thirty percent and that, when combined with Osipov's

testimony regarding Kravit's statements about Altomare, the resulting difference in valuation

"established both a lack of fair market value and Mr. Kravit's bad faith." (Id. 7.)  In light of this

information, the SEC maintains that it was "justified . . . in proceeding through the evidentiary

hearing set by the Court to allow it to make the factual determination whether a nine percent

difference in valuation using Market Cash Value or a thirty-nine percent different using Fair

Market Value as used by TED's expert meant that TED had not paid fair market value for the

jewelry." (Id.)  Finally, the SEC argues that its decision to proceed to the hearing was

substantially justified because TED's good or bad faith in dealing with Altomare hinged on

credibility assessments of Osipov and Kravit.  (Id. 8.)

      C.    Analysis

      Contrary to TED's argument, the record makes clear that the SEC did, in fact, have

substantial justification for its initial decision to seize the Jewelry.  Prior to obtaining the

October 4, 2007 writ of execution, it received information from Osipov suggesting that Altomare

– who was subject to an unsatisfied judgment for more than $3 million – had sold certain jewelry

to TED in order to evade payment of the judgment.  (Hughes 11/5/07 Aff. ¶ 13.)  This

information was sufficient to raise legitimate suspicions that Altomare's transaction with TED

was fraudulent, and thus provided ample support for seizure of the Jewelry.

      The SEC's decision to file the Motion to Sell was also substantially justified.  According

to the SEC, it believed that the Motion, and any factual disputes that the Motion raised, could be

resolved on the basis of TED's expert appraisal, Osipov's testimony, and "evidence that the

wholesale value of the 11.02 ct diamond was $433,000, not the $143,700 appraised by [TED's

expert], which made it appear that TED had paid over twice the value of the diamond by

representing in Marc Kravit's affidavit, created after the fact, that TED had paid $385,000 for the diamond." (SEC Opp. 6 n.4.) Any suggestion that this Court could have resolved disputed issues of fact on the basis of "pleadings" in the Motion to Sell (id.) is entirely unpersuasive, as it is axiomatic that the existence of material issues of fact precludes a court from rendering judgment as a matter of law. Nevertheless, the mere fact that the parties' dispute raised issues of fact, and that granting summary judgment in favor of either party was therefore inappropriate, supports the SEC's contention that its position was substantially justified. While Osipov's assertions implicated credibility issues and thus required weighing by a factfinder, his testimony about the circumstances surrounding the sale of the Jewelry provided a reasonable factual basis for the SEC's contention that TED had knowledge of Altomare's intent to evade judgment and used that knowledge to obtain the Jewelry at an unfairly low price. Under applicable law, such facts – if true – would have precluded TED from asserting any legal entitlement to the Jewelry. For this reason, at the time it filed the Motion to Sell, the SEC's position had a reasonable basis in both law and fact.[14]

In addition to the foregoing, the SEC's proffered interpretation of the Florida secondhand dealer statute also provided substantial justification for the Motion to Sell. Although the Court noted the absence of case law supporting this interpretation, as well as the SEC's failure to engage relevant principles of statutory construction, it cannot be said that the SEC's claim was not grounded in fact and warranted by a good faith argument regarding the extension or

---

[14] The Court acknowledges that at the SEC's request, and prior to the filing of the Motion to Sell, TED furnished the SEC with affidavits and other evidence tending to legitimate its transaction with Altomare. (See Schoeppl 12/4/07 Aff. Ex. D.) While this showing put the SEC on notice that its position was questionable, for the reasons already discussed, it does not provide a sufficient basis for concluding that the SEC's position was not substantially justified.

interpretation of existing law.  The EAJA requires that prevailing parties be awarded attorney's fees "unless . . . the position of the United States was substantially justified or . . . special circumstances make an award unjust."  As the Second Circuit has noted, the special circumstances exception is a "safety valve" designed to "insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts."  Oguachuba v. INS, 706 F.2d 93, 98 (2d Cir. 1983), quoting H.R. Rep. No. 1418, 96th Cong., 2d Sess. at 11, reprinted in 1980 U.S. Code Cong. & Ad. News, 4953, 4984, 4990.  The SEC's reading of the Florida secondhand dealer statute – which presented an issue of first impression – is precisely the sort of novel but credible interpretation that Congress determined should not form the basis of an EAJA award. Accordingly, it also substantially justified the SEC's decision to file the Motion.

While the SEC's litigation position was substantially justified through issuance of the April 2008 Opinion and Order, it ceased to be substantially justified soon thereafter.  The SEC contends – and TED does not dispute – that after receiving the decision, it began the process of retaining an expert to conduct an appraisal of the Jewelry. (SEC Opp. 6.)  The SEC's expert appraiser ultimately concluded that the value of the Jewelry was $626,400.00 (id. 7), less than 9% higher than the $571,000 paid by TED.  Although the SEC did not obtain this conclusion until August 8, 2008 (id. 6) – a fact TED cites in support of its claim that the SEC's position was not substantially justified (TED Mem. 3, 26) – the Court cannot conclude that the SEC was not diligent in pursuing the appraisal, nor can it conclude that four months is an unreasonable length of time for retaining an expert and allowing that expert to conduct an appraisal and prepare a report.  Expert appraisers, like all other experts retained for purposes of litigation, are independent professionals who presumably contract their services to numerous parties and

therefore operate with competing demands on their time.  Consequently, even after such professionals are retained, it would be unreasonable to expect that the services they are obligated to render be completed instantaneously.

Under these circumstances, not until the SEC's expert appraiser actually determined that the fair value of the Jewelry was less than 9% higher than the price paid by TED did the SEC's position cease to be substantially justified.  Contrary to the SEC's argument (SEC Opp. 7), there is no merit to the claim that its expert's decision to reduce the Jewelry's fair value by thirty percent constituted an error that justified its belief, beyond the date of the appraisal, that TED was not a purchaser for fair value.  It is undisputed that Altomare's sale of the Jewelry to TED was private.  As there is no bar to the private sale of jewelry, the fact that additional fees may have been added to the price of the jewelry if it were auctioned is wholly irrelevant.  The relevant inquiry is what a willing buyer and a willing seller negotiating at arm's length would have agreed upon as the proper price of the Jewelry, and the SEC has not demonstrated any way in which its expert valuation fails to capture that assessment.[15]

Given the validity of the SEC's expert valuation, any further reliance by the SEC on Osipov's opinion that the fair value of the Jewelry was greater than the price paid by TED (cf. id. 8) lacked substantial justification.  It is undisputed that Osipov is neither a gemologist nor a

---

[15] Moreover, the SEC offers no competing expert assessment or other evidentiary support for its attack on its own expert's methodology.  That the opinion of an expert a party retained undermined its own position might not, under all circumstances, conclusively establish that the party's position was without substantial justification.  If, for example, some obvious flaw called the expert's position into question, the party might well be justified in seeking another opinion, rather than capitulating.  Here, however, the SEC neither sought nor obtained further evidence in support of its position.  Indeed, even now it offers no expert or other testimony retrospectively validating its arguments.  It simply maintains that it was justified in asking the Court to reject the opinions of its own and its adversary's expert witnesses and instead accept the ipse dixit of the SEC's lawyers as to the value of the Jewelry.

certified jewelry appraiser and therefore has no particular expertise in assessing the fair market value of precious gems such as those comprising the Jewelry. In addition, because he is not a disinterested party, the notion that his assessment of the terms of the sale could override the neutral judgment of an expert appraiser is untenable. As the April 2008 Opinion and Order established fair value as the central issue in resolving the parties' dispute, and made clear that the SEC's position on fair market value was relatively weak, the SEC's expert appraisal put it on notice that its position was unsupported and should therefore be abandoned.[16] Because the SEC failed to abandon its position, TED is entitled to an award of fees for that portion of the litigation occurring after August 8, 2008.

## III.    Fee Rate

In calculating the amount of attorney's fees to which a litigant is entitled, the applicable hourly rate is multiplied by the number of hours reasonably expended. For purposes of this determination, the EAJA establishes a presumptive maximum fee rate of $125 per hour. 28 U.S.C. § 2412(d)(2)(A)(ii). However, it permits a court to increase this rate to account for increases in the cost of living. See id. In light of this provision for cost-of-living-adjusted fee rates, TED contends that the proper hourly rate is $168.74. (TED Mem. 22.) The SEC opposes any fee award calculated at this rate, and instead argues that because an increased fee rate will negatively affect its enforcement program, TED's award should be calculated at the statutory rate of $125 per hour. (SEC Opp. 8-9.) The SEC's argument is meritless.

---

[16] To the extent the SEC contends that its interpretation of the Florida secondhand dealer statute continued to provide substantial justification for its position in August 2008, this argument is foreclosed by the Court's unequivocal rejection of that interpretation in its April 2008 Opinion and Order. See Universal Express, 2008 WL 1944803, at *6-7.

By definition, fees and costs awarded pursuant to the EAJA are assessed against the government. While the government generally should be presumed to pursue the public good, Congress – which established the statutory fee rate and explicitly provided for its inflation adjustment – contemplated that even a government that pursues the public good makes errors. In these situations, it has determined that the cost of the errors should be borne by the government and not by innocent victims of unjustified government litigation. The cost of living adjustment is a statutory factor designed to ensure that the rate established by the EAJA remains current without the need for regular congressional amendment. That the award is made against an agency with an important agenda provides no more basis for denying the cost of living adjustment than it would for cutting the $125 fee itself. Accordingly, the SEC's contention fails and TED will be awarded fees at a rate that accounts for the applicable increase in the cost of living.

For purposes of measuring the cost of living, courts have routinely relied upon the Consumer Price Index ("CPI"). See, e.g., Harris v. Sullivan, 968 F.2d 263, 265 (2d Cir. 1992) (noting that "cost of living" for purposes of awarding EAJA fees "is properly measured by the Consumer Price Index"). Because the current cap of $125 per hour applies to all civil cases commenced on or after March 29, 1996, the CPI closest to that date should be used to determine the proper cost of living increase in the applicable fee rate. See Grey v. Chater, No. 95 Civ. 8847, 1997 WL 12806, at *3 (S.D.N.Y. Jan. 14, 1997); Morelli, 1995 WL 9387, at *11. Based on the increase in the CPI from March 1996, when it was 155.7 (TED Mem. Ex. B-5), to November 2007,[17] when it was 210.177 (id.), the $125 statutory rate would be increased to a rate

---

[17] "The appropriate CPI to calculate . . . attorney's fees is the 'closest available Consumer Price Index to the date on which plaintiff became a prevailing party.'" Grey, 1997 WL 12806, at

24

of $168.74.[18]

Applying this hourly rate to the 547 hours it reasonably expended on this litigation, TED contends that it is entitled to $92,300.78 in attorney's fees. (Id. 22-23.) Because the SEC's initial position was substantially justified, however, TED is not entitled to fees for those segments of the litigation preceding the SEC's receipt of its expert's August 8, 2008, appraisal. Accordingly, TED will be granted fees for all work completed on or after August 8, 2008. Based on its time records, TED expended 319.1 hours during this time period. Applying the hourly rate of $168.74, TED is therefore entitled to $53,844.93 in attorney's fees.

## IV.    Costs

TED also seeks reimbursement for various costs incurred in connection with this litigation. (Id. 23; TED Reply Mem. 15-16.) The SEC, however, argues that any assessment of costs is prohibited by statute. (SEC Opp. 9-10.) Because some of the costs TED seeks are, in fact, prohibited by statute, its request will be granted only to the extent permitted by applicable law.

The EAJA provides for the assessment of costs "except as otherwise specifically provided by statute." 28 U.S.C. § 2412(a)(1). According to Section 22(a) of the Securities Act of 1933 and Section 27 of the Securities Act of 1934, "[n]o costs shall be assessed for or against the Commission in any proceeding under this subchapter brought by or against it." 15 U.S.C. §

---

*3, quoting Garcia v. Schweiker, 829 F.2d 396, 402 (3d Cir. 1987); see also Williams v. Sullivan, 775 F. Supp. 615, 620 (S.D.N.Y. 1991).

[18] The increased hourly rate is calculated by dividing the difference between the 1996 and 2007 CPIs (210.177-155.7 = 54.477) by the 1996 CPI (155.7) to determine the percentage increase in the CPI (34.988%). The $125 per hour statutory rate is then increased by 34.988% ($125 x 1.34988), which results in the increased hourly rate of $168.74.

77v; see also id. § 78aa. Because this dispute arises under these securities laws,[19] TED is not entitled to recover costs. As discussed in SEC v. Kaufman, 835 F. Supp. 157 (S.D.N.Y. 1993), aff'd sub nom. SEC v. PriceWaterhouse, 41 F.3d 805 (2d Cir. 1994), however, TED's inability to recover costs does not prevent it from recovering those out-of-pocket litigation expenses that are typically billed to clients and that are not otherwise specifically barred as costs under Sections 22(a) and 27. See id. at 159; see also SEC v. Morelli, No. 91 Civ. 3874, 1995 WL 9387, at *12 (S.D.N.Y. Jan. 11, 1995) (applying Kaufman to conclude that the EAJA permits recovery of expenses for local transportation, word processing, and telephone and fax charges).

When "given their normal meaning as defined by the plain language of 28 U.S.C. § 1920, which is specifically referred to in 28 U.S.C. § 2412(a)," costs include "fees of the clerk and marshal, fees of the court reporter for necessary stenographic transcripts, fees and disbursements for printing and witnesses, fees for necessary exemplification and copies of papers, docket fees, and compensation of court appointed experts, interpreters and special interpretation services under 28 U.S.C. § 1828." Kaufman, 835 F. Supp. at 159; see also 28 U.S.C. § 1920. Applying this definition, TED is precluded from recovering expenses for printing, witness fees, copying, and expert services. It may, however, recover the cost of postage, telephone charges, overnight delivery services, legal research and travel, as none of these expenses falls within the scope of

---

[19] Without any citation to relevant authority, TED argues that this dispute does not arise under Sections 22(a) and 27 because the SEC was not attempting to enforce the federal securities laws, but instead acting only as a judgment creditor of Altomare. (TED Reply Mem. 15.) This argument is meritless. The Universal Express case is an enforcement action brought under the securities laws, and the SEC's efforts to enforce an order requiring a securities fraudster to disgorge his ill-gotten gain is an integral part of such an action.

§ 1920 and they are all the type of expenses that would normally be billed to a client.[20]

Accordingly, TED will be awarded $4,459.11 in out-of-pocket litigation expenses, which

consists of $659.65 in overnight delivery costs, $922.00 in computer research costs, and

$2,877.46 in travel costs.

<strong>CONCLUSION</strong>

For the foregoing reasons, TED's motion for attorney's fees is granted in part and denied

in part. Judgment shall be entered in its favor in the amount of $58,304.04, which includes

$53,844.93 for attorney's fees and $4,459.11 for out-of-pocket litigation expenses typically

billed to clients and not otherwise specifically barred as costs under Section 22(a) of the

Securities Act of 1933 and Section 27 of the Securities Act of 1934.

SO ORDERED.

Dated: New York, New York
       June 25, 2009

GERARD E. LYNCH
United States District Judge

---

[20] Although the SEC cites <u>United States ex rel. Evergreen Pipeline Constr. Co., Inc. v. Merritt Meridian Constr. Corp.</u>, 95 F.3d 153 (2d Cir. 1996), in support of its argument that computer research fees are not reimbursable (SEC Opp. 10), its reading of that case is erroneous. While the Second Circuit opined that "computer research is merely a substitute for an attorney's time that is compensable under an application for attorneys' fees and is not a separately taxable cost," <u>id.</u> at 173, it has since made clear that parties seeking an award of attorney's fees pursuant to fee-shifting provisions should be permitted to recover the cost of computerized research "because such 'services presumably save money by making legal research more efficient,' and because 'paying' clients 'reimburse[] lawyers' LEXIS and WESTLAW expenses, just as [they] reimburse[] their paralegal expenses.'" <u>Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany</u>, 369 F.3d 91, 98 (2d Cir. 2004) (alterations in original; quotations omitted). Accordingly, <u>Evergreen</u> poses no bar to TED's recovery of computer research fees.