UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                      :

U.S. SECURITIES & EXCHANGE          :
COMMISSION,                         :
                                           :
              Plaintiff,         :
                                         :           04 Civ. 2322 (GEL)
       -v.-                   :
                                         :        **OPINION AND ORDER**
UNIVERSAL EXPRESS, INC., et al.,     :
                                         :
              Defendants.     :
---------------------------------------------------------------x

Leslie J. Hughes and Julie K. Lutz, Securities and
Exchange Commission Central Regional Office,
Denver, CO, Robert B. Blackburn, Securities and
Exchange Commission Northeast Regional Office,
New York, NY, for plaintiff.

Brent R. Baker, Parsons Behle & Latimer, Salt Lake
City, UT, for defendant Mark S. Neuhaus.

Marvin G. Pickholz, Jason R. Pickholz, Duane Morris
LLP, New York, NY, for defendant George J. Sandhu.

GERARD E. LYNCH, District Judge:

       This enforcement action arises from the alleged dissemination of false information to

investors by Universal Express, Inc., its chief executive officer Richard A. Altomare, and its in-

house counsel Chris G. Gunderson (collectively, "Organizational Defendants"), in an effort to

facilitate the illegal unregistered distribution of 500 million shares of Universal Express stock to

the public through re-sellers Mark S. Neuhaus, George J. Sandhu, Spiga Limited, and Tarun

Mendiratta (collectively, "Re-Sellers"). Defendants Neuhaus and Sandhu entered into bifurcated

settlement agreements on November 19 and November 25, 2007, respectively. Pursuant to those

agreements, they consented to be held liable for disgorgement, prejudgment interest, and civil

penalties, if appropriate. The SEC now moves for an order granting such relief. For the reasons discussed below, judgment will enter against Neuhaus in the amount of $14,221,508, which consists of $9,786,589 in disgorgement, $3,434,919 in prejudgment interest, and $1,000,000 in civil penalties, and against Sandhu in the amount of $6,036,117, which consists of $4,064,058 in disgorgement, $1,472,059 in prejudgment interest, and $500,000 in civil penalties.

## BACKGROUND

### I.    Procedural History

The SEC commenced this enforcement action on March 24, 2004, alleging that defendants Universal Express, Inc., Richard Altomare, Chris Gunderson, Mark Neuhaus, George Sandhu, and Tarun Mendiratta violated various provisions of the federal securities laws. On August 17 and 18, 2006, the SEC sought summary judgment against all defendants on claims that they offered or sold unregistered securities in violation of Section 5 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77e, and against all defendants except Mendiratta on claims that they engaged in fraud relating to the purchase, offer, or sale of securities in violation of Section 17(a) of the Securities Act, id. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), id. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Universal Express, Altomare, and Gunderson cross-moved for summary judgment as to Section 5 liability, while Neuhaus and Sandhu cross-moved for summary judgment on all claims.

In a February 21, 2007, Opinion and Order, this Court granted the SEC's motion for summary judgment against the Organizational Defendants on all claims. See SEC v. Universal Express, Inc., 475 F. Supp. 2d 412, 426-28 (S.D.N.Y. 2007), aff'd sub nom. SEC v. Altomare, 300 Fed. Appx. 70 (2d Cir. 2008). Finding that those defendants "violated [federal registration and anti-fraud securities] laws and, if not enjoined, likely would do so again," the Court also

granted the SEC's request to permanently enjoin them from committing similar violations in the future.[1]  Id. at 428.  In addition, the Court granted the SEC's motion for summary judgment against Neuhaus as to Section 5 liability, but denied the motion in all other respects.  Id. at 433-34.  All other requests for summary judgment, including defendants' cross-motions, were denied.  Id. at 434-40.

Although the Court denied the SEC's motion for summary judgment against Neuhaus as to the statutory fraud claims, and denied the SEC's motion for summary judgment against Sandhu in its entirety, instead of going to trial both Neuhaus and Sandhu entered into bifurcated consent agreements, the terms of which were materially identical.  Among other terms, Neuhaus and Sandhu consented – without admitting or denying the allegations set forth in the complaint – to be permanently enjoined from committing future violations of the securities registration provisions of Section 5 of the Securities Act, the anti-fraud provisions of Section 17(a) of the

_____

[1] Accordingly, on March 8, 2007, the Court entered judgment against Universal Express, Altomare, and Gunderson.  (Judgment of Mar. 8, 2007, at 1.)  Pursuant to the terms of judgment, the defendants were permanently enjoined from future (i) violations of Section 5 of the Securities Act, including the "direct[] or indirect[]" sale, via interstate commerce, of "any [unregistered] security" in the absence of any applicable exemption (id. at 2); and (ii) violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, or Rule 10b-5, including the offer or sale of any security via interstate commerce by use of any means "to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  (Id. at 2-3.)  In addition, Altomare and Gunderson were permanently prohibited from participating in the offering of any penny stock, and Altomare was prohibited from acting as an officer or director of any company that issues certain types of securities, including Universal Express.  (Id. at 9-10.)  Finally, the judgment ordered payment of the following sums to the Clerk of the Southern District of New York by April 16, 2007: Universal Express was ordered to pay $21,906,483, consisting of $9,959,828 in disgorgement, $1,986,827 in prejudgment interest, and $9,959,828 in civil penalties (id. at 4); Altomare was ordered to pay $3,121,123, consisting of $1,419,025 in disgorgement, $283,073 in prejudgment interest, and $1,419,025 in civil penalties (id. at 6); and Gunderson was ordered to pay $794,711, consisting of $361,317 in disgorgement, $72,077 in prejudgment interest, and $361,317 in civil penalties.  (Id. at 8.)

Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5.  (11/19/07 Consent

Agreement ¶ 2(a); 11/25/07 Consent Agreement ¶ 2(a); <u>see also</u> 11/26/07 Order of Permanent

Injunction and Other Relief Against Defendant George Sandhu at I-III; 12/4/07 Order of

Permanent Injunction and Other Relief Against Defendant Mark Neuhaus at I-III.)  They further

consented to be barred from participating in the offering of penny stock.  (11/19/07 Consent

Agreement ¶ 2(b); 11/25/07 Consent Agreement ¶ 2(b); <u>see also</u> 11/26/07 Order of Permanent

Injunction at IV; 12/4/07 Order of Permanent Injunction at IV.)

      In addition to the foregoing,

> [Neuhaus and Sandhu] agree[d] that the Court shall order
> disgorgement of ill-gotten gains and prejudgment interest thereon;
> that the amounts of disgorgement and civil penalty, if any, shall be
> determined by the Court upon motion of the Commission; and that
> prejudgment interest shall be calculated from February 1, 2004,
> based on the rate of interest used by the Internal Revenue Service
> for the underpayment of federal income tax as set forth in 26
> U.S.C. § 6621(a)(2).  [They] further agree[d] that, upon motion of
> the Commission, the Court shall determine whether a civil penalty
> is appropriate pursuant to Section 20(d)(2)(C) of the Securities Act
> . . . and Section 21(d)(3)(B)(iii) of the Exchange Act . . . , and if
> so, the amount of the penalty.

(11/19/07 Consent Agreement ¶ 5; 11/25/07 Consent Agreement ¶ 5.)  For purposes of any such

motion, Neuhaus and Sandhu acknowledged that they would be "precluded from arguing that

[they] did not violate the federal securities laws as alleged in the [c]omplaint"; that they could

not contest the validity of the Court's summary judgment Opinion, their Consents, or the Orders

of Permanent Injunction; that the allegations of the complaint would be deemed true; and that the

Court could "determine the issues raised in the motion on the basis of affidavits, declaration,

excerpts of sworn depositions or investigative testimony, and documentary evidence, without

regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of

Civil Procedure." (11/19/07 Consent Agreement ¶ 5; 11/25/07 Consent Agreement ¶ 5.)

Finally, both Neuhaus and Sandhu explicitly affirmed that they "enter[ed] into th[e] Consent[s] voluntarily and . . . that no threats, offers, promises, or inducements of any kind ha[d] been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce [them] to enter into th[e] Consent[s]." (11/19/07 Consent Agreement ¶ 8; 11/25/07 Consent Agreement ¶ 8.)

## II. Facts Relating to Neuhaus's and Sandhu's Liability

Because the parties' consent agreements require the Court to accept the allegations in the complaint as true, and because the agreements also prohibit Neuhaus and Sandhu from contesting the validity of the Court's February 2007 Opinion and Order, the facts relating to liability are essentially undisputed.[2]

### A. Overview of the Organizational Defendants and Re-Sellers

Universal Express is a publicly traded Nevada corporation purportedly involved in shipping and transportation. Universal Express, 475 F. Supp. 2d at 415-16. At times relevant to this action, it maintained its principal place of business in Florida and had an office in New York City. Id. at 416. From 1992 to August 31, 2007, when Universal Express was placed into a receivership, Richard Altomare served as the company's chief executive officer and director. Id.

---

[2] While Sandhu's opposition to this motion attempts to establish the existence of disputed issues of fact, the assertions contained in the opposition are largely irrelevant. As previously discussed, Sandhu explicitly agreed that for purposes of determining the extent of his liability for disgorgement, prejudgment interest, and civil penalties, he would be precluded from arguing that he did not violate the federal securities laws as alleged in the complaint. Thus, although he began this litigation with the right to have a trial at which the Court would hear witnesses and decide the relevant facts, including drawing any reasonable inferences and assessing culpability, he relinquished that right when he chose the settle the case on terms that explicitly avoided trial, and when he agreed that, for purposes of this motion, the Court would treat the allegations in the complaint as proven.

Altomare was assisted by Chris Gunderson, a lawyer who served as Universal Express's in-house counsel.  Id.

Mark Neuhaus trades securities.  Id.  He founded and managed the company Coldwater Capital, LLC ("Coldwater").  Id.  He also formed and controlled Perfect Line Investments ("Perfect Line"), and helped form the partnership H&N LLC ("H&N").  Id.  Both Perfect Line and H&N were involved in the sale of Universal Express shares.  Id.

George Sandhu is an investment advisor who, at all times relevant to this dispute, advised a mutual fund called Target Growth Fund Ltd. ("Target"), id., and exercised trading authority over certain brokerage accounts belonging to Spiga, Ltd.[3]  (Compl. ¶ 21.)  Spiga, an investment company owned by Sandhu's brother-in-law, was involved in the sale of Universal Express shares.  (Id.)  It also received investment advice from Sandhu.[4]  Universal Express, 475 F. Supp. 2d at 416.

B.    Section 5 Liability

Between April 2001 and January 2004, Universal Express issued more than 500 million shares of stock to Neuhaus, Sandhu, and Tarun Mendiratta, another Re-seller whose role and liability are not at issue here.[5]  Id.  These shares were issued pursuant to written agreements purporting to exchange stock for the Re-sellers' consulting services.  Id.  The agreements, which

---

[3] In his capacity as Target's investment advisor, Sandhu made trading recommendations for various brokerage accounts, including recommendations to sell Universal Express stock. (Sandhu Dep. 125-27.)

[4] In connection with this authority, Sandhu also controlled the transfer of funds to and from the relevant accounts.  (Compl. ¶ 21.)

[5] Universal Express stock was issued to these re-sellers either directly or indirectly through one or more of the entities or accounts that they owned and/or controlled.

were drafted by Gunderson and signed by Altomare, represented that the exchanged shares were registered. Id. at 416-17. However, with the exception of two S-8 forms,[6] Universal Express filed no securities registration statements between January 1, 2001, and March 31, 2004. Id. at 416. The first S-8 form was filed on May 7, 2001, and covered 30 million shares. Id. The second was filed on January 22, 2002, and covered 20 million shares. Id. Accordingly, of the 500 million shares issued by Universal Express during this time period, only 50 million were covered by the S-8 forms.[7] Id.

Between April 2001 and March 2004, Neuhaus received 270,698,345 of the purported "S-8 shares," 235 million of which were deposited into brokerage accounts he opened in the names of Coldwater, H&N, and Perfect Line. Id. at 417. During the same time period, Neuhaus also received 26,233,248 restricted Universal Express shares, over 5.5 million of which he deposited into the Coldwater, H&N, and Perfect Line accounts. Id. Neuhaus subsequently sold 259,649,167 shares of Universal Express stock for proceeds of $9,786,589. Id. From April 2002 to November 2003, however, he transferred $5,861,488 from bank accounts controlled by him to Universal Express. Id.

---

[6] Provided certain conditions are met, the SEC's Form S-8 provides an abbreviated registration procedure for securities offered or sold to an issuer's employees, including consultants. See "General Instructions, A Rule as to Use of Form S-8," at http://www.sec.gov/about/forms/forms-8.pdf. Although the form may be used to register resales or shares privately issued to employees or consultants, in such cases the form must include a reoffer prospectus that identifies the selling shareholders. See id.; see also SEC v. Cavanagh, 155 F.3d 129, 134 n.22 (2d Cir. 1998).

[7] It should be noted that the S-8 forms filed by Universal Express failed to comply with the SEC guidelines for their use. In particular, the forms did not identify the recipients of the Universal Express shares, nor did they disclose any of the defendants as the selling shareholders or provide reoffer prospectuses. See Universal Express, 475 F. Supp. 2d at 416 n.2.

During the course of Neuhaus's sale of Universal Express stock, a brokerage firm where Coldwater maintained accounts contacted him and inquired about the trading status of the stock. Id. at 417-18. Although that firm subsequently closed Coldwater's accounts, Neuhaus never took any steps to determine whether a registration statement was in effect for the Universal Express shares issued to him. Id.

Between April 2001 and January 2004, Universal Express issued 152,389,115 of the purported "S-8 shares" and 6,310,625 of the restricted shares to Spiga. Id. Sandhu subsequently offered and sold, either directly or indirectly, at least 142,634,872 of these shares. 134,490,539 shares were sold through the foreign and domestic brokerage accounts of Spiga Ltd. for proceeds of $3,970,280, while 8,144,333 shares were sold through the foreign brokerage account of Target for proceeds of $93,778. Id. at 418; see also SEC Ex. 416b. During the period covering these sales, Sandhu caused Spiga to make payments to Universal Express totaling $2,604,880. Id.

B.    Statutory Fraud Liability

Contemporaneous with their previously-described sales of Universal Express shares, Neuhaus and Sandhu provided certain misleading letters to Universal Express to assist it in consummating future business acquisitions. Id. at 419. Not only were these letters created at Altomare's behest, but he essentially determined their contents. Id. On March 25, and May 21, 2002, Sandhu submitted two such letters. Id. at 419-20. The March 25, 2002, letter advised that he had "authorized up to $7,500,000 in additional capital from the [Target Growth Fund] for future approved [Universal Express] acquisitions." Id. at 419. However, at the time of the letter, Target's assets totaled only $4 or $5 million. (Compl. ¶ 42.) The March 2002 letter also represented that the Fund was "prepared based upon due diligence and proper collateral to arrange an additional $50,000,000 in long term financing for such an acquisition." (Id.) The

8

May 21, 2002, letter built upon the March 2002 letter, stating that "based upon the initial proposed letter of intent, we would be committed to the funding of the combined company. Please let us know when the final terms have been negotiated so we can move our discussions to the next level." Universal Express, 475 F. Supp. 2d at 420.

On March 22 and May 22, 2002, Neuhaus delivered to Altomare letters similar to those provided by Sandhu. Id. at 419. The March 22, 2002, letter noted that Coldwater had "been very happy with its investments in Universal Express, investing over $2,000,000 in the company over the past 10 years." Id. The letter also represented that Coldwater's "Board of Directors ha[d] authorized $5,000,000 in additional seed capital for any acquisitions Universal Express may wish to undertake," and that Coldwater would "provide up to $40,000,000 in long-term financing, if necessary." Id. Contrary to the statements contained in the letter, however, Coldwater had not been investing in Universal Express for 10 years, it had invested only $1,500,000 in Universal Express, it did not have the $40,000,000 on hand that it claimed it would commit in long-term financing, and it altogether lacked a board of directors. Id.

Neuhaus's May 22, 2002, letter, which was also written on behalf of Coldwater, maintained that his "hedge fund and partners enthusiastically commit to the funding of Universal Express's strategic acquisition." Id. While Neuhaus signed the letter, it is undisputed that he did not manage a hedge fund. (Compl. ¶ 45.)

On May 23, 2002, after receiving the Sandhu and Neuhaus letters, Altomare issued a press release announcing that – for purposes of future acquisitions – Universal Express had "receive[d] over $100,000,000 in funding commitments" from "two International Hedge Funds." Universal Express, 475 F. Supp. 2d at 419. As the contents of the letters and the underlying facts make clear, however, the funding commitments at issue were hardly definite. To the contrary,

9

the vast majority of the funds promised were either beyond the means of the promising entity or contingent upon further due diligence, or both.

Following the issuance of the May 2002 press release, Universal Express's stock price rose as high as $0.038 and closed at $0.033, a 68% increase over the previous day's closing price of $0.020. (Compl. ¶ 48.) In addition, its trading volume increased 800% over the previous day's volume. (Id.) Although Neuhaus had sold approximately 500,000 Universal Express shares per day prior to the issuance of the press release, on May 23 he sold more than three million shares. (Id. ¶ 49.) Similarly, Sandhu sold one million shares on May 23 and an additional million shares on May 24. (Id. ¶ 50.)

The effect of a July 10, 2002, press release – which falsely represented that "in addition to its previously announced $100,000,000 in venture funding commitments, . . . [Universal Express] ha[d] received a letter of intent from a funding institution for $460,000,000" – was no different. (Id. ¶ 52.) Following its issuance, Sandhu – who had been selling between 50,000 and 450,000 Universal Express shares per day – sold nearly 1.5 million shares. (Id. ¶ 56.) Accordingly, he benefitted not only from the increase in share price from $0.02 on July 9, to a high of $0.035 on July 10, but also from the 700% increase in trading volume over the prior day. (Id. ¶¶ 52, 54.) While Neuhaus disposed of very few Universal Express shares on July 9, 2002, he resumed his sale of substantial numbers of shares on July 10. (Id. ¶ 55.)

The relationship between Universal Express's distribution of press releases and Neuhaus's and Sandhu's sales of Universal Express stock continued into late 2002 and 2003. On November 19, 2002, Transamerica Business Capital Corporation issued Universal Express a funding proposal letter for a $20 million credit facility relating to a proposed acquisition. (Id. ¶ 57.) The letter made clear that it was "only a letter of proposal and . . . [that it was] not intended

nor should it be construed as a commitment on the part of Transamerica." (Id.)  The next day, Universal Express received a similar letter regarding a $5 million credit facility from New Millenium Financial Corp.  (Id.)  In light of these proposals, Altomare issued another press release on November 21, 2002, falsely representing that Universal Express had received "additional funding of $25,000,000 from Transamerica and New Millenium Financial," thus bringing its "total financial commitments to $585,000,000."  (Id. ¶ 58.)  Consistent with their prior courses of conduct, Nehaus sold at least one million Universal Express shares on November 21, and Sandhu sold 2.9 million shares on November 22.  (Id. ¶¶ 62, 64.)  As before, these sales capitalized on the resulting increase in Universal Express's share price and trading volume.  (Id. ¶ 61.)

On April 9, 2003, despite his failure to identify a bank willing to participate in a proposed three-party financing program for Universal Express's acquisition of Coach USA (id. ¶¶ 65-66), Altomare issued another press release falsely representing that Universal Express "[today] received $300,000,000 in committed and approved funds and plans to acquire a soon to be announced nationally established transportation company."  (Id. ¶¶ 66-67.)  The press release further noted that "[d]uring the developmental stages of any company, that company may receive financial commitments based on the funder's due diligence requirements. . . . [Today]'s commitment is far more definite and it is for that reason a press release has been issued."  (Id. ¶ 67.)  Once again, issuance of the press release was followed by an increase in the share price and trading volume of Universal Express stock.  (Id. ¶ 69.)  Presumably in response to these changes, Neuhaus sold 800,000 shares on April 9, 2003, and larger amounts thereafter, while Sandhu sold 15 million shares on April 9 and more than 6 million shares on April 10.  (Id. ¶¶ 70-71.)

In the fall of 2003, Altomare and the owner of North American Airlines ("North American") executed a contract for the sale of the airline to Universal Express. (Id. ¶ 77.) In connection with the contract, the owner of North American required that Altomare pay a 50% non-refundable deposit of $1 million. (Id.) To fund the deposit, Altomare formulated an agreement with Neuhaus pursuant to which Neuhaus would wire the $1 million on Universal Express's behalf in exchange for 20 million "free trading" Universal Express shares and 20 million restricted Universal Express shares. (Id.) Thus, even if an announcement of the proposed sale of North American failed to cause an increase in Universal Express's stock price, Neuhaus could recover the $1 million deposit by selling the 20 million "free trading" shares he received as part of his agreement with Altomare. (Id.)

After being apprised that North American's owner refused to make an exception to the contract's confidentiality provisions so that Universal Express could publicly announce the contract, Neuhaus sent the owner an email falsely stating that SEC rules required such an announcement. (Id. ¶ 78.) Upon receiving the email, the owner retracted his objections to a public announcement. (Id. ¶ 79.) Accordingly, on October 12, 2003, Altomare issued a press release, which Neuhaus had reviewed, announcing the North American deal, and advising that Universal Express had "paid a $1,000,000 deposit, 50% of which is non-refundable." (Id.) The release did not disclose that the deposit was funded by illegally issuing Universal Express shares to Neuhaus, or that Neuhaus intended to release the shares into the market following announcement of the deal. (Id. ¶ 80.) The following day, however, Neuhaus sold more than 1 million Universal Express shares, thus benefitting from the fact that the company's share price opened 50% higher than the previous day's close. (Id. ¶ 81.) Neuhaus continued selling an average of 1 million Universal Express shares per day for the next several weeks. (Id. ¶ 82.) By

12

November 6, 2003, his sales had not only covered the entire cost of the $1 million deposit, but also generated another $1 million in proceeds.  (Id.)

## DISCUSSION

### I.    Disgorgement

Where a party violates the federal securities laws, this Court has broad discretion not only to order the disgorgement of any ill-gotten gains, but also to determine the amount to be disgorged.  See SEC v. Fischbach Corp., 133 F.3d 170, 175 (2d Cir. 1997); SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474 (2d Cir. 1996); SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 329 (S.D.N.Y. 2007).  This remedy is designed to deprive wrongdoers of any unjust enrichment and, in doing so, to deter others from engaging in similar conduct.  See Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 73, 81 (2d Cir. 2006); SEC v. Tome, 833 F.2d 1086, 1096 (2d Cir. 1987); SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1104 (2d Cir. 1972).  It is not, however, intended to be punitive.  See, e.g., SEC v. Cavanagh, 445 F.3d 105, 116 n.25 (2d Cir. 2006); Manor Nursing, 458 F.2d at 1104.

In determining the amount of disgorgement to be ordered, a court must focus on the extent to which a defendant has profited from his fraud.  See First Jersey, 101 F.3d at 1474; SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159, 2002 WL 1968341, at *2 (S.D.N.Y. Aug. 23, 2002).  Where this assessment cannot be made with precision, the "risk of uncertainty . . . should fall on the wrongdoer whose illegal conduct created that uncertainty."  SEC v. Lorin, 76 F.3d 458, 462 (2d Cir. 1996), quoting SEC v. Patel, 61 F.3d 137, 140 (2d Cir. 1995) (internal quotation marks omitted); see also SEC v. Bilzerian, 814 F. Supp. 116, 121 (D.D.C. 1993) (noting that, in light of the difficulty in many cases of separating "legal from illegal profit, . . . it is proper to assume that all profits gained while defendants were in violation of the law

13

constituted ill-gotten gains") (citations omitted).  Accordingly, the amount of "disgorgement need only be a reasonable approximation of profits causally connected to the violation."  Patel, 61 F.3d at 139, quoting SEC v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989). Once the SEC has satisfied its burden to demonstrate such an approximation, "the burden shifts to the defendant to demonstrat[e] that he received less than the full amount allegedly misappropriated and sought to be disgorged."  SEC v. Rosenfeld, No. 97 Civ. 1467, 2001 WL 118612, at *2 (S.D.N.Y. Jan. 9, 2001) (quotation omitted); see also Opulentica, 479 F. Supp. 2d at 330.

Where an individual or entity has collaborated or worked closely with another individual or entity to violate the securities laws, those individuals and/or entities may be held jointly and severally liable for any disgorgement.  First Jersey Sec., 101 F.3d at 1475; SEC v. Stone, No. 06 Civ. 6258, 2009 WL 82661, at *6 (S.D.N.Y. Jan. 13, 2009).  In such situations, the joint tortfeasors bear the burden of demonstrating that their liability can be reasonably apportioned. See SEC v. Hughes Capital Corp., 124 F.3d 449, 455 (3d Cir. 1997).  Generally, however, "apportionment is difficult or even practically impossible because [the] defendants have engaged in complex and heavily disguised transactions."  Id.

Here, the SEC has demonstrated a reasonable approximation of the extent to which Neuhaus and Sandhu profited from the violations of the federal securities laws to which they have admitted for purposes of this motion.  As neither Neuhaus nor Sandhu has adequately shown that they received less proceeds than the amount calculated by the SEC, the SEC's motion for disgorgement will be granted in its entirety.

A.    Neuhaus

In light of the allegations set forth in the complaint, which are deemed true for purposes of this motion, as well as the findings of fact set forth in this Court's February 2007 Opinion and Order, the SEC has demonstrated that from 2001 to 2004, Neuhaus's illegal trades involving Universal Express shares generated proceeds of $9,786,589.  See Universal Express, 475 F. Supp. 2d at 417.

Although Neuhaus argues that "his profit in this scheme should be limited to what he . . . actually kept after he remitted [$5,861,488] to Universal Express," and that the failure to do so renders any disgorgement punitive (Neuhaus Opp. 2), this argument is meritless.  "Courts in this Circuit consistently hold that a court may, in its discretion, deduct from the disgorgement amount any direct transaction costs, such as brokerage commissions, that plainly reduce the wrongdoer's actual profit," SEC v. McCaskey, No. 98 Civ. 6153, 2002 WL 850001, at *4 (S.D.N.Y. Mar. 26, 2002), but they have taken care to distinguish such costs from "general business expenses, such as overhead expenses, which should not reduce the disgorgement amount."  Id. n.6; see also SEC v. U.S. Envt'l, Inc., No. 94 Civ. 6608, 2003 WL 21697891, at *28 (S.D.N.Y. July 21, 2003); Rosenfeld, 2001 WL 118612, at *2.  Moreover, as this Court has previously noted, "it is irrelevant for disgorgement purposes, how the defendant chose to dispose of the ill-gotten gains; subsequent investment of these funds, payments to charities, and/or payment to co-conspirators are not deductible from the gross profits subject to disgorgement." Rosenfeld, 2001 WL 118612, at *2; see also SEC v. Bocchino, No. 98 Civ. 7525, 2002 WL 31528472, at *2 (S.D.N.Y. Nov. 8, 2002); Benson, 657 F. Supp. 1122, 1134 (S.D.N.Y. 1987) (noting that "[t]he manner in which Benson chose to spend his misappropriations is irrelevant as to his objection to disgorge.  Whether he chose to use this money to enhance his social standing

15

through charitable contributions, to travel around the world, or to keep his co-conspirators happy is his own business.").

In this case, the precise purpose of the $5,861,488 that Neuhaus remitted to Universal Express is unclear. Contrary to the SEC's suggestion (SEC Mem. 11), there is no evidence that this payment should be classified as a general business expense tantamount to overhead costs or any other routine cost of running a business operation.[8] Absent some showing that the expense at issue constitutes a direct transaction cost, however, payments made with the proceeds from an individual's violations of the securities laws – including payments to one's co-conspirators – do not provide a justification for reducing the amount to be disgorged. As Neuhaus has offered no evidence demonstrating that his $5,861,488 payment to Universal Express constitutes a direct transaction cost, the expense will be disregarded in establishing the appropriate amount of disgorgement.

Neuhaus's claim that "he presently has no money or ability to pay" (Neuhaus Opp. 3; see also id. 2) is also an insufficient basis for altering the amount of disgorgement, as is his suggestion that the SEC acted unreasonably when, "without explanation," it discontinued

---

[8] To the contrary, the context of the payment makes it likely that Neuhaus would be liable for disgorgement of that amount in any event, because the evidence suggests that Neuhaus was dividing with Universal Express the proceeds of fraudulent sales of unregistered stock. Accordingly, Neuhaus should be held jointly and severally liable with Universal Express for the disgorgement of any proceeds from the illegal trading scheme, regardless of whether those proceeds were retained by him or remitted to Universal Express. Not only did Neuhaus provide Universal Express with letters containing materially false information, but he stood by as Universal Express used those letters to misrepresent to investors the extent of the funding commitments made to the company. In addition, Neuhaus collaborated with Universal Express in its efforts to misrepresent to investors the likelihood that it would consummate an agreement to buy North American Airlines. Accordingly, although – for the reasons stated above – the $5,861,488 payment to Universal Express does not provide cause for reducing the amount to be disgorged, it would also be appropriate to hold Neuhaus jointly and severally liable with Universal Express for that portion of Neuhaus's proceeds.

16

settlement negotiations that presumably were aimed at resolving the issues of disgorgement, prejudgment interest, and civil penalties, and filed the instant motion. (Id. 2.) In deciding a motion for disgorgement, a court is not bound to consider a defendant's claims of financial hardship. See McCaskey, 2002 WL 850001, at *5 ("The Court may order disgorgement . . . without giving consideration to whether or not the defendant may have squandered and/or hidden the ill-gotten profits."); cf. Inorganic Recycling, 2002 WL 1968341, at *4 ("[C]laims of poverty cannot defeat the imposition of a disgorgement order or civil penalty."). Even if the Court were inclined to entertain his argument, Neuhaus has provided no evidence of financial hardship other than his own self-serving and conclusory assertions. Moreover, as this Court has previously noted, "to withhold the remedy of disgorgement or penalty simply because a swindler claims that [he] has already spent all the loot and cannot pay would not serve the purposes of the securities laws." Inorganic Recycling, 2002 WL 1968341, at *4.

As to the SEC's settlement-related conduct, it cannot be disputed that the November 2007 consent agreement signed by Neuhaus gives the SEC an unqualified right to seek an order establishing the amount of disgorgement, prejudgment interest, and civil penalty, if any, to be paid. (11/19/07 Consent Agreement ¶ 5.) Whatever settlement negotiations the SEC may have conducted with Neuhaus, those negotiations did not alter the terms of the consent agreement, nor did they in any way obligate the SEC to refrain from enforcing its rights under that agreement. Once Neuhaus entered into the agreement, which he explicitly acknowledged was done voluntarily and independent of any "threats, offers, promises, or inducements of any kind" (id. ¶ 8), he was on notice that the SEC could, at any moment, move for disgorgement, prejudgment interest, and civil penalties. Accordingly, the SEC has done precisely what the consent agreement gives it the right to do, and any claim by Neuhaus that the SEC should be "estopped"

17

from pursuing those rights must fail.

For the foregoing reasons, judgment will enter against Neuhaus for disgorgement in the amount of $9,786,589.

    B.    Sandhu

In light of the allegations contained in the complaint, and the findings of fact contained in the Court's February 2007 Opinion and Order, the SEC has established that Sandhu's illegal trading activity generated proceeds of $4,064,058.

Although Sandhu argues that the SEC has not adequately demonstrated that these proceeds should be attributed to him, rather than to Spiga, the complaint in this action specifically alleges that Sandhu controls Spiga and exercises trading authority over the brokerage accounts in its name, including the right to direct any transfer of funds from those accounts. (Compl. ¶ 21.) Because Sandhu has admitted the truth of the allegations contained in the complaint for purposes of this motion, any contention that he did not have a sufficiently close relationship with Spiga to be held jointly and severally liable for the securities violations involving Spiga's accounts must be rejected. In exercising the control and authority over Spiga to which he has (for present purposes) admitted, Sandhu clearly possessed the authority to determine how the funds in Spiga's brokerage accounts would be used. Such determinations ultimately resulted in Spiga selling millions of shares of Universal Express stock in such a way as to benefit from the share price and volume increases that followed Universal Express's issuance of materially false press releases. Under these circumstances, Sandhu plainly collaborated with Spiga in violating the securities laws. Thus, in the absence of any evidence that liability can be reasonably apportioned, Sandhu and Spiga are jointly and severally liable. See, e.g., Hughes Capital, 124 F.3d at 455 (noting that joint and several liability is appropriate

18

where apportionment is difficult given the fact that "defendants move funds through various accounts to avoid detection, [or] use several nominees to hold securities or improperly derived profits").

Although the complaint does not allege that Target was under Sandhu's control, it is undisputed that Sandhu served as Target's investment advisor and that he acted on Target's behalf in submitting to Altomare the March 25 and May 21, 2002, letters regarding funding commitments. In addition, Sandhu permitted Altomare to dictate the content of the letters generated on Target's behalf, regardless of the factual accuracy of that content. Because the March 25 and May 21, 2002, letters were solicited and subsequently used as a basis for the false press releases issued by Universal Express, it is clear that both Sandhu and Target collaborated in the resulting securities violations. Likewise, because the record reveals that Sandhu's position as Target's investment advisor furnished him with substantial influence over the nature and timing of Target's sale of securities (see Sandhu Dep. 125-27), including Universal Express shares, Sandhu and Target jointly collaborated in the securities violations arising from the sale of the Universal Express shares themselves. Accordingly, in addition to being held jointly and severally liable with Spiga, Sandhu will also be held jointly and severally liable for violations on the part of Target.

Assuming that disgorgement is proper, Sandhu next argues that the amount to be disgorged should be reduced by the $2,604,880 Spiga remitted to Universal Express during the time of the sales. For the reasons previously discussed, this argument must fail. Like Neuhaus, Sandhu has made no showing that the $2,604,880 payment to Universal Express constitutes a direct transaction cost. Accordingly, the payment will be disregarded and Sandhu will be liable for disgorgement in the amount of $4,064,058.

## II.     Prejudgment Interest

In addition to its discretion to order disgorgement, a court has the discretion to award prejudgment interest on the amount of disgorgement and to determine the rate at which such interest should be calculated.  See First Jersey, 101 F.3d at 1476.  Awarding prejudgment interest, "like the remedy of disgorgement itself, is meant to deprive wrongdoers of the fruits of their ill-gotten gains from violating securities laws."  SEC v. Lorin, 877 F. Supp. 192, 201 (S.D.N.Y. 1995), aff'd in part and vacated in part, SEC v. Lorin, 76 F.3d 458 (2d Cir. 1996). Because a defendant has use of the unlawful profits from the time of the wrongdoing until entry of judgment, prejudgment interest is necessary to capture the full measure of the defendant's ill-gotten gains.  See SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998); Stone, 2009 WL 82661, at *6 ("Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity."), quoting SEC v. Roor, No. 99 Civ. 3372, 2004 WL 1933578, at *10 (S.D.N.Y. Aug. 30, 2004) (internal quotation marks omitted).

By the terms of their consent agreements, Neuhaus and Sandhu have agreed that an award of prejudgment interest on any ill-gotten gains is appropriate.  (11/19/07 Consent Agreement ¶ 5; 11/25/07 Consent Agreement ¶ 5.)  Sandhu, however, disputes the SEC's contention that such interest should be calculated using the IRS underpayment rate.  This argument is baseless.  The consent agreements into which Neuhaus and Sandhu entered explicitly state that "prejudgment interest *shall* be calculated . . . based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax."  (11/19/07 Consent Agreement ¶ 5 (emphasis added); 11/25/07 Consent Agreement ¶ 5 (emphasis added).) Even if this were not the case, the IRS underpayment rate would still apply because, as the

Second Circuit has noted, it "reflects what it would have cost to borrow [the amount of fraudulently obtained] money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud."  First Jersey, 101 F.3d at 1476. Accordingly, prejudgment interest in this matter will be calculated using the IRS underpayment rate.

Applying that rate to Neuhaus's proceeds of $9,786,589 from March 1, 2004, to October 31, 2008, the SEC calculates that Neuhaus is liable for $3,434,919 in prejudgment interest. Applying the same rate to Sandhu's proceeds of $4,064,058 from February 1, 2004, through November 30, 2008, the SEC calculates that Sandhu is liable for $1,472,059 in prejudgment interest.  For the foregoing reasons, judgment will be entered against Neuhaus for prejudgment interest in the amount of $3,434,919, and against Sandhu for prejudgment interest in the amount of $1,472,059.

## III.    Civil Penalties

Upon a proper showing, Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act permit a court to impose civil monetary penalties on those who have violated the Acts.  See 15 U.S.C. §§ 77t(d) and 78u(d)(3).  Such penalties are designed to deter future violations of the securities laws and thereby further the goals of "encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry."  See SEC v. Palmisano, 135 F.3d 860, 866 (2d Cir. 1998).  Moreover, whereas disgorgement "merely restores [the] defendant to his original position without extracting a real penalty for his illegal behavior," H.R. Rep. No. 98-355, 98th Cong. 2d Sess., 7-8 (1984), reprinted in U.S.C.C.A.N. 2274, 2280-81, the imposition of civil penalties is appropriate to accomplish the goal of punishment.  See, e.g., SEC v. Credit Bancorp, Ltd., No.

99 Civ. 11395, 2002 WL 31422602, at *1 (S.D.N.Y. Oct. 29, 2002).

Section 20(d) of the Securities Act and Section 21(d)(3)(B) of the Exchange Act outline three categories – referred to as "tiers" – of civil penalties.  Although each tier establishes a maximum penalty per violation, the amount of any civil penalty rests squarely in the discretion of the court.  See SEC v. Lybrand, 281 F. Supp. 2d 726, 729 (S.D.N.Y. 2003), aff'd sub nom. SEC v. Kern, 425 F.3d 143 (2d Cir. 2005).

Here, the SEC seeks imposition of third tier penalties on both Neuhaus and Sandhu.  These penalties, which may not exceed the greater of $120,000 per violation or the gross pecuniary gain from the violation, may be imposed on a natural person if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and such . . . violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. §§ 77t(d)(2)(C) and 78u(d)(3)(B)(iii).  In determining the appropriate amount of any such penalty, a court must consider the "facts and circumstances" of the particular case.  §§ 77t(d)(2), 78u(d)(3).  Accordingly, courts typically consider:

> (1) the egregiousness of the violations at issue; (2) defendants' scienter; (3) the repeated nature of the violations; (4) defendants' failure to admit their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

Lybrand, 281 F. Supp. 2d at 730.

A.    <u>Neuhaus</u>

In light of the foregoing standards, Neuhaus's conduct plainly warrants imposition of a third tier penalty.  At a minimum, his repeated sales of millions of shares of unregistered securities over the course of a three-year period, and his failure to take any steps to confirm the legitimacy of these sales – even after being put on notice that the sales might not be lawful – demonstrates a reckless disregard for the regulatory requirements governing the sale of securities.  Moreover, Neuhaus willingly submitted funding commitment letters to Altomare that he knew contained materially false information, assisted Universal Express in its efforts to misrepresent to investors the likelihood that it would consummate an agreement to buy North American Airlines, and structured the timing of his sales of Universal Express shares so as to profit from the short-term increases in share price and trading volume created by Universal Express's release of materially misleading press releases.  This conduct provides ample support for the conclusion that his violations also involved manipulation and deceit.  For these reasons, the first prong of the test governing imposition of a third tier penalty has been satisfied.

As to the second prong of the test for imposing third tier penalties, not only did Neuhaus's dissemination of materially false information create a significant risk of substantial loss to the investing public, but his actual sale of Universal Express shares at artificially inflated prices caused those losses.  Accordingly, this prong of the test has also been met.

Having determined that Neuhaus's conduct satisfies the requirements for imposition of a third tier penalty, the only remaining issue is the appropriate amount of that penalty.  By any standard, Neuhaus's conduct was egregious.  Not only did he repeatedly supply information to Universal Express and others that he knew to be false and, in doing so, assist Universal Express in misleading investors, but he also capitalized on the misinformation he helped disseminate,

23

reaping millions in profits over the course of several years.

Despite the severity of his violations and the extent to which those violations should be punished, however, the Court also considers the extent to which other aspects of the relief and/or judgment issued in this matter will have the desired punitive effect. See, e.g., Credit Bancorp, 2002 WL 31422602, at *4. Not only will Neuhaus be required to pay some $13 million in disgorgement and prejudgment interest, but he has also been permanently enjoined from participating in the offering of any penny stock or engaging in further violations of the securities laws. These portions of the judgment against Neuhaus will likely have a retributive effect. The SEC's request for civil penalties in the amount of Neuhaus's gross pecuniary gain therefore exceeds the additional punishment required in these circumstances. In light of these considerations, a civil penalty of $1,000,000 is more appropriate. Accordingly, judgment will be entered against Neuhaus for $1,000,000 in civil penalties.

B.    Sandhu

Like Neuhaus, Sandhu engaged in conduct that merits the imposition of a third tier penalty. His sale of millions of shares of unregistered Universal Express stock recklessly disregarded the regulations governing the sale of securities, and his conduct created a significant risk of substantial losses to the purchasers of the unregistered stock. Moreover, Sandhu's decision to furnish Universal Express with funding commitment letters containing materially false information, and his decision to structure the timing of his sales of Universal Express shares so as to profit from Universal Express's release of materially misleading information, only strengthens the case for third tier penalties, as his involvement in these aspects of the related securities violations involved manipulation and deceit. For these reasons, the requirements for imposing a third-tier penalty have been met, and the Court turns to consider the

appropriate amount of the penalty.

As with Neuhaus, in determining the appropriate amount of the civil penalty to be imposed on Sandhu, the Court takes into account both the seriousness of Sandhu's violations of the securities laws and any mitigating circumstances. The gravity of Sandhu's violations is plain. On numerous occasions, he provided Universal Express with funding commitment letters that he knew to be false. He then reaped millions in profits by coordinating his sale of Universal Express shares with the temporary increases in share price and trading volume that accompanied Universal Express's release of materially misleading information to the investing public. In addition to these violations, over the course of several years, Sandhu also sold millions of unregistered shares of Universal Express stock, placing unwitting investors at risk of substantial losses.

While these violations are less extensive than the violations committed by Neuhaus, they are egregious nonetheless. Despite this fact, Sandhu's conduct does not warrant as severe a penalty as the SEC seeks. Because Sandhu will be required to pay more than $5 million in disgorgement and prejudgment interest, and because he has been permanently enjoined from participating in the offering of any penny stock or engaging in further violations of the securities laws, any civil penalty imposed need not provide the entire retributive effect desired in this case. A civil penalty of $500,000 is therefore appropriate. Accordingly, judgment will be entered against Sandhu in the amount of $500,000 in civil penalties.

## CONCLUSION

For the foregoing reasons, judgment shall be entered against Neuhaus in the amount of $14,221,508, which consists of $9,786,589 in disgorgement, $3,434,919 in prejudgment interest, and $1,000,000 in civil penalties, and against Sandhu in the amount of $6,036,117, which

consists of $4,064,058 in disgorgement, $1,472,059 in prejudgment interest, and $500,000 in civil penalties.

SO ORDERED.

Dated: New York, New York
        August 14, 2009

GERARD E. LYNCH
United States District Judge